**2016-1275, 1575**

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

G. DAVID JANG, M.D.,

*Plaintiff-Appellant*,

v.

BOSTON SCIENTIFIC CORPORATION, and
SCIMED LIFE SYSTEMS, INC., nka Boston Scientific Scimed, Inc.,

*Defendants-Cross-Appellants.*

*Appeal from the United States District Court for the Central District of California in Case No. 5:05-cv-00426, Judge Virginia A. Phillips.*

## PRINCIPAL BRIEF FOR PLAINTIFF-APPELLANT
## G. DAVID JANG, M.D

Jed I. Bergman
KASOWITZ, BENSON, TORRES
& FRIEDMAN LLP
1633 Broadway
New York, NY 10019
(212) 506-1700

Jeffrey J. Toney
KASOWITZ, BENSON, TORRES
& FRIEDMAN LLP
1349 West Peachtree St., NW, Suite
1500
Atlanta, GA 30309
(404) 260-6080

Adam M. Conrad
KING & SPALDING LLP
100 N. Tryon St., Suite 3900
Charlotte, NC 28202
(704) 503-2600

Daryl L. Josseffer
KING & SPALDING LLP
1700 Pennsylvania Avenue, NW
Washington, DC 20006
(202) 737-0500

Jonathan K. Waldrop
Darcy L. Jones
KASOWITZ, BENSON, TORRES
& FRIEDMAN LLP
333 Twin Dolphin Dr., Suite 200
Redwood Shores, CA 94065
(650) 453-5170

*Counsel for Appellant G. David Jang, M.D.*

MAY 23, 2016

## **CERTIFICATE OF INTEREST**

Counsel for Plaintiff-Appellant G. David Jang, M.D. certifies the following:

1. The full name of every party represented by us is: G. David Jang, M.D.

2. The name of the real party in interest represented by us is: None.

3. All parent corporations and any publicly held companies that own 10% or more of the stock of the party or amicus curiae represented by us are: None.

4. The following law firms and attorneys appeared for Plaintiff-Appellant in the district court or are expected to appear in this Court:

   a. KASOWITZ, BENSON, TORRES & FRIEDMAN LLP: Jed I., Bergman, Uttam G. Dubal (now with Paul Hastings), Darcy L. Jones, Norman E. Minnear (now with Verizon), Jeffrey J. Toney, Jonathan K. Waldrop, Marcus A. Barber, Heather S. Kim, Paul G. Williams, Robert P. Watkins (now with Apple).

   b. LATHAM & WATKINS LLP: Jeffrey G. Homrig, Douglas E. Lumish, Patricia Young.

   c. MUNDELL, ODLUM & HAWS: James A. Odlum, Thomas C. Mundell (Deceased).

   d. GIBSON, DUNN & CRUTCHER LLP: Wayne M. Barsky, Joshua A. Jessen, Brenda L. Kleidosty, Shannon E. Mader, Julian W. Poon, Michael A. Sitzman, June T. Tai (now with Deere & Company).

e.  Formerly of HELLER EHRMAN WHITE AND MCAULIFFE: Alexander L. Brainerd (now with Judicial Arbitration and Mediation Services), Duane D.B. Nash (now with Vital Therapies), Paul A. Rose (now with 4th Circuit Court of Appeals), Naomi B. Walker (now with Hyde & Swigart).

f.  GOODWIN PROCTOR LLP: David E. Kleinfeld.

g.  KING AND SPALDING LLP: Daryl L. Joseffer, Adam M. Conrad.

Dated: May 23, 2016                    Respectfully submitted,

                                        */s/ Jed I. Bergman*
                                        Jed I. Bergman
                                        KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
                                        1633 Broadway
                                        New York, NY 10019
                                        Tel: (212) 506-1700
                                        *Attorney for Plaintiff-Appellant*
                                        *G. David Jang, M.D.*

# **TABLE OF CONTENTS**

STATEMENT OF RELATED CASES ..................................................... VIII

JURISDICTIONAL STATEMENT ............................................................. 1

INTRODUCTION ...................................................................................... 1

STATEMENT OF THE ISSUES ................................................................ 4

STATEMENT OF THE CASE .................................................................... 4

      A.    Dr. Jang's Invention And The '021 Patent ................................. 4

      B.    BSC's Acquisition And Exploitation Of Dr. Jang's Patent Portfolio .................................................................................... 10

      C.    The Present Breach-Of-Contract Suit ...................................... 12

            1.    Claim Construction ........................................................ 13

            2.    The District Court's Exclusion Of BSC's Invalidity Assertions ..................................................................... 14

            3.    The Trial And The Jury's Verdict Of Infringement ...... 15

      D.    The District Court's Ensnarement Hearing And Overruling Of The Verdict ............................................................................. 20

      E.    The District Court's Denial Of Dr. Jang's Rule 50(b) Motion 24

SUMMARY OF THE ARGUMENT ......................................................... 25

STANDARDS OF REVIEW .................................................................... 28

ARGUMENT ............................................................................................ 29

      I.    The District Court Erred In Overturning The Jury's Verdict Based On The Ensnarement Doctrine. .................................... 29

            A.    BSC Waived The Ensnarement Defense. ....................... 30

            B.    The District Court Erred In Rejecting Dr. Jang's Hypothetical Claims, Discarding The Verdict, and Entering Judgment Without Analyzing Ensnarement. .. 36

            1.    Dr. Jang's Hypothetical Claim 3 Was Proper ................ 36

            2.    Dr. Jang's Hypothetical Claim 5 Was Proper ................ 40

            3.    The District Court Erred In Failing To Conduct An Ensnarement Analysis ................................................... 43

C.    BSC's Ensnarement Challenge Fails As A Matter Of Law.................................................................................. 46

II.    The District Court Erred In Denying JMOL As To Literal Infringement. ............................................................. 51

A.    The Express Stent Infringed As A Matter Of Law........ 51

B.    The Micro Elements' Status As Connecting-Strut Columns Does Not Depend On Whether They Also Satisfy The Definition Of Another Claim Term............ 54

C.    It Is Legally Irrelevant Whether The Express Stents Contain "Extra Metal" In Addition To The Accused Features. ........................................................................ 57

D.    BSC Is Taking Inconsistent Positions For Purposes Of Literal Infringement And Ensnarement. ........................ 60

CONCLUSION ............................................................................ 61

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*,
  960 F.2d 1020 (Fed. Cir. 1992) .........................................................34

*Abbott Labs v. Dey, L.P.*,
  287 F.3d 1097 (Fed. Cir. 2002) .........................................................42

*Ashwander v. TVA*,
  297 U.S. 288 (1936) (Brandeis, J., concurring).................................48

*Baxter Healthcare Corp. v. Spectramed, Inc.*,
  49 F.3d 1575 (Fed. Cir. 1995) ...........................................................55

*Beacon Theatres v. Westover*,
  359 U.S. 500 (1959)............................................................................50

*Bendix v. United States*,
  600 F.2d 1364 (Ct. Cl. 1979)..............................................................50

*Boston Scientific Corp. v. Conor Medsystems Inc.*,
  1:05-cv-00768-SLR (D. Del.)..............................................................12

*Callicrate v. Wadsworth Mfg., Inc.*,
  427 F.3d 1361 (Fed. Cir. 2005) .........................................................51

*Collegenet, Inc. v. ApplyYourself, Inc.*,
  418 F.3d 1225 (Fed. Cir. 2005) .........................................................58

*Cordis Corp. v. Boston Scientific Corp.*,
  561 F.3d 1319 (Fed. Cir. 2009) ...................................12, 14, 15, 35

*Crystal Semiconductor Corp. v. TriTech Microelectronics Intern.,
  Inc.*,
  246 F.3d 1336 (Fed. Cir. 2001) .........................................................58

*Del Mar Avionics, Inc. v. Quinton Instrument Co.*,
  836 F.2d 1320 (Fed. Cir. 1987) .........................................................57

*Depuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*,
    567 F.3d 1314 (Fed. Cir. 2009) ................................................................*passim*

*Duro-Last, Inc. v. Custom Seal, Inc.*,
    321 F.3d 1098 (Fed. Cir. 2003) ..........................................................31

*Fiskars, Inc. v. Hunt Mfg. Co.*,
    221 F.3d 1318 (Fed. Cir. 2000) ..........................................................32

*Free Motion Fitness, Inc. v. Cybex Int'l, Inc.*,
    423 F.3d 1343 (Fed. Cir. 2005) ....................................................24, 58

*Gibbs v. Triumph Trap Co., Inc.*,
    26 F.2d 312 (2d Cir. 1928) (L. Hand, J.)............................................55

*Interactive Pictures Corp. v. Infinite Pictures, Inc.*,
    274 F.3d 1371 (Fed. Cir. 2001) ..........................................................44

*Jang v. Boston Scientific Corp.*,
    493 Fed. Appx. 70 (Fed. Cir. 2012)....................................13, 28, 59

*Jang v. Boston Scientific Corp.*,
    767 F.3d 1334 (Fed. Cir. 2014) ..........................................................15

*Karlin Tech., Inc. v. Surgical Dynamics, Inc.*,
    177 F.3d 968 (Fed. Cir. 1999) ............................................................51

*In Re Kelley*,
    305 F.2d 909 (C.C.P.A. 1962)............................................................55

*Key Mfg. Grp., Inc. v. Microdot, Inc.*,
    925 F.2d 1444 (Fed. Cir. 1991) ....................................................30, 48

*Markman v. Westview Instruments, Inc.*,
    517 U.S. 370 (1996)............................................................................48

*Medisim Ltd. v. BestMed LLC*,
    758 F.3d 1352 (Fed. Cir. 2014) ..........................................................31

*Medtronic Inc. v. Guidant Corp.*,
    465 F.3d 1360 (Fed. Cir. 2006) ..........................................................33

*Microsoft Corp. v. i4i Ltd. P'ship*,
  564 U.S. 91 (2011) ............................................................................... 49

*Minnesota Min. & Mfg. Co. v. Chemque, Inc.*,
  303 F.3d 1294 (Fed. Cir. 2002) ........................................................ 43

*New Hampshire v. Maine*,
  532 U.S. 742 (2001) ........................................................................... 43

*Newell Cos., Inc. v. Kenney Mfg. Co.*,
  864 F.2d 757 (Fed. Cir. 1988) .......................................................... 50

*Patlex Corp. v. Mossinghoff*,
  758 F.2d 594 (Fed. Cir. 1985) .......................................................... 48

*Perkin-Elmer Corp. v. Computervision Corp.*,
  732 F.2d 888 (Fed. Cir. 1984) .......................................................... 47

*Pierce Cnty. Hotel Emps. & Rest. Empls. Health Trust v. Elks Lodge*,
  827 F.2d 1324 (9th Cir. 1987) .......................................................... 31

*Powell v. Home Depot U.S.A., Inc.*,
  663 F.3d 1221 (Fed. Cir. 2011) ........................................................ 55

*Qualcomm Inc. v. Broadcom Corp.*,
  548 F.3d 1004 (Fed. Cir. 2008) ........................................................ 28

*Spansion, Inc. v. Int'l Trade Comm'n*,
  629 F.3d 1331 (Fed. Cir. 2010) ........................................................ 34

*Streamfeeder, LLC v. Sure-Feed Sys., Inc.*,
  175 F.3d 974 (Fed. Cir. 1999) ............................................... 35, 38, 44

*Studiengesellschaft Kohle, M.B.H. v. Shell Oil Co.*,
  112 F.3d 1561 (Fed. Cir. 1997) ........................................................ 50

*Tate Access Floors, Inc. v. Interface Architectural Res., Inc.*,
  279 F.3d 1357 (Fed. Cir. 2002) .................................................. 33, 49

*Tec Air. Inc. v. Denso Mfg.*,
  192 F.3d 1353 (Fed. Cir. 1999) ........................................................ 28

*Thomas & Betts Corp. v. Litton Sys., Inc.*,
  720 F.2d 1572 (Fed. Cir. 1983) ............................................................26, 47, 50

*Tortu v. Las Vegas Metro. Police Dep't*,
  556 F.3d 1075 (9th Cir. 2009) ...........................................................................31

*Typeright Keyboard Corp. v. Microsoft Corp.*,
  374 F.3d 1151 (Fed. Cir. 2004) ........................................................................35

*U.S. v. First Nat'l Bank of Circle*,
  652 F.2d 882 (9th Cir. 1981) ............................................................................32

*Ultra-Tex Surfaces, Inc. v. Hill Bros. Chem. Co.*,
  204 F.3d 1360 (Fed. Cir. 2000) ........................................................................38

*Wilson Sporting Goods Co. v. David Geoffrey & Assoc.*,
  904 F.2d 677 (Fed. Cir. 1990) ....................................................................*passim*

*Woods v. DeAngelo Marine Exhaust, Inc.*,
  692 F.3d 1272 (Fed. Cir. 2012) ........................................................................31

*Wordtech Sys., Inc. v. Integrated Network Sols., Inc.*,
  609 F.3d 1308 (Fed. Cir. 2010) ..................................................................29, 60

## Constitution, Statutes, Rules

U.S. Const. amend. VII...............................................................................3, 27, 48

28 U.S.C. § 1295(a) ...........................................................................................1

28 U.S.C. § 1332(a) ...........................................................................................1

35 U.S.C. § 282...........................................................................................31, 49

Fed. R. Civ. P. 8...............................................................................................30

Fed. R. Civ. P. 16.............................................................................................30

Fed. R. Civ. P. 26(e) ..................................................................................30, 31

Fed. R. Civ. P. 37(c) .........................................................................................31

Fed. R. Civ. P. 50..................................................................................1, 24, 31, 34

Fed. R. Civ. P. 59 ...................................................................................... 1

**Other Authorities**

Avery Johnson, *J&J Stent Failure Puts Firm Further Behind*, The
Wall Street Journal (May 8, 2007) .................................................................. 12

Henrik D. Parker, *Doctrine of Equivalents Analysis After* Wilson
Sporting Goods*: The Hypothetical Claim Hydra*, 18 AIPLA Q.J.
262, 279 (1990) ................................................................................................ 44

4 Moy's Walker on Patents § 13:85 (4th ed.) ........................................................ 44

## **STATEMENT OF RELATED CASES**

Pursuant to Fed. Cir. R. 47.5, counsel states that there have been three previous appeals to this Court in this civil action.  *See G. David Jang, M.D. v. Boston Scientific Corp. and Scimed Life Sys., Inc*., No. 2007-1385, 532 F.3d 1330 (Fed. Cir. July 15, 2008) (Gajarsa, Linn & Dyk, JJ.); *G. David Jang, M.D. v. Boston Scientific Corp. and Scimed Life Sys., Inc*., No. 2011-1633, 493 Fed. Appx. 70 (Fed. Cir. Aug. 22, 2012) (Linn, Plager & Dyk, JJ.); *G. David Jang, M.D. v. Boston Scientific Corp. and Scimed Life Sys., Inc*., No. 2014-134, 767 F.3d 1334 (Fed. Cir. Sept. 16, 2014) (Dyk, Plager & Linn, JJ.).

Plaintiff-Appellant is not aware of any pending case that would be directly affected by this Court's decision in this appeal.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. § 1332(a).  A final judgment was entered on October 30, 2015.  (Appx1-5.)  On November 25, 2015, Dr. Jang timely moved under Fed. R. Civ. P. 50 and 59.  (Appx11331-11361.)  On November 30, 2015, Dr. Jang timely filed a Notice of Appeal.  (Dr. Jang's Notice of Appeal [Dkt. 728].)  Because the Rule 50(b) motion was pending, this Court deactivated the appeal until that motion was resolved.  (D.I. 5.)  On February 3, 2016, the district court denied the Rule 50(b) motion (Appx20-36) and the appeal was reactivated on February 4, 2016. (D.I. 7.)  On February 12, 2016, Dr. Jang filed an Amended Notice of Appeal, adding the denial of his Rule 50(b) motion as another ground for appeal.  (Dr. Jang's Amended Notice of Appeal [Dkt. 745] at 2; D.I. 10 at 2.)  This Court has jurisdiction pursuant to 28 U.S.C. § 1295(a).

## INTRODUCTION

Dr. G. David Jang, M.D. ("Dr. Jang") developed and patented a groundbreaking improvement to coronary stent technology.  Boston Scientific Corporation ("BSC") was sufficiently impressed to purchase Dr. Jang's patent portfolio in 2002 for $50 million plus additional royalties that were contingent on, among other things, BSC's sales of products using the patented technology.  BSC used those patents to exclude competitors from the market, but when it

came time to pay Dr. Jang the contractual royalties for BSC's products it had promised to pay, BSC balked and litigated for years. BSC asserted that its products did not, after all, use the patented technology it had acquired from Dr. Jang. BSC even tried to evade liability by deep-sixing the patent rights it had acquired from Dr. Jang. It initiated an *ex parte* reexamination of the claims on which Dr. Jang relied in this case and then refused (as patent owner) to defend the claims, consent to Dr. Jang's intervention in the reexamination, or appeal the examiner's rejection of the claims.

Before trial, the district court barred BSC from relying on those maneuvers, in part because the claims' validity is irrelevant to this contract dispute: all of the royalties due to Dr. Jang under the assignment agreement accrued *years* before BSC challenged the claims' validity. A jury found that BSC was liable for royalties because its accused product practiced the asserted patent claims. In light of that verdict, Dr. Jang is entitled to approximately $200 million in royalties and interest.

Although the district court correctly excluded BSC's validity challenge, it erroneously allowed BSC, post-verdict, to reassert its invalidity case under the guise of "ensnarement." That limited and seldom-used doctrine was developed by this Court to ensure that the asserted scope of equivalents does not read on the prior art. The district court took that to mean that, after trial, it should

consider whether a hypothetical claim encompassing the accused product would have been valid. The court then found for BSC solely because it believed, incorrectly, that Dr. Jang had not framed his proposed hypothetical claims properly. Based only on that perceived technical foot-fault, the court overturned the jury verdict. It did not consider what an appropriate hypothetical claim would be, and it never analyzed ensnarement.

Under the proper analysis, the jury verdict must be upheld. As an initial matter, BSC waived its ensnarement defense as a matter of law by failing to plead it, disclose it during discovery, list it in the Pretrial Order, or – critically – raise it by motion either before trial or in a motion for judgment as a matter of law ("JMOL") at the close of evidence. In any event, Dr. Jang's hypothetical claims were properly drafted, while BSC's ensnarement challenge improperly rehashed its excluded invalidity defense. Instead of presuming that the literal claims are valid and seeking to show that the difference between the literal and equivalent claim scope raises an additional prior-art issue, as this Court's precedents require, BSC just sought to use ensnarement as a collateral attack on validity generally. That misuse of the ensnarement doctrine contravenes this Court's express instruction that ensnarement is not a vehicle for a collateral attack on validity, as well as the Seventh Amendment jury trial right, the statutory presumption of patent validity, the clear-and-convincing evidence

3

standard for proving invalidity, and the reasons the court excluded invalidity from the jury's consideration in the first place.

The district court also erred in denying Dr. Jang's motion for JMOL with respect to literal infringement.  The parties disputed whether an element of the accused product is a "connecting strut column."  BSC argued that it was not because the relevant element (or a portion thereof) *also* satisfies the definition of a different claim element, and because the accused product purportedly contains an *additional* feature ("extra metal") not described in the claims.  Because neither of those arguments removes the accused product from the literal claim scope, Dr. Jang is entitled to JMOL on literal infringement as well.

## STATEMENT OF THE ISSUES

1.  Whether the district court erred in overturning the jury's verdict of infringement under the doctrine of equivalents based on its truncated consideration of BSC's untimely ensnarement defense.

2.  Whether the district court erred in denying judgment as a matter of law or a new trial on literal infringement.

## STATEMENT OF THE CASE

### A.    Dr. Jang's Invention And The '021 Patent

Dr. Jang is an interventional cardiologist and inventor.  During the mid-1990s, he developed improvements to coronary stents.  These improvements

resulted in more than 20 patents in the United States alone, including U.S. Patent No. 5,922,021 ("the '021 patent"), which is at issue here.

A stent is an expandable, mesh-like, metal tube. When it is placed inside a coronary blood vessel, it acts as scaffolding for the arterial walls, propping open the vessel and helping to ensure blood flow. To implant a stent, an interventional cardiologist inserts an unexpanded stent, mounted on a deflated balloon, through a catheter in the patient's femoral or radial artery and navigates this device through the arterial system to deliver the stent to the blockage site in the coronary vessel. The physician then inflates the balloon, which expands (deploys) the stent. The balloon is deflated and removed, leaving behind the expanded stent to support the arterial walls. (Appx2935.)

During the delivery phase, flexibility is desired so that the crimped stent can navigate through the tortuous blood vessels without scraping or puncturing the vessel walls along the path to the treatment site. (Appx8626 at 48:3-15.) Once deployed, the expanded stent needs both radial strength (a stent's ability to remain "open" and not collapse) and vessel coverage (the degree of contact between the stent and the inside of the treated vessel). (*Id.*; *see also* Appx4556-4559.)

Prior to Dr. Jang's invention, stents lacked the optimal balance between the flexibility to navigate through tortuous blood vessels and the radial strength

needed to keep the vessel open once deployed.  (Appx8653-8655 at 75:1-77:23.)
Dr. Jang solved that problem by combining "expansion columns" with
"connecting strut columns" in various geometric configurations to provide both
flexibility during delivery and strength and coverage after deployment.  (*Id.*;
Appx4559-4560.)  As relevant here, claim 1 recites geometrical relationships
that provide the improved flexibility.  The figure below depicts one example of
this crucial advance:



FIG. 9D

(Appx92; *see also* Appx2981.)

Expansion columns (in the green-dashed boxes) provide the "scaffolding" that supports the vessel walls after the stent is deployed. (Appx101-102 at col. 3-5; *see also* Appx103 at col. 8 ll. 36-44.) Connecting-strut columns (in the red box) join expansion columns together by way of connecting struts, and provide the stent with sufficient flexibility during delivery. (Appx101-102 at col. 3-5.) Both types of columns expand because the entire stent expands when the balloon inflates during deployment. But they serve different functions: the "expansion" columns serve primarily to provide strength and coverage after expansion, while the "connecting" strut columns serve primarily to provide increased flexibility before expansion. (Appx8652-8655 at 74:3-77:8.)

These elements are further demonstrated on the slide below, which was used at trial.



(Appx93, 108.)

Each connecting strut is a three-part connector including:  (i) a section at the "proximal" end that connects to an expansion strut pair; (ii) a section at the "distal" end that connects to a different expansion strut pair; and (iii) an intermediate section that is not parallel to the two end sections.  This three-part connecting strut links two expansion strut pairs in such a way that they are offset from one another.  In addition, the connecting strut links the expansion strut pairs in a "peak-to-peak" configuration, connecting the end of one expansion-strut pair with the beginning of the second expansion-strut pair.  (Appx108 at

col. 18 ll. 24-40; Appx8494-8496 at 25:9-27:2.)  This three-part, offset

configuration allows the connecting struts to bend and straighten for flexibility

(Appx103 at col. 8 ll. 45-47), such that the stent as a whole can navigate

effectively through tortuous vessels. (Appx100-101 at col. 2 l. 66 - col. 3 l. 7;

Appx102 at col. 6 ll. 30-36.)

Claim 1 reads as follows:

1. A stent in a non-expanded state, comprising:

a first expansion strut pair including a first expansion strut
positioned adjacent to a second expansion strut and a joining strut
of the first expansion strut pair that couples the first and second
expansion struts at a distal end of the first expansion strut pair, a
plurality of the first expansion strut pair forming a first expansion
column;

a second expansion strut pair including a first expansion strut
positioned adjacent to a second expansion strut and a joining strut
of the second expansion strut pair that couples the first and second
expansion struts of the second expansion strut pair at a proximal
end of the second expansion strut pair, a plurality of the second
expansion strut pair forming a second expansion column;

a first connecting strut including a first connecting strut proximal
section, a first connecting strut distal section and a first connecting
strut intermediate section, the first connecting strut proximal section
being coupled to the distal end of the first expansion strut pair in the
first expansion column and the first connecting strut distal section
being coupled to the proximal end of the second expansion strut
pair of the second expansion column, a plurality of the first
connecting strut forming a first connecting strut column that
couples the first expansion column to the second expansion column,
the first connecting strut intermediate section being non-parallel to
the first connecting strut proximal and distal sections, wherein the
first expansion strut of the first expansion strut pair in the first
expansion column has a longitudinal axis offset from a longitudinal

9

axis of the first expansion strut of the second expansion strut pair in the second expansion column.

(Appx108 at col. 18 ll. 9-40.)

Dependent claim 8, which was also asserted at trial, adds an

additional limitation concerning radii of curvature:

> 8. The stent of claim 1, wherein a first radius of curvature is formed where the first connecting strut proximal section is coupled to the first connecting strut intermediate section and a second radius of curvature is formed where the first connecting strut distal section is coupled to the first connecting strut intermediate section.

(Appx109 at col. 19 ll. 1-6.)

### B. BSC's Acquisition And Exploitation Of Dr. Jang's Patent Portfolio

In 2002, Dr. Jang assigned his patent portfolio, including the '021 patent,

to BSC. (Appx1392-1393 at § 2.1, Appx1413.) The assignment divided the

purchase price into a fixed, initial payment of $50 million and contingent

payments of up to $110 million, as follows: (1) an "Earn Out" of 10 percent of

the "Net Sales" of "Contingent Payment Products" up to $60 million; plus (2) a

$50 million milestone payment if Net Sales exceeded $2.5 billion within five

years. (Appx1395 at § 3.1 (c)-(d).) The agreement defines a "Contingent

Payment Product" as one that, but for the assignment, would infringe Dr. Jang's

patents. (Appx1389.)

In April 2003, Dr. Jang notified BSC that its Express stent is a Contingent

Payment Product. (Appx1877.) The Express stents employ what BSC refers to

as "tandem architecture," whereby "Macro elements" are joined to "Micro elements." (Appx11537-11539.) As illustrated in the below schematic of the Express stent, the Micro elements are smaller and narrower than the Macro elements and include linear bars; the Micro elements join (*i.e.*, connect) one Macro element to the next:



(Appx4146; Appx11653.) All parties agree that the Macro elements are "expansion columns" as used in claim 1 of the '021 patent. (Appx24.) The parties dispute whether the Micro elements are "connecting strut columns." (*See* Appx2942-2943.)

The Express stent was a blockbuster success for BSC. Worldwide sales exceeded $2.5 billion by the time this action was filed in 2005. (Appx9921.) Accordingly, if the Express stent is a "Contingent Payment Product," BSC was

required to pay Dr. Jang $110 million in 2003-2005.  To date, it has not.[1]

While BSC has refused to pay Dr. Jang, it has asserted the assigned patent rights to exclude competitors from the market.  BSC successfully prosecuted a counterclaim against Cordis Corporation for infringing claims of the '021 patent that are similar to the '021 patent claims at issue here.  *See Cordis Corp. v. Boston Scientific Corp.*, 561 F.3d 1319 (Fed. Cir. 2009).  After this Court upheld a jury verdict of infringement under the doctrine of equivalents, the case settled, and Cordis left the stent market.  *See id.* at 1324-1332, 1339; Appx9653-9654 at 73:17-74:6.  In 2005, BSC also sued Conor MedSystems, Inc. for infringement of the '021 patent.  *See Boston Scientific Corp. v. Conor Medsystems Inc.*, 1:05-cv-00768-SLR (D. Del.).  The parties dismissed the case after Conor withdrew its request for FDA approval of its stents.  Avery Johnson, *J&J Stent Failure Puts Firm Further Behind*, The Wall Street Journal (May 8, 2007), http://www.wsj.com/articles/SB117853824065494360.

### C.    **The Present Breach-Of-Contract Suit**

Dr. Jang commenced this breach-of-contract suit against BSC in 2005, alleging that the Express stent is a Contingent Payment Product because, but-for the assignment, it would have infringed the '021 patent.

---

[1] The principal currently owed is $86.5 million, reflecting a $10 million payment by BSC under a different provision (Appx7559) and a Settlement Agreement in a separate, but related, case in the District of Delaware.  (Appx7208 at fn. 2.)

### 1.    Claim Construction

At BSC's urging, the district court originally construed the term "connecting strut column" to mean "a column formed solely of a plurality of connecting struts *unattached to each other* and arranged along the circumference of the strut." (Appx3324-3327 (emphasis added).) Dr. Jang appealed, and this Court reversed, holding that "the district court impermissibly imported the 'unattached' limitation into the claims based on the examples in the specification." *Jang v. Boston Scientific Corp.*, 493 Fed. Appx. 70, 78 (Fed. Cir. 2012). This Court explained that the "function of the connecting strut column is to couple the first expansion column to the second expansion column," which does not depend on "whether the connecting struts are attached to one another." *Id.*

On remand, the district court construed "connecting strut column" to mean "a structure formed of a plurality of connecting struts and arranged in a column along the circumference of the stent." (Appx5019.) The court also construed "connecting strut" to mean "a strut that connects expansion columns," and "expansion column" to mean "a structure formed of a plurality of expansion strut pairs and arranged in a column along the circumference of the stent." *Id.*

### 2.    The District Court's Exclusion Of BSC's Invalidity Assertions

In October 2013, while the case was on remand from Dr. Jang's successful appeal to this Court, BSC petitioned the PTO for *ex parte* reexamination of the patents it had acquired from Dr. Jang.  BSC sought reexamination only of the claims that Dr. Jang was asserting in this case. (Appx4675; Appx4736; Appx7560-7561.)  And BSC advised the PTO that it would not defend the claims, even though it had both the right to do so as patent owner (Appx5145; Appx5146), and the contractual duty to "prosecute and maintain" the assigned patents.  (Appx1402-1403 § 7.2.)  When Dr. Jang asked to intervene, BSC refused.  (Appx6214-6223.)  This maneuver came after eight years of litigation and two appeals to this Court in this case.  It also came three years after BSC successfully defeated an invalidity challenge to the '021 patent by Cordis.  *See Cordis*, 561 F.3d at 1339.

In conjunction with its reexamination petition, BSC moved for the first time for leave to amend its answer to add invalidity as an affirmative defense. (Appx5032, 5034.)  BSC invoked the contractual requirement that a "Contingent Payment Product" be covered by a "valid claim."  *Id.*  The district court denied leave, in part because it "would lead to an absurd result, namely, that BSC could avoid payment or seek repayment under the Agreement, even if the patents were declared invalid years after the payments were due."  (Appx6091.)  The court

found the parties' contract to be "unambiguous" that BSC could not avoid payment for past-due royalties by procuring a subsequent invalidation of the patents. *Id.*

The PTO cancelled the claims in February 2014, and BSC did not appeal. (Appx116; Appx6610.)  As the district court recognized, these claims were "invalidated . . . because, as the patent owner," BSC put the claims into an *ex parte* reexamination but "did not contest the PTO's rejection of those claims." (Appx7561.)

In a later motion for summary judgment, BSC renewed its invalidity challenge, arguing that the PTO's cancellation of the asserted claims erased its liability.  (*See* Appx6477-6482.)  Again, the district court disagreed, holding that BSC's 2014 invalidation maneuver did not excuse its failure to pay royalties that had accrued nearly a decade earlier.  (Appx7570, *citing Studiengesellschaft Kohle, M.B.H. v. Shell Oil Co.*, 112 F.3d 1561 (Fed. Cir. 1997).)  The court allowed BSC leave to seek an interlocutory appeal, which this Court denied. *Jang v. Boston Scientific Corp.*, 767 F.3d 1334, 1339 (Fed. Cir. 2014).

### 3.    The Trial And The Jury's Verdict Of Infringement

At trial, Dr. Jang further streamlined his case by asserting only claims 1 and 8 of the '021 patent.  Dr. Jang demonstrated, and BSC did not dispute, that the Macro elements of the Express stent meet all "expansion strut," "expansion

column," and related limitations. (*See, e.g.*, Appx8718-8719 at 32:2-3, 32:23-33:6, Appx8720 at 34:18-23, Apx8722 at 36:22-25, Appx8723 at 37:2-22, Appx8724 at 38:9-16; Appx9377 at 7:3-21; Appx9015 at 169:3-12.)

The key dispute at trial was whether the Express stent's Micro elements comprised connecting strut columns, either literally or under the doctrine of equivalents. The following trial demonstrative illustrates the testimony of Dr. Jang's experts, Mr. Michael J. Lee and Dr. Nicolas A.F. Chronos, on that point:



(Appx94, Appx108; Appx11647.)

As shown, a Micro element connects two Macro elements via a three-section connecting strut, consisting of two straight bar sections at the ends – that is, "proximal" and "distal" sections – and an intermediate, non-parallel,

s-shaped section. The connection is between offset expansion-strut pairs, and it connects those expansion pairs "peak to peak," thus meeting all relevant limitations of claim 1 of the '021 Patent. (*See, e.g*., Appx8725 at 39:10-18, Appx8730 at 44:14-20, Appx8731 at 45:10-18, Appx8732 at 46:20-23; Appx9015 at 169:13-23, Appx9016-9025 at 170:3-179:6.) Dr. Jang's experts also testified that the Micro elements satisfy the additional limitation of dependent claim 8 concerning radii of curvature. (*See, e.g.*, Appx8737-8738 at 51:17-52:9; Appx9025-9026 at 179:25-180:23.)

In the alternative, Dr. Jang presented expert testimony that, if the Express stent does not literally meet the relevant limitations, it satisfies them under the doctrine of equivalents. Dr. Jang's experts testified that the *function* of the "connecting strut" is to add flexibility; the *way* it provides flexibility is by using the geometry of a multi-section connecting strut with proximal and distal sections and a non-parallel intermediate section to connect offset expansion strut pairs; and the *result* is a stent that can maneuver through tortuous vessels and provide the requisite strength and coverage when expanded or deployed. (Appx72 at Abstract, Appx101 at col. 3 l. 61 - col. 4 l. 9, Appx102 at col. 6 ll. 30-36, Appx106 at col. 13 ll. 38-67; Appx9242-9246 at 20:14-24:11, Appx9248-9256 at 26:15-28:12, Appx9251-9254 at 29:14-32:16, Appx9255-9256 at 33:24-34:5; Appx8742-8743 at 56:23-57:17, Appx8749-8750 at 63:7-64:2, Appx8753-

8754 at 67:16-68:21, Appx8763 at 77:4-13, Appx8768 at 82:8-21, Appx8775 at

89:4-18; Appx8779-8780 at 93:11-94:11; Appx9013 at 167:13-21.)

Dr. Jang's experts pointed to physical models, BSC's internal documents,

benchtop testing and finite element analysis ("FEA") to show that the Micro

elements are substantially the same as the claimed connecting-strut columns in

all of those respects.  (*Id.*; *see also* Appx8761 at 75:4-13.)  For example, finite

element analysis showed that when the Express stent was subjected to force,

tension, or compression, strain occurred along the Micro elements (in green),

thus demonstrating that those elements, like Dr. Jang's connecting strut

columns, provided the requisite flexibility to the Express stent:



(Appx8775-8780 at 89:7-94:6; Appx12095; Appx12096.)

The flexibility of the Micro elements (and strength of the Macro elements) was further confirmed by BSC's own marketing documents, including the one below:



(Appx8768 at 82:8-21, Appx8770 at 84:3-19; Appx9248-9250 at 26:18-28:12; Appx11654-11701.)

In opposition, BSC argued that the Micro elements are expansion columns rather than connecting-strut columns. In BSC's view, a structure that meets the definition of an "expansion column" cannot also be a "connecting strut column." (Appx10570 at 100:16-23, Appx10573 at 103:8-9; *see also* Appx11366.) BSC further argued that the Micro element could not meet the connecting-strut and

connecting-strut-column limitations because it contains "extra metal" that attaches the connecting struts to one another around the circumference of the stent. (*See, e.g.*, Appx9342-9343 at 120:23-121:8; *see also* Appx10579-10580 at 109:8-16, 109:23-110:9.)

Dr. Jang responded that the only question is whether the Micro elements meet the definition of a "connecting strut column," or are equivalent thereto. He argued it is legally irrelevant whether they might *also* be considered expansion struts, and whether the accused product contains *additional* features such as "extra metal" attaching the connecting struts to each other. (Appx10599-10605 at 129:20-135:6.)

The jury found that the Express stent infringed claims 1 and 8 under the doctrine of equivalents but did not literally infringe either claim. (Appx10647-10649.) The jury also found that Dr. Jang had performed his obligations under the assignment, and that BSC had breached the contract by failing to make required payments. *Id.*

## D.    The District Court's Ensnarement Hearing And Overruling Of The Verdict

On the sixth day of trial, BSC argued that if the jury found infringement under the doctrine of equivalents, the court should hold a post-verdict "mini trial" to determine whether the equivalent "ensnares the prior art." (Appx9858-9862 at 122:1-126:10.) In response, Dr. Jang noted that, just a few days earlier,

the district court had denied BSC's attempt to introduce alleged prior art references as exhibits, ruling that ensnarement was "an affirmative defense that has not been pled." (Appx8084 at 10:1-9.) Dr. Jang also explained that BSC was "arguing the [excluded] invalidity case all over again" and objected that a "mini trial" would be highly prejudicial because neither party had conducted any discovery on the issue and no expert had opined on it. (*Id.*; Appx9962-9963 at 5:25-6:19; Appx10165-10166 at 79:1-80:2, Appx10171-10175 at 85:18-89:21.)

After the verdict, the district court stated that it would hold an ensnarement hearing. (Appx10371 at 38:10-14; Appx10658-10660 at 9:3-11:8.) The court allowed the parties only three weeks to develop evidence, submit trial briefs, and prepare for an evidentiary hearing. (Appx12208 at 2.) In an attempt to carry its initial burden of production, BSC relied on the same prior art references and the same expert "invalidity report" that had made up its excluded invalidity defense. (*See* Appx10710; Appx11384 at fn. 3.)

In preparing his ensnarement case, Dr. Jang followed this Court's suggestion that it is helpful to "visualize[e] a *hypothetical* patent claim, sufficient in scope to *literally* cover the accused product," and then determine "whether that hypothetical claim could have been allowed by the PTO over the prior art." *Wilson Sporting Goods Co. v. David Geoffrey & Assoc.*, 904 F.2d 677, 684 (Fed. Cir. 1990). Dr. Jang proposed several alternative hypothetical

versions of claim 1, two of which (version #3 and version #5) were specifically

addressed at the hearing.

| Hypothetical Claim Proposal No. | Language Altered in Dr. Jang's Proposals |
|---|---|
| 3 | the first connecting strut ~~intermediate section being non-parallel to the first connecting strut proximal and distal sections~~ **column configured to provide increased flexibility compared to the first and second expansion columns,** |
| 5 | a first connecting strut including **at least** a first connecting strut proximal section, a first connecting strut distal section and a first connecting strut intermediate section, |

(Appx10795.)

Dr. Jang submitted declarations from his experts, Mr. Lee and Dr.

Chronos, showing that these hypothetical claims would be infringed literally by

the Express stent but would not ensnare the prior art references on which BSC

relied – the Lau, Brown, and Wijay patents.  (Appx10835-10885 at ¶¶ 56-177;

Appx10903-10909 at ¶¶ 6-24.)  Dr. Jang also collected and presented evidence

that the Wijay patent was not actually prior art.  (Appx10911-10912,

Appx10915-10920; Appx10922-10926; Appx174-176, Appx180; Appx210;

Appx216; Appx10978-10979 at 46:17-47:13; Appx11015-11017 at 83:10-85:16,

Appx11018-11031 at 86:3-99:14.)

BSC proposed its own hypothetical claim for consideration by the court

(Appx10764-10769), but did not submit a declaration from its expert, Dr.

Moore.  (Appx11204 at 72:7-12.)  At the hearing, Dr. Moore admitted that he had never previously opined on ensnarement in this case.  *Id.*

The district court overturned the jury's verdict.  The court found that BSC had preserved its ensnarement defense in (i) a motion *in limine* that (unsuccessfully) sought to exclude Dr. Jang's equivalents case, in part on the ground that the PTO had invalidated the patent claims, and (ii) a footnote in a another pretrial pleading briefly stating that the accused products are "the same as what is in the prior art."  (Appx9-12; Appx7215 at fn. 5.)

The court then rejected Dr. Jang's hypothetical claims.  Hypothetical claim 3 responded to BSC's literal-infringement defenses by replacing the requirement of a non-parallel intermediate section with a requirement that the connecting strut be configured to provide increased flexibility.  (Appx14.)  The court held that this claim was improper because it narrowed the claim. (Appx14-16.)

In response to BSC's argument that the Micro elements include "extra metal," Dr. Jang's hypothetical claim 5 required that connecting struts include "at least" the parts specified in the claim language.  (Appx17.)  The court held that the added language – "at least" – did not broaden the claim scope because it did not remove any claim limitations.  (Appx18.)

Without further analysis, the court determined that BSC was entitled to entry of judgment in its favor. (Appx1-5.) It never conducted an actual ensnarement analysis by determining whether a properly drafted hypothetical claim would ensnare the relevant prior art. (Appx12-18.)

### E.    The District Court's Denial Of Dr. Jang's Rule 50(b) Motion

Dr. Jang moved for judgment as a matter of law at the close of evidence, *see* Fed. R. Civ. P. 50(a), on the issue of literal infringement. (Appx10454-10464.) After the verdict, Dr. Jang renewed his argument, *see* Fed. R. Civ. P. 50(b), that any "extra metal" in Express's Micro elements did not preclude literal infringement because it was at most an additional feature. (Appx11337, Appx11344-11348.) Dr. Jang also emphasized that, for purposes of ensnarement, BSC had argued, and the district court had held, that adding "at least" to the claims did not narrow them precisely because the literal claims were not limited to products containing *only* the recited elements. (Appx11349-11351; Appx18.) Dr. Jang argued that BSC could not have it both ways – it could not argue that the literal claim scope excluded products with "extra metal," yet argue that adding "at least" did not broaden claim scope in any way. The district court disagreed. The court credited BSC's expert testimony that the "extra metal" was a "significant structural feature[] of the microelement." (Appx30.)

Dr. Jang also argued that BSC's other literal infringement defense – that the Micro element could not be a connecting strut because it also met the court's construction of the "expansion column" limitation – was legally flawed. (Appx11394-11397.)  The district denied JMOL without expressly addressing that point, and also denied Dr. Jang's alternative request for a new trial. (Appx23-32, Appx35.)  This appeal followed.

## SUMMARY OF THE ARGUMENT

**I.**     The doctrine of "ensnarement" provided no basis for the district court to set aside the jury's verdict.

**A.**     At the outset, BSC waived that defense.  Because ensnarement is based on underlying facts, a party must raise it "either on a motion for partial summary judgment or on a motion for judgment as a matter of law at the close of the evidence and after the jury verdict."  *Depuy Spine, Inc. v. Medtronic Sofamor Danek, Inc*., 567 F.3d 1314, 1324 (Fed. Cir. 2009) (*quoting Warner-Jenkinson Co., Inc. v. Hilton Davis Chem. Co*., 520 U.S. 17, 39 n. 8 (1997)). BSC did neither, and the district court had no authority to excuse BSC's failure to meet this legal requirement, which alone warrants reversal.

**B.**     The district court further erred by not even conducting an ensnarement analysis.  The district court held that two of the hypothetical claims proposed by Dr. Jang were not properly framed – and entered judgment against

him for that reason alone.  Under correct legal standards, both of those

hypothetical claims were proper because they addressed specifically the non-

infringement arguments advanced by BSC at trial.

Even if there had been some shortcoming in those claims, Dr. Jang did not

thereby forfeit the jury verdict.  The ultimate question in an ensnarement

analysis is whether the asserted scope of equivalents would ensnare the prior art.

Under this Court's precedents, the court should have selected another

hypothetical claim, proposed by a party or formulated by the court itself, and

then proceeded to consider ensnarement on the merits.  At a minimum, this

Court should remand for further proceedings and an actual ensnarement analysis.

**C.**    No remand is necessary, however, because as a matter of law,

BSC's "ensnarement" challenge was not properly an ensnarement defense at all.

BSC simply resurrected the same invalidity challenge the district court had

rejected before trial.  Ensnarement may not "be a 'camouflaged or back-handed

attack' on the validity of the" patent's claims.  *Thomas & Betts Corp. v. Litton

Sys., Inc.*, 720 F.2d 1572, 1580 (Fed. Cir. 1983) (*quoting Bendix v. United

States*, 600 F.2d 1364, 1373 (Ct. Cl. 1979)).  Instead, ensnarement looks to the

incremental claim scope added by equivalents.  In other words, the question is

whether, assuming the literal claims are valid, the *additional* claim scope

attributable to the doctrine of equivalents presents a prior-art issue.  Affording

any broader scope to the ensnarement doctrine would allow defendants to mount a collateral attack on validity, contrary to this Court's decisions, and in outright circumvention of the Seventh Amendment jury trial right, the statutory presumption of validity, and the clear-and-convincing-evidence standard for proving invalidity.

BSC has admitted that its expert's ensnarement "opinions were virtually identical to those set forth in his expert report on invalidity" and that "he showed *in the same manner* how Jang's claims covered those prior art references." (Appx11384 at fn. 3 (emphasis added).)  In other words, BSC just launched an impermissible, collateral attack on validity.

**II.**   Alternatively, the district court should have granted JMOL of literal infringement.  Dr. Jang showed that the Express stent's Micro elements are "connecting strut columns."  BSC responded with two arguments that are legally erroneous.  They are thus insufficient as a matter of law to support the verdict.

BSC argued that if the Micro elements met the definition of "expansion columns," they *could not be* "connecting strut columns."  But the relevant question is whether the Micro elements fall within the meaning of "connecting strut columns."  Whether they might *also* be considered "expansion columns" is beside the point.  Indeed, this Court has repeatedly held that a single structure, or portion of a structure, can satisfy more than one claim limitation.

BSC also argued that the Micro elements could not be "connecting strut columns" because they contained "extra metal" – *i.e.*, additional portions of the Micro element that attach the connecting struts to one another. But all that matters is whether the accused product contains the claim limitations; whether it *also* contains *other* features is legally irrelevant. Indeed, this Court already held, in a prior appeal in this matter, that nothing in the '021 patent requires the connecting struts to be "unattached." *See Jang*, 493 Fed. Appx. at 78.

## STANDARDS OF REVIEW

The district court's conclusion that BSC had not waived the ensnarement defense is reviewed for abuse of discretion. *Qualcomm Inc. v. Broadcom Corp.*, 548 F.3d 1004, 1019 (Fed. Cir. 2008). Issues of law underlying that ruling are reviewed *de novo*. *Id.*

Determining whether the scope of equivalents accorded to a particular claim would encompass the prior art is an issue of law that this Court reviews *de novo*. *DePuy*, 567 F.3d at 1324. Factual issues decided by the district court are reviewed for clear error, *id.*, and the jury is assumed to have resolved underlying evidentiary conflicts in the verdict-winner's favor, *see Wilson Sporting Goods*, 904 F.2d at 684.

The district court's denial of a motion for JMOL is reviewed *de novo*. *See Tec Air. Inc. v. Denso Mfg.*, 192 F.3d 1353, 1357 (Fed. Cir. 1999). The denial of

a motion for new trial is reviewed for abuse of discretion. *Wordtech Sys., Inc. v. Integrated Network Sols., Inc.*, 609 F.3d 1308, 1312-13 (Fed. Cir. 2010).

## ARGUMENT

### I.     The District Court Erred In Overturning The Jury's Verdict Based On The Ensnarement Doctrine.

After a decade of litigation and a jury verdict finding the '021 patent infringed, the district court overturned the verdict based on its misunderstanding of the ensnarement doctrine and the proper procedure for applying it.  In doing so, the court applied that doctrine in a manner, both rigid and expansive, that is well beyond anything this Court has sanctioned and that is contrary to the doctrine's purpose.

Precedents concerning the ensnarement doctrine are limited.  The doctrine is of relatively recent vintage, and does not arise in most doctrine-of-equivalents cases.  But the basic point is to prevent patentees from using the doctrine of equivalents to evade limitations on patentability.  *See Wilson Sporting Goods*, 904 F.2d at 684.  The PTO allows literal claims after determining they are patentable over the prior art, but ordinarily does not consider whether any *expansion* of claim scope resulting from equivalents would present any *additional* prior-art issues.  This Court's ensnarement jurisprudence addresses the latter point by providing that the prior art "limits the range of permissible equivalents of a claim."  *Id.*

Procedurally speaking, this Court has held that ensnarement is "a question of law for the court, not the jury, to decide." *DePuy*, 567 F.3d at 1324. A "helpful first step" in analyzing ensnarement can be "to construct a hypothetical claim that literally covers the accused device." *Id.* The court must then compare the hypothetical claim to the scope of the prior art. *See id.* at 1325. But ensnarement "does not envision application of a full-blown patentability analysis to a hypothetical claim." *Key Mfg. Grp., Inc. v. Microdot, Inc.*, 925 F.2d 1444, 1449 (Fed. Cir. 1991). Instead, the question for the court is simply whether the incremental claim scope added by equivalents presents any additional prior-art issues. Here, it does not.

## A.    BSC Waived The Ensnarement Defense.

At the outset, BSC waived this defense. Because ensnarement depends on factual inquiries, this Court has held that it is to be "determined by the court either on a pretrial motion for partial summary judgment or on a motion for judgment as a matter of law at the close of the evidence and after the jury verdict." *DePuy*, 567 F.3d at 1324 (quoting *Warner-Jenkinson*, 520 U.S. at 39 n. 8). The district court cited that holding, but failed to apply it. (Appx8.)

The relevant facts are undisputed. BSC did not plead ensnarement in its answer, raise it during discovery, or list it in the final Pretrial Order. (Appx2400-2405, 2415-2417; Appx8055-8073; *see* Fed. R. Civ. P. 8(b-c), 16(d-

e), 26(e).)  And critically, BSC did not raise ensnarement on a pretrial motion for partial summary judgment.  Nor did it raise the defense on a motion for JMOL at the close of the evidence.  Having failed to seek JMOL under Federal Rule of Civil Procedure 50(a) at the close of evidence, BSC was barred from seeking JMOL on this issue after the verdict under Rule 50(b).  *See, e.g.*, *Medisim Ltd. v. BestMed LLC*, 758 F.3d 1352, 1356 (Fed. Cir. 2014).  As a matter of law, the district court was not free to excuse BSC's failure to file a timely motion for summary judgment or pre-verdict JMOL.  *See, e.g.*, *Duro-Last, Inc. v. Custom Seal, Inc.*, 321 F.3d 1098, 1107 (Fed. Cir. 2003); *Tortu v. Las Vegas Metro. Police Dep't*, 556 F.3d 1075, 1082, 1083 (9th Cir. 2009).

BSC's waiver is especially egregious because it deprived Dr. Jang of any fact or expert discovery on the defense, ever, or any notice that it would argue ensnarement until after Dr. Jang had presented his case.  In fact, BSC never produced any documents concerning ensnarement, and never supplemented its discovery responses to raise ensnarement as required by Fed. R. Civ. P. 26(e). (Appx12210 at ¶ 10; Appx2576-2578; Appx5120-5128.)  BSC's non-disclosure alone compels a finding of waiver.  *See* Fed. R. Civ. P. 37(c); 35 U.S.C. § 282(c); *see also Woods v. DeAngelo Marine Exhaust, Inc.*, 692 F.3d 1272, 1282-83 (Fed. Cir. 2012).  Likewise, Ninth Circuit law is clear that any defense not listed in the Pretrial Order is waived.  *See, e.g.*, *Pierce Cnty. Hotel Emps. &*

*Rest. Empls. Health Trust v. Elks Lodge*, 827 F.2d 1324, 1329 (9th Cir. 1987);

*U.S. v. First Nat'l Bank of Circle*, 652 F.2d 882, 886 (9th Cir. 1981).  And this

Court has held that ensnarement must be "pled and supported with evidence."

*Fiskars, Inc. v. Hunt Mfg. Co*., 221 F.3d 1318, 1323 (Fed. Cir. 2000).

At the outset of trial, the district court ruled exactly that.  When BSC

sought to introduce alleged prior art as exhibits, the district court denied the

request because the exhibits were "untimely designated" and ensnarement had

"not been pled."  (Appx8084 at 10:1-9.)  At the pretrial conference, the district

court ruled that "everything that's not in the pretrial conference order is

eliminated from the case."  (Appx10789; Appx7714 at 35:4-5.)  Even at the

ensnarement hearing, the court reiterated that "the law is that you can abandon

issues by not having them in the pretrial conference order even if you've raised

them earlier."  (Appx10947 at 15:23-25.)

The district court evidently changed its mind.  In its decision overturning

the jury verdict, the court held that BSC had preserved ensnarement through two

fleeting references in a motion *in limine* and in a pretrial memorandum.

(Appx12.)  That was reversible error:  for the reasons discussed above, any such

effort at preservation was insufficient as a matter of law.

Moreover, BSC's motion *in limine* sought only to exclude Dr. Jang's

doctrine of equivalents case, not to litigate ensnarement.  The motion, citing the

2014 *ex parte* invalidation ruling, argued that "expanding the claims' [literal] scope still further so as to embrace or 'ensnare' even more of the prior art is improper."  (Appx6802.)  That passing use of the word "ensnare" did not request an ensnarement hearing, much less identify the relevant prior art or the claimed basis for ensnarement.  And the court *denied* that motion.  (Appx65-69.)

The pre-trial memorandum cited by the district court did not even reference ensnarement.  It asserted in a footnote that, in light of three alleged prior-art references, "the Express stents are the same as what is in the prior art." (Appx6741 at fn. 5.)  That clearly alludes to an improper practicing-the-prior-art defense, *see Tate Access Floors, Inc. v. Interface Architectural Res., Inc.*, 279 F.3d 1357, 1365 (Fed. Cir. 2002), or perhaps the recapture rule, *see Medtronic Inc. v. Guidant Corp.*, 465 F.3d 1360, 1372-73 (Fed. Cir. 2006).  But it utterly fails to disclose an ensnarement-cum-invalidity defense.

The prejudice to Dr. Jang is manifest and manifold.  Throughout discovery and trial, Dr. Jang had no notice of BSC's ensnarement defense. There was no discovery or expert opinion offered on the issue.  (Appx12211 at ¶¶ 12-13.)  Indeed, BSC expert Dr. Moore conceded at the post-verdict ensnarement hearing that he had *never* previously opined on ensnarement in this case.  (Appx11204 at 72:10-12.)  Dr. Jang therefore never had the opportunity to depose BSC's expert on the issue or to offer rebuttal expert testimony.

When the court decided to consider ensnarement after trial, after ten years of litigation and a jury verdict in Dr. Jang's favor, he was allowed only three weeks to develop evidence, expert opinion, and argument – as well as proposed hypothetical claims – on the defense.  BSC disclosed none of its argument until its post-verdict briefing, and no expert opinion until the Rule 50(b) hearing.  None of this was harmless.  And because almost ten years had passed from when Dr. Jang raised the doctrine of equivalents to when BSC raised ensnarement, memories faded, witnesses became unavailable, and non-party documents were lost or destroyed.  (Appx11298-11300; Appx10929-10932.)  *Cf. A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*, 960 F.2d 1020, 1035 (Fed. Cir. 1992) (six-year delay gives rise to presumption of laches).

One concrete example illustrates the point:  in the limited time between the verdict and the ensnarement hearing, Dr. Jang collected and presented evidence swearing behind the Wijay patent, showing that it was not actually prior art.  *See* p. 22, *supra*.  If the ensnarement defense had been disclosed timely, Dr. Jang could have sought discovery to help prove that he conceived his invention before all of the allegedly ensnaring prior-art references.  *See Spansion, Inc. v. Int'l Trade Comm'n*, 629 F.3d 1331, 1356 (Fed. Cir. 2010).  And Dr. Jang would have been entitled to present any resulting issues of fact as

to the prior art to the jury.  *See Typeright Keyboard Corp. v. Microsoft Corp.*, 374 F.3d 1151, 1157-59 (Fed. Cir. 2004).

Had BSC timely raised and supported its ensnarement defense, Dr. Jang also could have – and would have – litigated a different case.  Dr. Jang elected to narrow the issues throughout the case:  he only asserted a few of the 1400-plus claims in the 20-plus patents he assigned to BSC from the beginning, then dropped the '743 patent entirely prior to the pretrial conference, along with all but two claims of the '021 patent.  (*Compare* Appx6768 at fn. 1 with Appx7619 at fn. 1.)  If ensnarement had been in the case, Dr. Jang could have chosen to address that defense by asserting additional claims, including additional dependent claims, which can survive because of their narrower scope even if an independent claim ensnares.  *See Streamfeeder, LLC v. Sure-Feed Sys., Inc*., 175 F.3d 974, 984-85 (Fed. Cir. 1999).  For example, Dr. Jang could have asserted '021 patent claim 36 (Appx110, col. 22 ll. 42-52), which BSC had already successfully asserted against Cordis, and the validity of which this Court had upheld on appeal.  *Cordis*, 561 F.3d at 1324-1332, 1339.  BSC's ambush deprived Dr. Jang of these opportunities.

**B.    The District Court Erred In Rejecting Dr. Jang's Hypothetical Claims, Discarding The Verdict, and Entering Judgment Without Analyzing Ensnarement.**

The district court rejected two of Dr. Jang's proposed hypothetical claims and – on that basis alone – directed the entry of judgment for BSC.  (Appx16-19.)  Under this Court's precedents, that was error thrice over.  Each of the hypothetical claims was proper.  But even if there had been a problem with their drafting, the district court was still required to analyze ensnarement, instead of overturning the jury verdict on what would have been at most a technicality.

### 1.    Dr. Jang's Hypothetical Claim 3 Was Proper.

Dr. Jang's third hypothetical version of claim 1 revised the first connecting-strut limitation as follows:

> the first connecting strut ~~intermediate section being non-parallel to the first connecting strut proximal and distal sections~~ **column configured to provide increased flexibility compared to the first and second expansion columns,**

(Appx14.)  The revision replaces the claimed "non-parallel" geometry with a broader, non-geometric limitation covering a configuration that "provide[s] increased flexibility" relative to the expansion columns.  (Appx10795; *see also* Appx103 at col. 8 ll. 45-57, Appx108 at col. 18 ll. 35-38.)

This alteration responds directly to BSC's core defense to literal infringement, which was that the Express stent's Micro elements did not meet the "connecting strut" and related "connecting strut column" limitations.  (*See,*

*e.g.*, Appx10570 at 100:16-23, Appx10573 at 103:8-9; Appx11366.)   As Dr.

Jang's expert and the patent both explained, the literal requirement that is

omitted here – positioning the intermediate section of a 3-part connecting strut

non-parallel to the proximal and distal sections – is but one way to configure the

strut to add the requisite flexibility to the stent.  (Appx11138 at 6:11-19;

Appx103 at col. 8 ll.45-57 ("efficient bending and straightening and connecting

struts at pivot points allows increased longitudinal flexibility").)

Dr. Jang's hypothetical claim thus replaced a limitation disclosing a

specific way to configure the connecting struts for flexibility with a broader

requirement of flexibility in the connecting struts, which was consistent with the

equivalents case that Dr. Jang presented at trial.  (Appx72 at Abstract, Appx101

at col. 3 l. 61 – col. 4 l. 9, Appx102 at col. 6 ll. 30-36, Appx106 at col. 13 ll. 38-

67); Appx9242-9246 at 20:14-24:11, Appx9248-9256 at 26:15-28:12,

Appx9251-9254 at 29:14-32:16, Appx9255-9256 at 33:24-34:5; Appx8742-8743

at 56:23-57:17, Appx8749-8750 at 63:7-64:2, Appx8753-8754 at 67:16-68:21,

Appx8763 at 77:4-13, Appx8768 at 82:8-21, Appx8775 at 89:4-20, Appx8779-

8780 at 93:11-94:11; Appx9013 at 167:13-21.)  It also directly addressed BSC's

defenses to Dr. Jang's literal infringement case.

The district court held that this hypothetical claim "improperly narrows

the claims of the original patent" (Appx16) by "adding a requirement of

increased flexibility." (Appx14.) According to the court, "a hypothetical claim that narrows the original claim *in any way* is impermissible." (Appx15 (emphasis added).)

That is not the law, and this hypothetical claim is not narrower than the original in any event. Under this Court's cases, there is nothing wrong with changing a single limitation in a way that broadens the claim to cover the accused product while also narrowing the claim in other, irrelevant respects. In *DePuy*, for example, the hypothetical claim substituted "conically-shaped" for "spherically-shaped" in describing part of a surgical screw. *DePuy*, 567 F.3d at 1325. That single change both broadened *and* narrowed the claim limitation: it included shapes that were conical, but not spherical, yet excluded shapes that were spherical, but not conical. Despite that nominal "narrowing," this Court accepted the hypothetical claim. *Id*. at 1325-28.

The district court relied on *Streamfeeder*, but in that case the plaintiff had "simultaneously broaden[ed] one limitation of original claim 1 and narrow[ed] another" limitation. *Id*. at 982. This Court held that a patentee may not "cut and trim" in different places, "expanding here, and narrowing there," to avoid the prior art. 175 F.3d at 983; *see also Ultra-Tex Surfaces, Inc. v. Hill Bros. Chem. Co.*, 204 F.3d 1360, 1365 (Fed. Cir. 2000) (rejecting hypothetical claim that eliminated one limitation and added four others). In other words, an expansion

that reads on the prior art cannot be excused by other, unrelated restrictions.

As *DePuy* reflects, however, there is nothing wrong with changing *a single limitation* in a way that broadens the claim in relevant respects while narrowing it in others.  Indeed, replacing a literal limitation with an equivalent could always be said to "trim" by removing a limitation (the literal one), but that is not the point:  as long as the equivalent covers the accused device by broadening the literal claim scope in the relevant respect, and it does not read on the prior art, there can be no concern that the doctrine of equivalents is being used to circumvent limits on permissible claim scope.

Dr. Jang's proposed hypothetical claim broadens the claim scope in all relevant respects and does not narrow it at all, as discussed above.  *See* pp. 36-38, *supra.*  And while the district court stated that Dr. Jang's expert Mr. Lee had "admitted" that the added language narrowed the original claim, (Appx15), he did not.  Mr. Lee testified only that "configured to provide flexibility" would be "narrowing" when compared to a non-existent version of the claim that had *no limitation at all.*  (Appx11137-11144 at 5:20-12:4.)  Mr. Lee made clear that, when compared with the actual, literal claim language, "I don't think it's narrower."  (Appx11170 at 38:15-16; *see also* Appx11137 at 5:17-19.)

Hypothetical claim 3 thus does exactly what this Court's precedents instruct:  it replaces specific geometric language with a broader functional

description to "broaden" a single limitation to "literally cover[] the accused device." *DePuy*, 567 F.3d at 1324.  The district court erred in rejecting it.

### 2. Dr. Jang's Hypothetical Claim 5 Was Proper.

The district court also erred in rejecting Dr. Jang's fifth hypothetical claim.  (Appx17-18.)  This claim added language allowing the connecting strut to include "at least" the three identified sections:  "a first connecting strut including *at least* a first connecting strut proximal section, a first connecting strut distal section and a first connecting strut intermediate section." (Appx17.)

This claim directly responded to BSC's position, illustrated in BSC's slide below, that the Micro elements *could not be* connecting-strut columns because they included "extra metal" on which Dr. Jang did not rely to demonstrate infringement – specifically, the portions, depicted in silver below, that attach the connecting struts (shown in green) to each other. (*See, e.g*., Appx9342-9343 at 120:23-121:8; Appx10579-10580 at 109:5-110:8.)



(Appx11648; Appx11649.)

Although Dr. Jang does not agree with that view of the Express stent, his hypothetical claim adds the words "at least" to clarify that the inclusion of an additional feature does not defeat infringement. This revision is also consistent with Dr. Jang's equivalents case at trial. (Appx8728-8729 at 42:21-43:16; Appx8803 at 117:5-11.)

The district court ruled that this hypothetical claim "does not broaden the language of any claim of the original patent, as it does not remove any requirement of those claims." (Appx18.) To the extent that the court required a hypothetical claim to "remove" words from a claim, it erred as a matter of law because there are other ways to broaden a claim. For example, adding the word

"or" between limitations could have that effect – as BSC itself recognized.  (*See* Appx10764-10765 (BSC proposing hypothetical claim by adding italicized words:  "proximal *or distal ...* offset … *or parallel*").)  So could adding alternative ways of satisfying a limitation, such as broadening a claimed numerical range.  *Cf. Abbott Labs v. Dey, L.P.*, 287 F.3d 1097, 1105-07 (Fed. Cir. 2002).

BSC also argued, and the district court erroneously acceded, that adding "at least" was surplusage because the '021 patent uses the term "comprising," which itself indicates that a product infringes so long as it includes the claim elements, even if it also includes other features (such as extra metal).  (Appx11011-11013 at 69:20-71:9; Appx11189 at 57:5-21; Appx11270-11271; Appx11398-11400.)  Under applicable legal principles, that was correct.  Indeed, Dr. Jang has always argued exactly that in opposing BSC's "extra metal" defense to literal infringement.  *See* Section II.B, *infra*.

But BSC cannot have it both ways.  BSC argued to the jury that "comprising is not a weasel word," and that the jury could not "ignor[e] additional metal" in the Micro elements for purposes of infringement. (*See, e.g.*, Appx8803-8805 at 117:5-119:3; Appx10580 at 110:2-8.)

This Court must draw inferences in favor of the verdict.  *See Wilson Sporting Goods*, 904 F.2d at 684; *Jurgens*, 927 F.2d at 1561.  That means that it

must be presumed that the jury agreed with BSC that extra metal defeated literal

infringement, but also agreed with Dr. Jang that the Micro elements were

nonetheless equivalent to "connecting strut columns."  Because the hypothetical

claim directly addresses that presumed basis for the jury verdict, it provides an

excellent vehicle for considering ensnarement.  In any event, having secured a

jury verdict of no literal infringement by relying on extra metal, BSC cannot

now be heard to argue that "extra metal" should be ignored  as defeating

infringement under equivalents.  S*ee Minnesota Min. & Mfg. Co. v. Chemque,*

*Inc*., 303 F.3d 1294, 1303-04 (Fed. Cir. 2002); *cf. New Hampshire v. Maine*, 532

U.S. 742, 749 (2001) (judicial estoppel).

### 3.    The District Court Erred In Failing To Conduct An Ensnarement Analysis.

After erroneously rejecting two of Dr. Jang's proposed hypothetical

claims, the district court compounded its error by entering judgment in favor of

BSC, on that basis alone, without any further analysis.  (Appx18-19.)  The court

did not analyze Dr. Jang's alternative proposals, dependent claim 8, BSC's

proposed hypothetical claim, or a modified claim of its own devising.

(Appx10795; Appx12-18.) [2]  Nor, most importantly, did it consider, let alone

---

[2] On appeal, Dr. Jang has briefed only two of his hypothetical claims because the district court's analysis of those claims would apply to the others.  If the third claim was impermissibly limiting because it requires flexibility, the other claims would be as well.  Under the correct legal principles discussed above, however, all of the proposed claims are proper.  At a minimum, the district court must give them full consideration if this Court remands for further proceedings.

determine, whether a properly drafted hypothetical claim would ensnare the prior art.  (Appx12-18.)

That was error.  This Court has never held that proposing an improperly worded hypothetical claim forfeits a jury verdict.  Even when a patentee has proffered a deficient hypothetical claim, this Court has gone on to analyze ensnarement under "a permissible hypothetical claim." *Streamfeeder*, 175 F.3d at 983-84; *see also* 4 Moy's Walker on Patents § 13:85 (4th ed.) ("Procedurally, the court in *Streamfeeder* did not rest its decision on the patent owner's submission of a faulty hypothetical claim.").

Anything else would elevate form over substance and fail to accord proper respect to the jury's work.  Crafting a hypothetical claim is not an end in itself. It is just a "helpful first step," *DePuy*, 567 F.3d at 1324, that "may be useful," *Interactive Pictures Corp. v. Infinite Pictures, Inc*., 274 F.3d 1371, 1380 (Fed. Cir. 2001), to the extent that it can "simplify analysis and bring the issue onto familiar turf." *Wilson Sporting Goods*, 904 F.2d at 684.  If a hypothetical claim is "poorly worded" or "poorly drafted," the court should simply require "one or more further iterations."  Henrik D. Parker, *Doctrine of Equivalents Analysis After* Wilson Sporting Goods*: The Hypothetical Claim Hydra*, 18 AIPLA Q.J. 262, 279 (1990). As the Court stated in *DePuy*, "the District Court *must* assess the prior art introduced by the accused infringer and determine whether the

patentee has carried its burden of persuading the court that the hypothetical claim is patentable over the prior art."  567 F.3d at 1325 (emphasis added).

The court's unfinished analysis was especially unfortunate because a proper analysis would show no ensnarement no matter how the claims are framed.  For example, Dr. Jang demonstrated that the '021 patent predates the Wijay patent.  (Appx11015-11017 at 83:10-85:16, Appx11018-11031 at 86:3-99:14; Appx174-176, Appx180; Appx206-207; Appx208; Appx210; Appx216; Appx10978-10979 at 46:17-47:13; Appx10911-10912, Appx10915-10920; Appx10922-10926.)   Thus, Wijay is not prior art no matter how a hypothetical claim might be drafted.

In addition, BSC should be estopped from relying on the Wijay and Brown patents because its own expert testified (in the context of a reexamination proceeding) that neither was prior art. (Appx11308-11312; Appx11081 at 149:7-15; Appx11219 at 87:7-11; Appx11221-11224 at 89:20-92:17; Appx11225-11226 at 93:21-94:21; Appx4110-4112; Appx4115; Appx4125-4126 at ¶¶ 9-12; Appx4068; Appx4074-4083; Appx4060-4061; Appx10823-10827 at ¶¶ 24-33, Appx10828-10830 at ¶¶ 37-39, Appx10831-10833 at ¶¶ 44-47, Appx10859-10860 at ¶¶ 104-105, Appx10873 at ¶ 140, Appx10882-10883 at ¶ 171.)

Finally, Dr. Jang's expert, Mr. Lee, demonstrated that even if all three cited references were deemed prior art, Dr. Jang's hypothetical claims would not

ensnare.  (Appx11312-11316; Appx11056 at 124:2-9; Appx11066-11069 at 134:10-137:18; Appx11075-11078 at 143:9-146:7; Appx11090-11091 at 158:6-159:3; Appx11093 at 161:17-25; Appx11098-11099 at 166:21-167:18.)  The district court did not address any of these points.  Thus, at a minimum, this Court should remand for the district court to conduct further proceedings and complete its unfinished analysis.

### C.    BSC's Ensnarement Challenge Fails As A Matter Of Law.

In fact, no remand is required because BSC's "ensnarement" defense fails on a ground that requires no further factual analysis.  Instead of presuming that the literal claims are valid, and focusing on the incremental claim scope added by equivalents, BSC launched a broadside on the validity of the claims writ large.  This Court has long rejected that use of the ensnarement doctrine, which would circumvent the right to a jury trial on invalidity, the presumption of validity, the clear-and-convincing-evidence standard, and other important legal requirements.

The facts are stark.  Having failed to timely raise ensnarement (*see* pp. 30-35, *supra*), BSC had no ensnarement evidence or expert opinion to present after trial.  Instead, it repackaged the invalidity defense that the district court had excluded before trial.  (Appx11384 at fn. 3; Appx10710 ("BSC identified the prior art on which it will rely [for ensnarement purposes] in Dr. Moore's

November 22, 2013 invalidity report.").)  Citing the same three prior-art references, BSC argued that its expert's ensnarement "opinions were virtually identical to those set forth in his expert report on invalidity" and that "he showed *in the same manner* how Jang's claims covered those prior art references." (Appx11384 at fn. 3 (emphasis added).)  By BSC's own admission, its ensnarement arguments thus rise and fall with its previously excluded validity arguments; that is to say, if the equivalents ensnared the prior art, the literal claims would be invalid for the same reasons.

BSC's purported "ensnarement" challenge would thereby extend this Court's ensnarement doctrine far beyond the boundaries this Court has established.  Although ensnarement requires analysis of the prior art, this Court has repeatedly held that ensnarement "does not require a reassessment of validity."  *Perkin-Elmer Corp. v. Computervision Corp.*, 732 F.2d 888, 900 (Fed. Cir. 1984).  It may not "be a 'camouflaged or back-handed attack' on the validity of the" patent's claims.  *Thomas & Betts Corp.*, 720 F.2d at 1580.

Instead, ensnarement serves a much more limited purpose:  to recognize that the prior art "limits the range of permissible equivalents of a claim."  *Wilson Sporting Goods*, 904 F.2d at 684.  In keeping with that purpose, the only question is whether the broadening effect of the equivalents theory presented at trial would ensnare the prior art, not whether the literal claims also fall within

47

the scope of the prior art.  Anything else would run contrary to this Court's directive that ensnarement "does not envision application of a full-blown patentability analysis to a hypothetical claim."  *Key Mfg. Group*, 925 F.2d at 1449.

That conclusion is also compelled by more general, and fundamental, principles of law.  This Court has long held that the right to a jury trial on validity "is protected by the Seventh Amendment," *Patlex Corp. v. Mossinghoff*, 758 F.2d 594, 603 (Fed. Cir. 1985), but that ensnarement does not implicate the Seventh Amendment because "it has no bearing on the validity of the actual claims."  *DePuy*, 567 F.3d at 1323.  Under BSC's view, however, ensnarement would have everything to do with the validity of the literal claims.  Allowing a party to argue validity to a judge rather than a jury by calling it "ensnarement" would contradict that precedent and violate the Seventh Amendment, which looks to the substance of what is being decided, not how it is labeled.  *See Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 376 (1996).  That constitutional infirmity should be avoided here by reversing, based on this Court's prior holdings that ensnarement cannot simply be invalidity by a different name.  *See Ashwander v. TVA*, 297 U.S. 288, 347 (1936) (Brandeis, J., concurring) (principles of constitutional avoidance).  Holding otherwise on these facts would entirely vitiate those principles.

Reversal is also warranted because BSC's ensnarement challenge would bypass both the statutory presumption of validity, *see* 35 U.S.C. § 282, and the clear-and-convincing evidence standard for proving invalidity, *see Microsoft Corp. v. i4i Ltd. P'ship*, 564 U.S. 91, 95 (2011). The judicially crafted ensnarement doctrine cannot displace the statutory presumption of validity, which is what would happen if an accused infringer could simply present its validity challenge under the guise of ensnarement. This Court's ensnarement jurisprudence "does not . . . in any way undermine the presumed validity of [the] actual patent claims," *Wilson Sporting Goods*, 904 F.2d at 685, precisely because it does not sanction a collateral attack on their validity.

This Court has similarly observed, in the context of literal infringement, that practicing the prior art is no defense because "accused infringers are not free to flout the requirement of proving invalidity by clear and convincing evidence." *Tate Access Floors*, 279 F.3d at 1367. But that is exactly what BSC's improper "ensnarement" challenge intends.

Keeping the ensnarement doctrine within its existing boundaries is especially important in a case like this one, where the defendant (correctly) was not permitted to challenge validity at trial. In a typical infringement action, the jury considers validity of the literal claims, and its presumed underlying findings are controlling for purposes of other issues subsequently decided by the court.

*See Newell Cos., Inc. v. Kenney Mfg. Co.*, 864 F.2d 757, 765 (Fed. Cir. 1988); *cf. Beacon Theatres v. Westover*, 359 U.S. 500, 510-11 (1959). In such a case, the only remaining question for the court at an ensnarement hearing would be whether the incremental claim scope added by equivalents gave rise to any additional patentability issues.

In this case, the jury did not even consider invalidity because the district court correctly precluded BSC from pursuing it. That makes ensnarement even more inappropriate. *See Thomas & Betts Corp.*, 720 F.2d at 1580 ("Where validity in view of the prior art has not been challenged, the court is less free to limit the application of the doctrine of equivalents than where invalidity is specifically urged by the alleged infringer."); *Bendix Corp. v. U.S.*, 600 F.2d 1364, 1374 (Ct. Cl. 1979) (per curiam) (similar).

BSC's ensnarement challenge would also be an end-run around the contractual reasons, based on this Court's precedents, that BSC was precluded from using its 2014 invalidity gambit at trial to escape liability for royalty payments due by 2005. (Appx6091; Appx7570; *see Studiengesellschaft Kohle, M.B.H. v. Shell Oil Co.*, 112 F.3d 1561, 1568 (Fed. Cir. 1997).) Allowing BSC to achieve the same result by dressing up the same untimely and excluded validity challenge as "ensnarement," and using the same prior-art references "in the same manner" (Appx11384 at fn. 3), would be equally improper.

Because BSC's ensnarement challenge was simply a recycled version of its invalidity challenge, rather than one directed solely to the additional scope of equivalents, it fails as a matter of law.  Having defeated BSC's invalidity defense before trial, Dr. Jang should not have had to defeat the same defense again, masquerading as "ensnarement," after winning a jury verdict.

## II.    The District Court Erred In Denying JMOL As To Literal Infringement.

The District Court also erred when it denied Dr. Jang's motion for JMOL on literal infringement.  (Appx23-32.)  Dr. Jang proved literal infringement with undisputed facts.  Because BSC's counter-arguments rest on legally erroneous premises, they cannot support the jury's verdict of literal non-infringement, entitling Dr. Jang to JMOL.  *See, e.g., Callicrate v. Wadsworth Mfg., Inc.*, 427 F.3d 1361, 1372 (Fed. Cir. 2005); *Karlin Tech., Inc. v. Surgical Dynamics, Inc.*, 177 F.3d 968, 975-76 (Fed. Cir. 1999).

### A.    The Express Stent Infringed As A Matter Of Law.

Through the testimony of his experts, Mr. Lee and Dr. Chronos, Dr. Jang established that all elements of claim 1 and claim 8 of the '021 Patent were literally infringed by BSC's Express stents.  (*See supra* 15-20; Appx11340-11344; Appx11626-11635.)  As the District Court recognized, the parties agree that the Express stent's Macro elements meet all limitations of the "expansion strut" and "expansion column" elements.  (Appx24.)  And as a factual matter, no

party disputes the particulars of the physical structure of the Express stent. The only dispute is whether the Micro elements satisfy the "connecting strut" and "connecting strut column" requirements.

The Express stent contains Micro elements to provide flexibility. (Appx11537-11538; Appx103 at col. 8 ll. 45-57.) As shown in the slide below, which was used at trial, the Micro elements contain connecting struts that attach two adjacent Macro elements (expansion columns), which are shown in orange and purple. (Appx8717-8719 at 31:23-33:16.) The Micro elements connect the Macro elements peak-to-peak with distal (yellow) and proximal (green) sections along with a non-parallel intermediate section (pink). (Appx8724-8725 at 38:22-39:22.)



(Appx11653; Appx11647.)

The Micro elements contain multiple such connecting struts (*i.e.*, a plurality) forming a connecting-strut column, as shown in the slide below.

## The Express Stent Infringes Claim 1 of the '021 Patent

### BSC's Express Stent



Exhibit 968



Exhibit 932, BSC 0281569

**Claim Requirement:** "a plurality of the first connecting strut forming a first connecting strut column that couples the first expansion column to the second expansion column"

Michael Lee - 101

(Appx11653; Appx11647; Appx108 at 18:31-43.)

Dr. Jang's literal infringement case thus demonstrated that each of the relevant claim limitations was literally present in the accused product.

### B. The Micro Elements' Status As Connecting-Strut Columns Does Not Depend On Whether They Also Satisfy The Definition Of Another Claim Term.

BSC's principal defense to this evidence is that the Micro elements are expansion columns, and "as a necessary consequence" *cannot be* connecting-strut columns. (Appx11366.) In other words, BSC's position is one of mutual exclusivity: *if* the Micro elements *could be* deemed "expansion columns," then

they *cannot be* "connecting strut columns." *See also, e.g.,* Appx8413-8414 at
78:18-79:11; Appx10570 at 100:16-23, Appx10573 at 103:8-9 ("[T]he micro-
element is an expansion column, and, therefore, there is no infringement.").

As a matter of law, however, the only question for literal infringement is
whether the Micro elements meet the definition of a "connecting strut column."
*Baxter Healthcare Corp. v. Spectramed, Inc.*, 49 F.3d 1575, 1583 (Fed. Cir.
1995). As the district court instructed the jury, the correct inquiry is to
"determine whether every requirement of the claim is included in that product."
(Appx10701.) If the Micro elements satisfy the claim terms of a connecting-
strut column, then they *are* connecting-strut columns for literal infringement
purposes, regardless of whether they might *also* be considered something else
(such as expansion columns). Indeed, it is well-settled that one structure, or
portion of a structure, can satisfy more than one limitation in a patent claim.
*See, e.g., Powell v. Home Depot U.S.A., Inc.*, 663 F.3d 1221, 1231-32 (Fed. Cir.
2011); *Gibbs v. Triumph Trap Co., Inc.*, 26 F.2d 312, 314 (2d Cir. 1928) (L.
Hand, J.); *In Re Kelley*, 305 F.2d 909, 914 (C.C.P.A. 1962).

The district court's JMOL decision did not consider this issue. (Appx25-
28.) The court did not address the case law cited above (which Dr. Jang also
cited in the district court, *see* Appx11395). Instead, the court accepted BSC's
expert testimony that "each microelement formed an expansion column."

(Appx26.)  As explained above, that is not the question; the question instead is whether a Micro element satisfies the limitations of a connecting-strut column.

The district court's further conclusion that the Express stent could not satisfy the non-parallel or "peak-to-peak" requirements of the '021 Patent (Appx27-28) rested on the same erroneous premise and fails for the same reason. The court accepted BSC's reasoning that, "*if the jury believed that the microelement is an expansion column*, then the jury could have reasonably found that the [straight] connecting strut joining it to the macroelement" does not infringe.  *Id.* (emphasis added).  But even if the Micro element could be an expansion column, it was still a connecting-strut column.  And because the Micro element is a connecting-strut column, Express satisfies the "peak-to-peak" requirement, as shown above (pp. 51-54, *supra*).

Earlier in the case, the district court appeared to recognize the error in BSC's logic.  In claim-construction briefing, BSC had argued that the term "connecting strut column" should be construed to include the following:  "a structure that satisfies the definition of an expansion column is not a connecting strut column."  (Appx5012-5013.)  The District Court correctly rejected that proposal. (Appx5014-5016.)

On summary judgment, BSC similarly argued that Express could not infringe because the Micro elements expand, and thus "are 'expansion columns'

under the Court's constructions, not 'connecting strut columns.'"  (Appx6468.)

The district court *again* correctly disagreed, holding that BSC's "entire theory of

noninfringement" was "predicated upon the flawed premise of reading additional

limitations into the claims construed."  (Appx7567 (denying summary

judgment).)

The district court thus got it right the first two times, and should have

reached the same conclusion on JMOL.  *See, e.g., Del Mar Avionics, Inc. v.

Quinton Instrument Co*., 836 F.2d 1320, 1324 (Fed. Cir. 1987) (law-of-the-case

doctrine).  Because BSC's evidence was erroneously directed to whether the

Micro elements could be considered expansion columns, as opposed to whether

they are connecting-strut columns, that evidence cannot support a finding of

non-infringement.  (Appx5012-5016, Appx5019; Appx10697; Appx9336-9338

at 114:24-116:7; Appx9377 at 7:3-21.)

### C.    It Is Legally Irrelevant Whether The Express Stents Contain "Extra Metal" In Addition To The Accused Features.

BSC also argued that the Micro elements were not "connecting strut

columns" because they included "extra metal" – *i.e.*, portions of the Micro

element that Dr. Jang did not rely on to prove infringement.  (*See, e.g*.,

Appx9342-9343 at 120:23-121:8.)  The supposed "extra metal" is depicted in the

BSC demonstrative on page 41, which shows the "expansion columns" in red,

the accused "connecting struts" and "connecting strut columns" in green, and the

so-called "extra metal" in silver.  Those silver portions attach the connecting struts to one another.  BSC's counsel characterized their "extra metal" argument as "the fundamental distinction between the parties' respective analyses"-- Dr. Jang's experts "were willing to disregard [the extra] metal," while BSC relied on it.  (Appx10579 at 109:8-16, Appx10579-10580 at 109:23-110:9.)

Once again, BSC's argument was wrong as a matter of law, and thus insufficient to support the jury verdict.  Even if there were "extra metal" – a point Dr. Jang disputes – its presence would not defeat literal infringement. Claims 1 and 8 are written in "open claiming" form, meaning that they claim a stent "comprising" certain features.  (Appx108 at col. 18 ll. 9-40; Appx109 at col. 19 ll. 1-6.)  "In the parlance of patent law, the transition 'comprising' creates a presumption that the recited elements are only a part of the device, that the claim does not exclude additional, unrecited elements." *Crystal Semiconductor Corp. v. TriTech Microelectronics Intern., Inc.*, 246 F.3d 1336, 1348 (Fed. Cir. 2001).  Thus, an accused device infringes if it includes the recited elements, regardless of whether it also includes additional elements and features.  *E.g., Free Motion Fitness, Inc. v. Cybex Int'l, Inc*., 423 F.3d 1343, 1347 (Fed. Cir. 2005); *Collegenet, Inc. v. ApplyYourself, Inc*., 418 F.3d 1225, 1235 (Fed. Cir. 2005).  The district court correctly instructed the jury on this point:  "A patent claim that uses the term 'comprising' is infringed as long as

every element of the claim is present in the accused Express stent.  One cannot avoid infringement merely by adding elements if each element recited in the claim is found in the accused device."  (Appx10701.)  BSC's contrary argument to the jury was legally erroneous.

Indeed, this Court has already rejected BSC's argument.  On the appeal from the district court's first claim-construction order, BSC argued that the connecting struts must be "unattached" – *i.e.*, could not be connected by any extra metal – but this Court refused to read this negative limitation into the claim.  "[T]he specifications do not require the connecting struts to be unattached," and "the connecting strut column can perform [its] function whether the connecting struts are attached to one another or not."  *Jang*, 493 F. App'x at 77.

In denying JMOL, the district court stated that "BSC did not claim that the 'extra metal' in the Express stent constituted a separate defense of non-infringement, but rather that Dr. Jang's characterization of the Express stent ignored significant structural features of the microelement."  (Appx30.)  There is no difference between those two characterizations of the argument.  Whether or not the additional features are called "significant structural features," they are additional, unclaimed features, and thus irrelevant to the literal infringement analysis.

### D.  BSC Is Taking Inconsistent Positions For Purposes Of Literal Infringement And Ensnarement.

Finally, this Court should not permit BSC to continue to espouse diametrically opposed positions, as it did in the district court.  For purposes of literal infringement, BSC argued that the Micro element's "extra metal" defeats infringement because "'comprising' is not a weasel word." (Appx11346.)  But when Dr. Jang proposed a hypothetical claim that added the words "at least" to account for BSC's extra-metal argument, BSC argued the claim was not broadening because "the addition of the words 'at least' to one of the claim elements . . . has *precisely the same effect* as the Court's instruction to the jury regarding the word 'comprising' . . . ." (Appx11270 (emphasis in original); *see also* Section I.B.2, *supra*.)  Doctrines like judicial estoppel exist to prevent precisely such duplicity, and BSC should not be allowed to have it both ways.

At a bare minimum, this Court should remand for a new trial on literal infringement that is not infected by BSC's legally erroneous and inconsistent positions.  (Appx11354-11360; Appx11400-11403.)  A new trial is warranted where, *inter alia,* the verdict is against the clear weight of the evidence or to prevent a miscarriage of justice.  *Wordtech*, 609 F.3d at 1313.

Here, the clear weight of the evidence supported Dr. Jang's position, whereas BSC relied on legally erroneous and even inconsistent premises.  On this record, allowing the verdict on literal infringement to stand would be a

miscarriage of justice, and the district court abused its discretion in denying Dr. Jang's alternative motion for a new trial on literal infringement.

## **CONCLUSION**

For the foregoing reasons, Dr. Jang respectfully requests that this Court reverse the judgment of the district court and remand for the entry of judgment in his favor or, in the alternative, for further proceedings as to ensnarement and/or a new trial on literal infringement.

Dated: May 23, 2016                    Respectfully submitted,


                                       */s/ Jed I. Bergman*_____
                                       Jed I. Bergman
                                       KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
                                       1633 Broadway
                                       New York, NY 10019
                                       Tel: (212) 506-1700

                                       Daryl L. Joseffer
                                       KING & SPALDING LLP
                                       1700 Pennsylvania Ave., NW
                                       Washington, DC 20006
                                       Tel: (202) 737-0500

                                       Jeffrey J. Toney
                                       KASOWITZ, BENSON, TORRES &
                                       FRIEDMAN LLP
                                       1349 West Peachtree Street, NW Ste. 1500
                                       Atlanta, GA 30309
                                       Tel: (404) 260-6080

                                       Jonathan K. Waldrop
                                       Darcy L. Jones
                                       KASOWITZ, BENSON, TORRES &
                                       FRIEDMAN LLP
                                       333 Twin Dolphin Drive, Ste. 200
                                       Redwood Shores, CA 94065
                                       Tel: (650) 453-5170

                                       Adam M. Conrad
                                       KING & SPALDING LLP
                                       100 N. Tryon St., Ste. 3900
                                       Charlotte, NC 28202
                                       Tel: (704) 503-2600

                                       *Attorneys for Plaintiff-Appellant G. David Jang,*
                                       *M.D.*

## ADDENDUM

| Page | Description | Basis for Inclusion |
|---|---|---|
| Appx1 - Appx5 | Final Judgment | Fed. Cir. R. 28(a)(11) |
| Appx6 - Appx19 | Order Granting Judgment in Favor of Defendants | Fed. Cir. R. 28(a)(11) |
| Appx20 - Appx36 | Order Denying Motion for Judgment as a Matter of Law and New Trial (Doc. No. 726); Denying Motion to Strike | Appx20 - Appx36 |
| Appx72 - Appx114 | U.S. Patent No. 5,922,021 to Jang [Trial Exhibit 901] | Fed. Cir. R. 28(a)(11) |

JS-6

**United States District Court**
**Central District of California**
**Eastern Division**

G. David Jang, M.D.,

                    Plaintiff,

          v.

Boston Scientific Corporation, et.
al.,

                    Defendants.

EDCV 05-00426-VAP (MRWx)

**Final Judgment**

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

This action came on regularly for trial on June 23, 2015, in Courtroom 2 of the above entitled Court, the Honorable Virginia A. Phillips, United States District Judge presiding. Plaintiff G. David Jang appeared by his attorneys Kasowitz, Benson, Torres & Friedman LLP by Jeffrey J. Toney, Jonathan K. Waldrop, Darcy L. Jones, Jed I. Bergman, and Heather S. Kim. Defendants Boston Scientific Corporation and Scimed Life Systems, Inc. (collectively, "BSC") appeared by their attorneys Arnold & Porter LLP, by Matthew M. Wolf, John E. Nilsson, Edward Han, Amie L. Medley, Allen Secretov, Robert P. Watkins, III, and Sara P. Zogg.

A jury of seven persons was regularly impaneled and sworn to try the action. Witnesses were sworn and testified.

1

United States District Court
Central District of California

On July 7, 2015, after hearing the evidence, the arguments of counsel, and the instructions given to the jury on Plaintiff's patent infringement claims, the jury retired to consider its verdict, and on July 8, 2015, returned its verdict by way of answers to the questions propounded to it, as follows:

**Question No. 1:**  Has Dr. Jang proven, by a preponderance of the evidence (*i.e.*, that it is more likely than not), that the Express stent literally infringes claim 1 of U.S. Patent 5,922,021 (*i.e.*, literally includes each and every requirement of claim 1)?

YES  \_\_\_\_\_               NO   \_\_X\_\_

If you answer "YES" to Question No. 1, skip to Question No. 3.

If you answer "NO" to Question No. 1, proceed to Question No. 2.

**Question No. 2:**  For any requirements of claim 1 of U.S. Patent 5,922,021 that are not literally infringed, has Dr. Jang proven, by a preponderance of the evidence (*i.e.*, that it is more likely than not), that the Express stent meets the requirement(s) under the doctrine of equivalents?

YES   \_\_X\_\_               NO   \_\_\_\_\_

If you answer "YES" to Question No. 2, proceed to Question No. 3.

If you answer "NO" to Question No. 2, STOP.  You have completed your deliberations.

2

United States District Court
Central District of California

**Question No. 3:** Has Dr. Jang proven, by a preponderance of the evidence (*i.e.*, that it is more likely than not), that the Express stent literally infringes claim 8 of U.S. Patent 5,922,021 (*i.e.*, literally includes each and every limitation of claim 1 <u>and</u> claim 8)?

YES  ＿＿＿＿  NO  ＿X＿＿

If you answer "YES" to Question No. 3, skip to Question No. 5.

If you answer "NO" to Question No. 3, proceed to Question No. 4.


**Question No. 4:** For any requirements of claim 8 of U.S. Patent 5,922,021 that are not literally infringed, has Dr. Jang proven, by a preponderance of the evidence (*i.e.*, that it is more likely than not), that the Express stent meets the requirement(s) under the doctrine of equivalents?

YES  ＿X＿＿  NO  ＿＿＿＿


If you answer "YES" to Question No. 4, proceed to Question No. 5.

If you answer "NO" to Question No. 4, STOP.  You have completed your deliberations.


**Question No. 5:** Has Dr. Jang proven, by a preponderance of the evidence (*i.e.*, that it is more likely than not), that he performed all of his obligations under the Assignment Agreement?

YES  ＿X＿＿  NO  ＿＿＿＿

If you answer "YES" to Question No. 5, proceed to Question No. 6.

If you answer "NO" to Question No. 5, STOP.  You have completed your deliberations.

3

**Question No. 6:** Has Dr. Jang proven, by a preponderance of the evidence (*i.e.*, that it is more likely than not), that BSC breached its obligations under the Assignment Agreement by failing to make required payments to Dr. Jang?

YES    __X__          NO    _____

    The Presiding Juror should now sign and date the verdict form in the spaces below and notify the bailiff that you have reached a verdict. The Presiding Juror should retain possession of the verdict form and bring it when the jury is brought back into the courtroom.

DATED: <u>July 8</u>, 2015                   By: _____/s/_____

                                              Presiding Juror

United States District Court
Central District of California

4

On September 29, 2015, the Court issued its Order Granting Judgment in Favor of Defendants (Doc. No. 712), finding BSC's Express stents do not infringe Claims 1 and 8 of U.S. Patent 5,922,021 under the doctrine of equivalents.

**NOW, THEREFORE, IT IS ADJUDGED, ORDERED AND DECREED THAT:**

Judgment be entered in favor of Defendants.

Dated:   October 30, 2015

*Virginia A. Phillips*

_____
Hon. Virginia A. Phillips
United States District Judge

United States District Court
Central District of California

5

1

2

3                                          O

4

5

6

7

8                UNITED STATES DISTRICT COURT

9               CENTRAL DISTRICT OF CALIFORNIA

10

11  G. DAVID JANG, M.D.,        )    Case No. EDCV 05-426-
                                )    VAP(MRWx)
12                Plaintiff,    )
                                )    **ORDER GRANTING JUDGMENT IN**
13       v.                     )    **FAVOR OF DEFENDANTS**
                                )
14  BOSTON SCIENTIFIC           )
    CORPORATION, a Delaware     )
15  corporation; SCIMED LIFE    )
    SYSTEMS, INC., a            )
16  Minnesota corporation,      )
                                )
17                Defendants.   )
    _____)
18

19

20       On July 8, 2015, a duly-empaneled jury in this case

21  delivered its special verdict. The jury found in favor of

22  Defendants Boston Scientific Corporation and Scimed Life

23  Systems, Inc., (collectively, "BSC"), and against

24  Plaintiff G. David Jang, M.D ("Dr. Jang") on the

25  interrogatories inquiring whether Defendant's Express

26  stents literally infringed Claims 1 and 8 of U.S. Patent

27  5,922,021 ("the '021 Patent").  The jury found in favor

28  of Dr. Jang and against BSC on interrogatories inquiring

1   whether the Express stents infringed Claims 1 and 8 of
2   the '021 Patent under the doctrine of equivalents.  (<u>See</u>
3   Doc. No. 661.)

5       Following the jury's findings in favor of Dr. Jang
6   under the doctrine of equivalents, the Court set an
7   evidentiary hearing concerning the ensnarement defense,
8   pursuant to <u>DePuy Spine, Inc. v. Medtronic Sofamor Danek,</u>
9   <u>Inc.</u>, 567 F.3d 1314 (Fed. Cir. 2009).  On August 18,
10  2015, the Court conducted that evidentiary hearing.  (<u>See</u>
11  Doc. No. 711.)  In lieu of closing arguments, the Court
12  directed the parties to submit closing briefs, which were
13  filed on August 25, 2015.  (<u>See</u> Doc. No. 708 ("Defs.'
14  Br."); Doc. No. 710 ("Pl.'s Br.").)  Having considered
15  the evidence and arguments presented at the hearing and
16  the written submissions, the Court rules as follows.

18                    **I.  BACKGROUND**
19      "Ensnarement bars a patentee from asserting a scope
20  of equivalency that would encompass, or 'ensnare,' the
21  prior art."[1]  <u>DePuy</u>, 567 F.3d at 1322 (citing <u>Wilson</u>

---

24      [1] Though the defense of ensnarement was not a theory
    that was explicitly enumerated by the Supreme Court in
25  <u>Warner-Jenkinson</u> as a legal limitation on the doctrine of
    equivalents, the Federal Circuit analogized the defense
    of ensnarement to prosecution history estoppel in <u>DePuy</u>.
26  <u>DePuy</u>, 567 F.3d at 1323 ("Although <u>Warner-Jenkinson</u> did
    not explicitly mention 'ensnarement' as one of the
27  'various legal limitations on the application of the
    doctrine of equivalents' to be decided by a court, we
28  have consistently treated it as such.").

                              2

1 <u>Sporting Goods Co. v. David Geoffrey & Assoc.</u>, 904 F.2d
2 677, 683 (Fed. Cir. 1990), <u>overruled in part on other</u>
3 <u>grounds</u>, <u>Cardinal Chem. Co. v. Morton Int'l, Inc.</u>, 508
4 U.S. 83, 92 n.12 (1993)).  The defense of ensnarement is
5 one of various "legal limitations on the application of
6 the doctrine of equivalents." <u>Id.</u> at 1323 (quoting
7 <u>Warner-Jenkinson Co., Inc. v. Hilton Davis Chem. Co.</u>, 520
8 U.S. 17, 39 n.8 (1997)).  Ensnarement is a legal
9 limitation that is decided by the court, either on a
10 motion for partial summary judgment, or a motion for
11 judgment as a matter of law at the close of evidence and
12 after the jury verdict. <u>Id.</u>
13
14     Once a patentee invokes a theory of infringement
15 under the doctrine of equivalents and the alleged
16 infringer has raised an ensnarement defense, the initial
17 burden rests on the alleged infringer to present "prior
18 art which shows that the asserted range of equivalence
19 would encompass the prior art . . . ." <u>Streamfeeder, LLC</u>
20 <u>v. Sure-Feed Sys., Inc.</u>, 175 F.3d 974, 983 (Fed. Cir.
21 1999).  After the infringer satisfies this burden, the
22 burden then shifts to the patentee "to show that [his]
23 claim does not cover the prior art." <u>Id.</u>; <u>see also</u>
24 <u>DePuy</u>, 567 F.3d at 1324 ("The burden of persuasion is on
25 the patentee to establish that the asserted scope of
26 equivalency would not ensnare prior art.").  Where a jury
27 has been empaneled as a finder of fact and has rendered
28

3

1  its decision, the court is to "presume that the jury
2  resolved underlying evidentiary conflicts in [patentee's]
3  favor [given that it prevailed at trial under the
4  doctrine of equivalents]."  Wilson Sporting Goods, 904
5  F.2d at 684.

6

7  **II. BSC DID NOT WAIVE ITS RIGHT TO RAISE ENSNAREMENT**

8      In Dr. Jang's opening brief filed before the
9  ensnarement hearing, he argued that BSC's ensnarement
10  defense should be stricken because it was pled
11  insufficiently, and therefore BSC had not met its initial
12  burden of presenting prior art.  (Doc. No. 686.)  BSC
13  countered by arguing that ensnarement is not an
14  affirmative defense that can be "waived" in the
15  traditional sense, but instead "is a limitation that
16  always governs the possible range of equivalents that a
17  patentee may claim."  (Doc. No. 684.)  In addition to
18  raising this issue in the opening briefs, the parties
19  also made arguments with respect to waiver during the
20  ensnarement hearing, as well as in their closing briefs.

21

22      The Court rejects BSC's contention that the defense
23  of ensnarement cannot be waived.  In Fiskars, Inc. v.
24  Hunt Mfg. Co., 221 F.3d 1318 (Fed. Cir. 2000), the
25  Federal Circuit disallowed an ensnarement defense where
26  the accused infringer "did not allege that its device is
27  in the prior art, or that a hypothetical claim covering
28

4

1  its device would be unpatentable."  221 F.3d at 1323.  As

2  the alleged infringer had not met its initial burden to

3  present prior art, "there was nothing for [the patentee]

4  to rebut."  Id.

5

6      In connection with the analogous defense of

7  prosecution history estoppel, the Federal Circuit also

8  has held that an alleged infringer's failure "to timely

9  argue and support its prosecution history estoppel

10  defense in district court" constituted a waiver of that

11  argument. Yeu v. Kim, 904 F.2d 44, at *1 (Fed. Cir. 1990)

12  (Table); see also Teva Pharm. USA, Inc. v. Sandoz, Inc.,

13  876 F. Supp. 2d 295, 347 (S.D.N.Y. 2012) rev'd in part on

14  other grounds, 723 F.3d 1363 (Fed. Cir. 2013) (declining

15  to consider a prosecution history estoppel defense where

16  the alleged infringer "waited until after trial to raise

17  this defense.").  Thus, an alleged infringer's leeway to

18  assert an ensnarement defense is not unlimited, and

19  certainly must be advanced prior to trial.[2]

20

21  ────────────────
    [2] The Federal Circuit has not held that ensnarement
22  is an affirmative defense that a party must raise at any
    particular stage of the proceedings. See Pac. Coast
23  Marine Windshields Ltd. v. Malibu Boats, LLC, 739 F.3d
    694, 702 (Fed. Cir. 2014) (assuming for purposes of
24  argument that the analogous theory of prosecution history
    estoppel was an affirmative defense, but that it did not
25  need to be raised in the defendant's answer).  District
    courts also have not reached consensus on the issue.  See
26  Deep9 Corp. v. Barnes & Noble, Inc., 772 F. Supp. 2d
    1349, 1351 (W.D. Wash. 2011) (striking affirmative
27  defense of prosecution history estoppel because it was
    not an affirmative defense, but allowing defendant to
28  raise it later in the case).

5

1    The record in this case abounds with accusations of
2    tardiness by both sides: BSC claims Dr. Jang did not
3    raise timely his theory of infringement under the
4    doctrine of equivalents, and Dr. Jang argues BSC failed
5    to disclose its ensnarement defense in a timely fashion.
6    Though the Court has considered the parties' respective
7    arguments, it declines to reverse its prior ruling, _i.e._,
8    that Dr. Jang's theory of infringement under the doctrine
9    of equivalents was raised timely, and was properly before
10   the jury.[3]  The Court also declines to find that BSC
11   failed to respond timely with its assertion of the
12   ensnarement defense.
13
14   Even assuming, without deciding, that BSC raised the
15   ensnarement defense for the first time after the Court
16   denied the defense's motion for summary judgment in 2014,
17   BSC raised its contention that Dr. Jang's construction of
18   the claim terms ensnared the prior art when it filed its
19   _in limine_ motions.[4]  Ensnarement can be raised after a
20   court has heard summary judgment motions.  See Juniper
21   Networks, Inc. v. Palo Alto Networks, Inc., 15 F. Supp.

---

23       [3] Indeed, the Court held as much in response to BSC's
     motion _in limine_ concerning this issue.  (See Motion in
24   Limine Order (Doc. No. 554) at 12-13.)

25       [4] In fact, BSC filed a motion _in limine_ seeking to
     preclude Dr. Jang's theory under the doctrine of
26   equivalents and filed its memorandum of contentions of
     fact and law stating that "the doctrine of equivalents
27   may not be used to capture what was in the prior art,"
     _before_ the Court ruled on its motion for summary
28   judgment.  (See Doc. Nos. 491, 498.)

6

3d 499, 518 n.18 (D. Del. 2014) (denying summary judgment
and stating that if the accused infringer wished to move
forward with an ensnarement defense, "it [would] need to
provide the court with a proffer before trial.").

The Court finds that BSC's references to the Lau,
Brown, and Wijay patents in its motion in limine
regarding the doctrine of equivalents and its pretrial
memorandum are sufficient to "go[] forward" with its
ensnarement defense. See Streamfeeder, 175 F.3d at 983.
Accordingly, the burden now shifts to Dr. Jang
"to show that [his] claim does not cover the prior art."
Id.

## III. DR. JANG'S HYPOTHETICAL CLAIMS ARE IMPROPER

At the ensnarement hearing BSC argued that, as a
threshold matter, Dr. Jang cannot meet his burden of
showing that the claims of the '021 patent, as construed
by the court, did not cover the prior art because his
hypothetical claims violated principles espoused in
Streamfeeder and Int'l Visual Corp. v. Crown Metal Mfg.
Co., 991 F.2d 768 (Fed. Cir. 1993). (Ensnarement Hearing
A.M. Tr. at 70:25-71:15.)

While "[s]light broadening is permitted" during the
drafting of a hypothetical claim, the "[h]ypothetical
claim analysis . . . cannot be used to redraft granted

7

claims in litigation by narrowing and broadening a claim at the same time." Streamfeeder, 175 F.3d at 983.  This is because "[w]holesale redrafting of granted claims during litigation by narrowing and expanding the claims at the same time in creating a hypothetical claim is not supported by [Federal Circuit] case law and it avoids the examination process." Id.  Thus, a "hypothetical claim is only a device for limited, not substantial, inclusion of unclaimed subject matter and not for exclusion of unduly limiting subject matter." Ultra-Tex Surfaces, Inc. v. Hill Bros. Chem. Co., 204 F.3d 1360, 1366 (Fed. Cir. 2000).

Moreover, as explained by the Federal Circuit in Int'l Visual, where a patentee asserts claims under the doctrine of equivalents, he must put forward a hypothetical claim that is broader than the patented claim.  911 F.2d at 772 (analysis under the doctrine of equivalents "requires a court to visualize a hypothetical claim that enlarges the scope of an issued claim so that it literally covers an accused device and to determine whether that hypothetical claim would have been patentable over the prior art."); see also Wilson Sporting Goods, 904 F.2d at 685 ("The specific question before us, then, is whether [the patentee] has proved that a hypothetical claim, similar to claim 1 but broad

8

1  enough to literally cover [the accused infringer's

2  product], could have been patentable.").

3

4     Dr. Jang has advanced two hypothetical claims, which

5  the parties have referred to as hypothetical claims three

6  and five.  The Court discusses each in turn.

7

8     **1.   Hypothetical Claim Three Impermissibly Narrows**

9          **the Claim**

10  Dr. Jang's hypothetical claim three reads:

11

12     the first connecting strut ~~intermediate section~~

13     ~~being non-parallel to the first connecting strut~~

14     ~~proximal and distal sections~~ **column configured**

15     **to provide increased flexibility compared to the**

16     **first and second expansion columns**

17

18     BSC contends this hypothetical claim broadens the

19  original claim by eliminating the requirement regarding

20  the location of the intermediate section, while

21  simultaneously narrowing the claim by adding a

22  requirement of increased flexibility.  (Defs.' Br. 3-4.)

23  BSC's expert witness Dr. Moore testified that, because

24  there was nothing in the relevant sections of the

25  original claims that provided for flexibility in this

26  manner, this new requirement of flexibility in

27  hypothetical claim three "narrows the claim down relative

28

9

1  to the case where it could be stiffer."  (Ensnarement
2  Hearing P.M. Tr. at 65:1-2.)  On cross-examination, Dr.
3  Jang's expert Mr. Lee admitted that the addition of the
4  language concerning flexibility in the hypothetical claim
5  three would narrow the original claims of the patent to
6  exclude prior art.  (Id. at 12:1-4.)
7
8  　　Dr. Jang counters this argument by contending that
9  the flexibility limitation does not narrow the claim, but
10 "instead replaces a limitation in a specific way" thereby
11 broadening the claim.  (Pl.'s Br. at 10.)  Dr. Jang also
12 argues that Streamfeeder is inapplicable here, because
13 the Streamfeeder court found that it was impermissible
14 only to alter two limitations (one narrowing, one
15 broadening) to add requirements not present in the prior
16 art.  (Id.)  Thus, Dr. Jang argues, Streamfeeder "does
17 not prohibit 'narrowing' per se, but the addition of
18 separate modifications that narrow the claim."  (Id.)
19
20 　　The Court disagrees that Streamfeeder prohibits only
21 a hypothetical claim that simultaneously broadens and
22 narrows an original claim, or that it allows for some
23 amount of narrowing.  (Id. at 10-11.)  As explained in
24 Streamfeeder, and in Ultra-Tex, a case relying on
25 Streamfeeder, a hypothetical claim that narrows the
26 original claim in any way is impermissible.  See
27 Streamfeeder, 175 F.3d at 983; Ultra-Tex, 204 F.3d at
28

10

1366 (forbidding a patentee from using a "hypothetical
analysis to 'freely redraft' its claim by impermissibly
broadening and narrowing it at the same time."); <u>see also</u>
2 Annotated Patent Digest § 13:75.

    Moreover, the Court also disagrees that the addition
of the language concerning flexibility actually broadens
the language of the original claim.  (Pl.'s Br. at 11.)
As Dr. Moore explained, the original claim here did not
describe a connecting strut being more flexible than the
expansion columns.  Thus, the addition of a flexibility
limitation is a narrowing of the claim, thereby
preventing the hypothetical claim from covering products
that allow the expansion columns to be stiff, rather than
flexible.

    Accordingly, as Dr. Jang's proposed hypothetical
Claim Three improperly narrows the claims of the original
patent, it is impermissible in light of <u>Streamfeeder</u> and
must be rejected.

11

## 2. **Hypothetical Claim Five Impermissibly Fails to Broaden the Claim**

Dr. Jang's hypothetical Claim Five reads:

> a first connecting strut including **at least** a first connecting strut proximal section, a first connecting strut distal section and a first connecting strut intermediate section . . .

BSC argues that the sole addition of "at least" to the language of hypothetical claim five is impermissible because it fails to broaden the claims of the original patent, thereby "resulting in a hypothetical claim of exactly the same scope as the original claims." (Defs.' Br. at 5.)  This is because the supposedly broadened hypothetical claim "does not remove any of the requirements of [claims of the original patent]," and thus, in other words, "[i]t contains all of the same elements, in exactly the same form, as the original claims . . . ."  (Id. at 6.)

Dr. Jang contends that hypothetical claim five is broader because it "clarifies that the connecting strut, like the Micro elements, may have additional 'metal.'" (Pl.'s Br. at 13.)

12

1    As noted above, <u>Int'l Visual</u> requires the court to
2  "visualize a hypothetical claim that enlarges the scope
3  of an issued claim so that it literally covers an accused
4  device and to determine whether that hypothetical claim
5  would have been patentable over the prior art."  991 F.2d
6  at 772.  Thus, it follows that if the patentee's
7  hypothetical claim does not enlarge the scope of the
8  original claim, the hypothetical claim must be rejected.
9
10    The Court agrees with BSC that the language of
11  hypothetical claim five does not broaden the language of
12  any claim of the original patent, as it does not remove
13  any requirement of those claims; indeed, adding "at
14  least" in the context of the claim language does not
15  broaden it at all.  As BSC argues, even with this
16  addition, the hypothetical claim still "contains all of
17  the same elements, in exactly the same form, as the
18  original claims . . . ."  (Defs.' Br. at 6.)
19
20    Accordingly, as Dr. Jang's proposed hypothetical
21  claim five fails to broaden original claims of the
22  patent, it is impermissible in light of <u>Int'l Visual</u> and
23  must be rejected.
24
25              **IV. CONCLUSION**
26    For the foregoing reasons stated, the Court finds BSC
27  is entitled to entry of judgment in its favor and against
28

13

1 Dr. Jang on the claims that the Express stents infringed
2 Claims 1 and 8 of the '021 Patent under the doctrine of
3 equivalents. The jury having rendered its verdict on the
4 special interrogatories on the theory of liability for
5 literal infringement in favor of BSC, BSC therefore is
6 entitled to a final judgment in its favor on all claims,
7 and shall submit a Proposed Judgment.

8

9

10 Dated: <u>September 29, 2015</u>

             VIRGINIA A. PHILLIPS
11         United States District Judge

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

14

**United States District Court**
**Central District of California**
**Eastern Division**

G David Jang MD,

                     Plaintiff,

      v.

Boston Scientific Corporation, et
al.,

                  Defendants.

EDCV 05-426-VAP (MRWx)

**Order Denying Motion for Judgment as a Matter of Law and New Trial (Doc. No. 726); Denying Motion to Strike (Doc. No. 733)**

On November 25, 2015, Plaintiff Dr. G. David Jang, M.D. ("Dr. Jang") filed a motion for Judgment as a Matter of Law and New Trial. (Doc. No. 726 ("Mot.").) On December 10, 2015, Defendants Boston Scientific Corporation and Scimed Life Systems, Inc. (collectively, "BSC") filed an opposition. (Doc. No. 730 ("Opp.").) Dr. Jang filed a reply on January 15, 2016. (Doc. No. 738.) BSC filed a Motion to Strike Dr. Jang's post-trial motions on December 23, 2015. (Doc. No. 733.)[1] On February 1, 2016, the court held a hearing and the parties submitted on their filings. After considering the papers filed in support of, and in opposition to, the Motion, the Court DENIES the Motion.

---

[1] The Court considered the papers filed in support of, and in opposition to, Defendants' Motion to Strike Plaintiff's Post-Trial Motions for Failure to Comply with Local Rule 7-3. The Court finds that Dr. Jang satisfied the spirit of the "meet and confer" requirement and that BSC was not prejudiced by any technical violation of the Rule. Thus, the Court DENIES the Motion.

1

## I. BACKGROUND

Dr. Jang is the inventor of certain coronary stents. The United States Patent and Trademark Office issued U.S. Patent No. 5,922,021 (the "'021 Patent") to Dr. Jang on July 19, 1999.  Dr. Jang and BSC entered into an agreement whereby Dr. Jang assigned his rights to the '021 Patent to BSC for monetary compensation if BSC used the '021 Patent to produce products commercially.  Dr. Jang alleges BSC breached the agreement by failing to compensate him for products it sold that were "covered by" the '021 Patent and instead paid him only a non-commercialization payment.

On July 8, 2015, a duly-empaneled jury in this case delivered its special verdict. The jury found in favor of BSC and against Dr. Jang on the interrogatories inquiring whether Defendant's Express stent literally infringed claims 1 and 8 of the '021 Patent.  The jury found in favor of Dr. Jang and against BSC on interrogatories inquiring whether the Express stent infringed claims 1 and 8 of the '021 Patent under the doctrine of equivalents. (See Doc. No. 661.)

Following the jury's findings in favor of Dr. Jang under the doctrine of equivalents, the Court conducted an evidentiary hearing concerning the ensnarement defense, pursuant to DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc., 567 F.3d 1314 (Fed. Cir. 2009).

On September 29, 2015, the Court found that BSC was entitled to entry of judgment in its favor and against Dr. Jang on the claims that the Express stent infringed claims 1 and 8 of the '021 Patent under the doctrine

2

of equivalents.  (See Doc. No. 712.)  The jury having rendered its verdict on the special interrogatories on the theory of liability for literal infringement in favor of BSC, BSC therefore was entitled to a final judgment in its favor on all claims.  On October 30, 2015, final judgment was entered in favor of BSC.  (Doc. No. 720.)

## II.    DISCUSSION

### A.   Judgment as a Matter of Law

#### 1. Legal Standard

Federal Rule of Civil Procedure 50 governs motions for judgment as a matter of law. Subsection (a) of the Rule states:

> If, during a trial by jury, a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue, the court may determine the issue against that party and may grant a motion for judgment as a matter of law against that party with respect to a claim or defense that cannot under the controlling law be maintained or defeated without a favorable finding on that issue.

Fed. R. Civ. Pro. 50(a)(1).

The standard for granting judgment as a matter of law is analogous to the standard for summary judgment.  Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000).  In reviewing all of the evidence in the record, "[t]he court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence."  Id.  The court "must disregard all evidence favorable to the

3

moving party that the jury is not required to believe." Id. at 151. In addition, "the court should give credence to the evidence favoring the nonmovant as well as that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that the evidence comes from disinterested witnesses." Id. (citing Anderson v. Liberty Lobby, 477 U.S. 242, 255 (1986)).

"JMOL in favor of a party is properly granted in the context of literal infringement if no reasonable jury could determine that every limitation recited in the properly construed claim is not, or is, found in the accused device." Karlin Tech., Inc. v. Surgical Dynamics, Inc., 177 F.3d 968, 974 (Fed. Cir. 1999).

## 2. Could a reasonable jury find that the Express stent's macro and micro elements did not literally infringe the required limitations of the '021 Patent?

Dr. Jang claims that the Express stent's macro and micro elements literally infringe the expansion and connecting column limitations in the '021 Patent. In order for the Court to grant Dr. Jang's motion for JMOL, it must find that there was no legally sufficient evidentiary basis for a reasonable jury to find that the Express stent did not literally infringe every limitation in the asserted claims of the '021 Patent. Southwall Tech., Inc. v. Cardinal IG Co., 54 F.3d 1570, 1575 (Fed. Cir. 1995). Accordingly, the Court reviews the evidence presented at trial related to the asserted claims of infringement.

4

### a. Macroelements and Expansion Strut Columns

At trial, Dr. Jang presented expert testimony that the macroelements
in the accused Express stent infringe the expansion column requirements
and all related requirements of claim 1 and claim 8 of the '021 Patent. Mr.
Lee, one of Dr. Jang's expert witnesses, testified that the Express stent's
first macroelement includes a plurality of first expansion strut pairs forming a
first expansion column, and similarly, that the Express stent's second
macroelement meets the second expansion column requirement of the '021
Patent. (See, e.g., June 25, 2015, PM Session, Trial Tr. at 32:2-3 (Lee); id.
at 32:23-33:6 (Lee); id. at 34:18-23 (Lee); id. at 36:22-25 (Lee); id. at 37:2-
22 (Lee); id. at 38:9-16 (Lee).)

At trial, Dr. Moore, BSC's expert witness, acknowledged that the
Express stent's macroelement meets all the limitations in the '021 Patent.
(See, e.g., June 30, 2015, PM Session, Trial Tr. at 7:3-21 ("Before we broke
for lunch, I talked about the macroelement of the Express stents and how
those form expansion columns, and, again, no one disagrees with that.");
June 26, 2015, Trial Tr. at 169:3-12 (Chronos) ("[Dr. Moore] doesn't dispute
anything about the macroelements. He agrees there are macroelements
there. He doesn't agree that the microelements are connecting struts. . . .
Dr. Moore suggests that the macroelements and microelements are all
expansion struts, and he seems to agree with the rest of the features of the
claims.").) BSC does not dispute in its opposition that the Express stent's
macroelement meets the expansion strut, expansion column, and related
limitations of claim 1 and claim 8 of the '021 Patent.

5

### b. Microelements and Connecting Strut Columns

Dr. Jang and BSC dispute whether the Express stent's microelement infringes the connecting column requirement of the '021 Patent.  Dr. Jang argues that the evidence presented at trial conclusively demonstrated that the Express stent's microelement infringes the '021 Patent. (Mot. at 5.) BSC argues that it presented substantial evidence at trial to support the jury's verdict of no literal infringement, and that Jang's evidence was conclusively rebutted by Dr. Moore, who explained that the microelement of the Express stent, like the macroelement, met the Court's definition of an expansion column, rather than a connecting column.  (Opp. at 2.)

At trial, both of Dr. Jang's experts, Dr. Chronos and Mr. Lee, testified that the Express stent literally includes all connecting strut, connecting strut column, and related requirements of claim 1 of the '021 Patent.  (See, e.g., June 25, 2015, PM Session, Trial Tr. at 39:10-18 (Lee) ("So, 'a first connecting strut including a first connecting strut proximal section,' . . . [t]hose items are all there. We see in the right picture, again, in the Express stent, again, yellow, green, and pink for those three sections."); June 26, 2015, Trial Tr. at 169:13-23 (Chronos) ("it is very clear that the connecting strut – oh, that the micro-element, as outlined in all the materials that Boston Scientific provides us, both its clinicians and in this case, are basically – those micro-element characteristics are the three-part connector with the offset and the proximal, mid, and distal piece.").)

While Mr. Lee repeatedly testified that he believed the microelement infringed the connecting column requirement in the '021 Patent, he did,

6

during cross-examination, acknowledge that there was a possibility that the
Express stent's microelement could be defined and identified as an
expansion strut pair.  (June 16, 2015, AM Session, Trial Tr. At 32-33 (Lee)
("The answer is, maybe it [microelement] could be an expansion strut pair.
In the right context, it could be an expansion strut pair.").)  Similarly, Dr.
Chronos testified that the Express stent's macro and micro elements expand
in the same way, and that the jury could find that the microelement is an
expansion column and not a connecting column.  (June 30, 2015, AM
Session, Trial Tr. At 38-39 (Chronos) ("They [microelements] probably open
up in length and then expand, yes."); id. at 56 ("Q: If the jury were to find
that the image on the upper left is an expansion strut pair, then the micro-
elements would be an expansion column under the Court's construction;
isn't that right?  A: If the jury were to find that way and ignore all the
evidence about connecting struts, then you're right.").)

BSC presented evidence through Dr. Moore's testimony that, like the
macroelements, each microelement formed an expansion column made by
expansion strut pairs joined at one end and open at the other.  (See June
30, 2015, AM Session, Trial Tr. at 112-16 (Moore).)  Though Mr. Lee and Dr.
Chronos tried to distinguish the macroelements and microelements by
focusing on their different respective sizes, widths, number of cycles, and
relative flexibility, Dr. Moore explained that such differences were irrelevant
to the plain language of the claim and to the Court's constructions.  Mr. Lee
agreed.  (See, e.g., June 30, 2015, AM Session, Trial Tr. At 114-16 (Moore)
("There is nothing in the claim language about dimensions or size or
thicknesses, or anything.  And there is nothing in the Court's construction

7

about thickness or size, or any sorts of dimensions on what limits an expansion column."); id. at 27, 29, 31 (Lee) ("No. Size is not in there… There is nothing that says it is about relative thickness, but there is [a] description of what a stent is.").)

Furthermore, BSC presented evidence at trial showing that the Express stent could not literally infringe the '021 Patent because the Express stent's macroelement (first expansion column) connects to the microelement (second expansion column) by a straight connector, which means that two claim requirements of the '021 Patent—(1) connecting strut columns and (2) a peak-to-peak formations— are not found in the Express stent design. (Opp. at 7.)

The '021 Patent requires that the expansion strut pairs of the first and second expansion columns be connected in a peak-to-peak configuration; however, in the Express stent they are connected in a peak-to-valley configuration. (See June 30, 2015, AM Session, Trial Tr. at 116-20 (Moore); id., PM Session Trial Tr. at 7, 19-20.) This is sufficient evidence for a reasonable jury to have found that the Express stent did not contain a required limitation of the '021 Patent. Similarly, if the jury believed that the microelement is an expansion column, then the jury could have reasonably found that the connecting strut joining it to the macroelement does not possess the non-parallel intermediate section required by the '021 Patent. (See Id.) Mr. Lee admitted as much:

> Q. So that [non-parallel] element wouldn't be met, either, if the green straight connector is a connecting strut?

8

A. Yes. As I would do my analysis, if I made that assumption, I would say that would not meet it…

Q. But if…Boston Scientific's understanding is correct and the blue portions of the microelements are an expansion column, then what we have is a peak-to-valley connection, correct?
A. That's assuming you agree that the blue section is exactly the same as the red sections.

(June 26, 2015, AM Session, Trial Tr. at 23-24, 26, 28 (Lee).)  Dr. Chronos made a similar admission.  (See, e.g., June 30, 2015, AM Session, Trial Tr. at 62-63.)

In reviewing the evidence in the record related to whether the Express stent's microelements literally infringe the connecting strut columns of the '021 Patent, the Court must draw all reasonable inferences in favor of BSC, the nonmoving party.  Reeves, 530 U.S. at 150.  The Court will not make credibility determinations or weigh the evidence.  Id.  Despite Dr. Jang's contention that his evidence of literal infringement was "unrebutted" (Mot. at 1, 2), the jury did hear substantial evidence from BSC's expert that the Express stent's microelement did not literally infringe the connecting strut column requirement of the '021 Patent.  Moreover, during cross-examination of Dr. Jang's experts, BSC elicited testimony that a reasonable jury could have used to support a finding of no literal infringement.  In short, the jury's verdict in favor of BSC is supported by substantial evidence.

9

### 3. Were BSC's non-infringement arguments legally sufficient to overcome Dr. Jang's evidence of literal infringement?

In his motion, Dr. Jang argues that BSC presented a number of misleading arguments at trial, including (a) that the Express stent's microelement could not infringe the connecting strut column because it contained "additional parts" to those required in the claims of the '021 Patent, despite the claims' use of the word "comprising"; (b) that relabeling the microelements as expansion strut columns instead of connecting strut columns avoids infringement; (c) that the '021 Patent covers only closed-cell designs; and (d) that the Express stent could not infringe because it practiced prior art.

### a. Did the Court erroneously instruct the jury on claim 1's use of "comprising"?

Dr. Jang argues that BSC misled the jury by arguing that the "extra metal" connecting the Express stent's macro and micro elements refuted Dr. Jang's infringement proof. Dr. Jang claims that this "theory of non-infringement" is wrong as a matter of law. Citing a number of cases, Dr. Jang argues if all the elements of a "comprising" claim are present in an accused device, the presence of additional elements does not preclude a finding of infringement. (Mot. at 10.) While BSC agrees that the cases cited stand for this proposition, it disagrees with Dr. Jang's application of it in this case. (Opp. at 12.)

The Court's jury instruction is consistent with the cited case law: "A patent claim that uses the term 'comprising' is infringed as long as every

10

element of the claim is present in the accused Express stent.  One cannot avoid infringement merely by adding elements if each element recited in the claim is found in the accused device."  (July 7, 2015, Trial Tr. at 36.)

BSC argues that claim 1's use of "comprising" does not allow Dr. Jang to substitute the requirement that expansion strut columns connect in a peak-to-peak configuration for a peak-to-valley configuration.  (Opp. at 13.) BSC presented substantial evidence at trial showing that the Express stent's microelement met the Court's definition of an expansion column.  Thus, the jury could reasonably conclude that the straight connector joining the macroelement and the microelement rendered the stent non-infringing, regardless of the claim's "comprising" language, because the peak-to-peak and non-parallel connector requirements were not met.

### b. Did BSC erroneously argue that portions of the Express stent could be relabeled to avoid infringement?

Dr. Jang argues that BSC misled the jury into believing that only the Express stent's straight connectors could be connecting struts columns, and that this erroneous "theory of non-infringement" was the basis for the jury's finding of no literal infringement.  (Mot. at 16.)

Dr. Jang mischaracterizes BSC's arguments.  BSC did not claim that the "extra metal" in the Express stent constituted a separate defense of non-infringement, but rather that Dr. Jang's characterization of the Express stent ignored significant structural features of the microelement.  (Opp. at 11.)

11

The Court previously discussed Dr. Jang's and BSC's arguments for
and against literal infringement as it relates to the Express stent's
microelements, supra Part II.A.2.b.

### c. Did BSC argue at trial that the Express stent's open-cell design was a defense to literal infringement?

BSC agrees with Dr. Jang that the open-cell design of the Express
stent is not a defense to literal infringement. (Opp. at 14.) The parties
disagree, however, about how the open-cell design argument was advanced
at trial. Dr. Jang claims that BSC tried to confuse the jury by discussing the
Express stent's open-cell design when there is nothing in the claim
construction that refers to open-cell design. (Mot. at 17.) BSC claims that
evidence of the Express stent's open-cell design was relevant to Dr. Jang's
doctrine of equivalents theory of infringement.

BSC did not argue that the Express stent could not literally infringe
any of the claims in the '021 Patent because of its open-cell design. (See
June 30, 2015, PM Session, Trial Tr. at 55 (Moore) ("Q. Is ...there anything
in the literal language of Claim 1 that precludes an open-cell stent from
infringing? A. No.... I don't believe that would be excluded by Claim 1.").)
Dr. Moore discussed open- cell design only in the context of the doctrine of
equivalents. Specifically, he explained that the Express stent achieves
flexibility in a different way than Dr. Jang's stent design in the '021 Patent.
(See June 30, 2015, PM Session, Trial Tr. at 15-17 (Moore).) Thus, BSC did
not improperly argue to the jury that the Express stent's open-cell design
was a defense to literal infringement.

12

### d. Did BSC argue at trial that the Express stent practiced prior art as defense to literal infringement?

BSC referenced the Lau and Brown patents at trial for reasons unrelated to Dr. Jang's infringement claims.  First, BSC discussed the prior art to clarify its position that it did not need Dr. Jang to teach it how to design stents.  Second, BSC discussed the prior art to refute Dr. Jang's claim that he was the first to develop a strong yet flexible stent design.  Dr. Jang made these issues relevant by claiming that only he could teach BSC how to design a strong, flexible stent.

### 4. Conclusion

In ruling on a motion for JMOL, the Court may not make credibility determinations or weigh the evidence for or against an infringement finding. Accordingly, the Court finds that the jury verdict of no literal infringement was supported by substantial evidence at trial.

**B. New Trial**

**1. Legal Standard**

A movant for judgment as a matter of law under Rule 50(b) "may file a renewed motion for judgment as a matter of law and may include an alternative or joint request for a new trial under Rule 59."  Fed. R. Civ. P. 50(b).  A trial court may grant a motion for new trial "only if the verdict is contrary to the clear weight of the evidence, is based upon false or perjurious evidence, or to prevent a miscarriage of justice."  Molski v. M.J. Cable, Inc., 481 F.3d 724, 729 (9th Cir. 2007); see Wordtech Sys. v. Integrated Networks Solutions, Inc., 609 F.3d 1308, 1313 (Fed. Cir. 2010).  "Unlike with a Rule 50 determination, the district court, in considering a Rule 59 motion for new trial, is not required to view the trial evidence in the light most favorable to the verdict.  Instead, the district court can weigh the evidence and assess the credibility of the witnesses."  Experience Hendrix L.L.C. v. Hendrixlicensing.com Ltd., 762 F.3d 829, 842 (9th Cir. 2014).

**2. Did the Court properly allow Dr. Moore to respond to Mr. Lee's And Dr. Chronos's doctrine of equivalents analysis?**

Dr. Jang argues that a new trial would allow him to present responses to arguments made by BSC and its expert Dr. Moore that were not disclosed before trial, including that the Express stent could not infringe the '021 Patent because its microelements are not connecting strut columns and that the '021 Patent only covers closed-cell design.  (Mot. at 22.)

In his report, Mr. Lee did not address the doctrine of equivalents analysis of Graver Tank & Mfg. Co. v. Linde Air Prods. Co., 339 U.S. 605

14

(1950), and Dr. Chronos's report contained blanket assertions that each claim in the '021 Patent performed substantially the same function, in substantially the same way, to achieve substantially the same result in the Express stent. (See Doc. No. 726-1 at 19-20) Thus, there was no doctrine of equivalents analysis to which Dr. Moore could respond. Dr. Jang, as the plaintiff, bears the burden of proving his theories of liability. Nevertheless, the Court allowed both Mr. Lee and Dr. Chronos to offer their opinions on the doctrine of equivalents at trial. (See June 30, 2015, AM Session, Trial. Tr. at 86, 126-128.) Thus, Dr. Moore's testimony on the doctrine of equivalents did not prejudice Dr. Jang.

### 3. Did the Court properly allow BSC to raise ensnarement?

Dr. Jang argues that the Court erred in granting judgment in favor of Defendants on their ensnarement defense (Doc. No. 712 ("Ensnarement Order")) because Dr. Jang clearly showed that there were "insubstantial differences" between the asserted claims and the Express stent. (Mot. at 24.) Dr. Jang argues also that he was prejudiced because Dr. Moore's ensnarement arguments were not revealed before trial. (Id. at 20.)

First, the Court addressed Dr. Jang's waiver arguments in its Ensnarement Order. (See Doc. No. 712 at 4-7.) Second, neither party's experts submitted an ensnarement analysis before the trial. Thus, Dr. Jang was not prejudiced by not hearing Dr. Moore's testimony before trial.

15

### 4. Is Dr. Jang entitled to a new trial to assert different claims?

Dr. Jang argues that had he known of the "new arguments" BSC would present at trial, he would have presented different claims, and thus, he is entitled to a new trial to present these different claims. (Mot. at 21.) This argument fails. A party is not entitled to a new trial so that it can present new arguments that it could have advanced at the first trial. United States v. Mullins, 992 F.2d 1472, 1477 (9th Cir. 1993) ("[A]dvancement of a new legal theory does not constitute newly discovered evidence warranting a new trial."); United States v. Hamling, 525 F.2d 758, 759 (9th Cir. 1975) ("[A] party who desires to present his case under a different theory in which facts available at the original trial now first become important, will not be granted a new trial.") Moreover, the Court disagrees with Dr. Jang, for the reasons stated above, that BSC was allowed to present "new arguments" at trial.

### 5. Conclusion

Accordingly, Dr. Jang is not entitled to a new trial because the jury's verdict was not contrary to the clear weight of the evidence, was not based upon false or perjurious evidence, and was not a miscarriage of justice. Thus, the alternative forms of relief Dr. Jang seeks are MOOT.

### III.    CONCLUSION

For the reasons stated above, the Court DENIES Dr. Jang's motion for judgment as a matter of law and for new trial.

16

**IT IS SO ORDERED.**

*Virginia A. Phillips*

Dated:   2/3/16  
_____  
Virginia A. Phillips  
United States District Judge

17

G. David Jang, M.D. v. Boston Scientific Corp, et al
Case: 16-1275    Document: 33
Case No.: ED CV 05-00426-VAP (MRWx)
**Exhibit 901**
Page: 111    Filed: 05/23/2016

US005922021A

# United States Patent [19]

Jang

[11] **Patent Number:** 5,922,021

[45] **Date of Patent:** *Jul. 13, 1999

[54] **INTRAVASCULAR STENT**

[76] Inventor: **G. David Jang,** ▮▮▮▮▮▮

[ * ] Notice: This patent is subject to a terminal disclaimer.

[21] Appl. No.: **08/845,657**

[22] Filed: **Apr. 25, 1997**

### Related U.S. Application Data

[63] Continuation-in-part of application No. 08/824,142, Mar. 25, 1997, application No. 08/824,866, Mar. 25, 1997, and application No. 08/824,865, Mar. 25, 1997
[60] Provisional application No. 60/017,484, Apr. 26, 1996.

[51] Int. Cl.$^6$ ..................................................... **A61F 2/06**
[52] U.S. Cl. ................................................ **623/1;** 623/12
[58] Field of Search .................................... 623/1, 11, 12; 606/108, 191, 194, 195, 198

[56] **References Cited**

#### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,102,417 | 4/1992 | Palmaz . | |
| 5,449,373 | 9/1995 | Pinchasik et al. | 606/198 |
| 5,591,197 | 1/1997 | Orth et al. | 606/194 |
| 5,593,442 | 1/1997 | Klein | 623/1 |
| 5,695,516 | 12/1997 | Fischell et al. | 606/194 |
| 5,697,971 | 12/1997 | Fischell et al. | 623/1 |
| 5,776,161 | 7/1998 | Globerman . | |
| 5,776,183 | 7/1998 | Kanesake et al. . | |
| 5,810,872 | 9/1998 | Kanesaka et al. | 623/1 |
| 5,824,059 | 10/1998 | Wijay | 623/1 |
| 5,836,964 | 11/1998 | Richter et al. | 623/1 |

#### FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 0 587 197 A1 | 3/1994 | European Pat. Off. | A61F 2/04 |
| 606 165 A1 | 7/1994 | European Pat. Off. | 623/1 |
| 0 679 372 A2 | 11/1995 | European Pat. Off. | A61B 19/00 |
| 0 709 067 A2 | 5/1996 | European Pat. Off. | A61F 2/06 |
| 4303181 A1 | 8/1994 | Germany | A61M 29/00 |
| 29608037 U1 | 8/1996 | Germany | A61M 29/00 |
| WO96/03029 | 2/1996 | WIPO | A61F 2/02 |
| WO96/26689 | 9/1996 | WIPO | A61F 2/06 |
| WO 97/40780 | 11/1997 | WIPO . | |
| WO 97/40781 | 11/1997 | WIPO . | |

*Primary Examiner*—David H. Willse
*Assistant Examiner*—Tram A. Nguyen
*Attorney, Agent, or Firm*—Wilson Sonsini Goodrich & Rosati

[57] **ABSTRACT**

A stent in a non-expanded state has a first expansion strut pair consisting of a first expansion strut positioned adjacent to a second expansion strut and a joining strut which couples the first and second expansion struts at a distal end of the first expansion strut pair. A plurality of the first expansion strut pair form a first expansion column. A second expansion strut pair consists of a first expansion strut positioned adjacent to a second expansion strut and a joining strut couples the first and second expansion struts at a proximal end of the second expansion strut pair. A plurality of the second expansion strut pair form a second expansion column. A first connecting strut includes a first connecting strut proximal section, a first connecting strut distal section and a first connecting strut intermediate section. The first connecting strut proximal section is coupled to the distal end of the first expansion strut pair in the first expansion column and the first connecting strut distal section is coupled to the proximal end of the second expansion strut pair of the second expansion column. A plurality of the first connecting struts form a first connecting strut column that couples the first expansion column to the second expansion column. A length of the first connecting strut proximal section is equal to a length of the first connecting strut distal section, and a length of the first connecting strut intermediate section is greater than the length of the first connecting strut proximal and distal sections.

**85 Claims, 27 Drawing Sheets**





EXHIBIT
2



FIG. 1A

FIG. 1B

FIG. 1C



*FIG. 2A*



*FIG. 2B*



FIG. 3B



FIG. 3A

FIG. 4A

FIG. 4B



FIG. 5



*FIG. 6A*



*FIG. 6B*



FIG. 7A



FIG. 7B



FIG. 7C



FIG. 8A

FIG. 8B



FIG. 8C



FIG. 8D



FIG. 8E



FIG. 8F



FIG. 86



FIG. 9A

FIG. 9B



FIG. 9C



FIG. 9D



FIG. 9E



*FIG. 9F*



FIG. 96



*FIG. 10A*



*FIG. 10B*





FIG. 10D

FIG. 10C

FIG. 10E



FIG. 10F



*FIG. 11*

5,922,021

1

**INTRAVASCULAR STENT**

CROSS-REFERENCE TO RELATED
APPLICATIONS

This application claims the benefit of Provisional Patent Application No. 60/017,484 filed Apr. 26, 1996, the disclosure of which is incorporated by reference. This application is a continuation in part of U.S. patent application Ser. No. 08/824,142, filed Mar. 25, 1997, entitled "Intravascular Stent", and a continuation in part of U.S. Pat. application Ser. No. 08/824,866, filed Mar. 25, 1997, entitled "Intravascular Stent" and is related to U.S. patent application Ser. No. 08/824,865, filed Mar. 25, 1997, entitled "Intravascular Stent" and is related to U.S. patent application Ser. No. 08/845,734, filed Apr. 25, 1997, entitled "Intravascular Stent" each having same named inventor G. David Jang and being incorporated by reference.

BACKGROUND OF THE INVENTION

1. Field of the Invention

This invention relates to intravascular stents, and more particularly to an intravascular stent which provides easy introduction through tortuous sections of vessels.

2. Description of the Related Art

Angioplasty, either coronary or general vascular, has advanced to become the most effective means for revascularization of stenosed vessels. In the early 1980's, angioplasty first became available for clinical practice in the coronary artery, and has since proven an effective alternative to conventional bypass graft surgery. Balloon catheter dependent angioplasty has consistently proven to be the most reliable and practical interventional procedure. Other ancillary technologies such as laser based treatment, or directional or rotational arthrectomy, have proven to be either of limited effectiveness or dependent on balloon angioplasty for completion of the intended procedure. Restenosis following balloon-based angioplasty is the most serious drawback and is especially prevalent in the coronary artery system.

Many regimens have been designed to combat restenosis, with limited success, including laser based treatment and directional or rotational arthrectomy. Intravascular stenting, however, noticeably reduces the restenosis rate following angioplasty procedures. The procedure for intravascular stent placement typically involves pre-dilation of the target vessel using balloon angioplasty, followed by deployment of the stent, and expansion of the stent such that the dilated vessel walls are supported from the inside.

The intravascular stent functions as scaffolding for the lumen of a vessel. The scaffolding of the vessel walls by the stent serve to: (a) prevent elastic recoil of the dilated vessel wall, (b) eliminate residual stenosis of the vessel; a common occurrence in balloon angioplasty procedures, (c) maintain the diameter of the stented vessel segment slightly larger than the native unobstructed vessel segments proximal and distal the stented segment and (d) as indicated by the latest clinical data, lower the restenosis rate. Following an angioplasty procedure, the restenosis rate of stented vessels has proven significantly lower than for unstented or otherwise treated vessels; treatments include drug therapy and other methods mentioned previously.

Another benefit of vessel stenting is the potential reduction of emergency bypass surgery arising from angioplasty procedures. Stenting has proven to be effective in some cases for treating impending closure of a vessel during

2

angioplasty. Stenting can also control and stabilize an unstable local intimal tear of a vessel caused by normal conduct during an angioplasty procedure. In some cases, an incomplete or less than optimal dilatation of a vessel lesion with balloon angioplasty can successfully be opened up with a stent implant.

Early in its development, the practice of stenting, especially in coronary arteries, had serious anticoagulation problems. However, anticoagulation techniques have since been developed and are becoming simpler and more effective. Better and easier to use regimens are continuously being introduced, including simple outpatient anticoagulation treatments, resulting in reduced hospital stays for stent patients.

An example of a conventional stent patent is U.S. Pat. No. 5,102,417 (hereafter the Palmaz Patent). The stent described in the Palmaz Patent consists of a series of elongated tubular members having a plurality of slots disposed substantially parallel to the longitudinal axis of the tubular members. The tubular members are connected by at least one flexible connector member.

The unexpanded tubular members of the Palmaz Patent are overly rigid so that practical application is limited to short lengths. Even with implementation of the multilink design with flexible connector members connecting a series of tubular members, longer stents can not navigate tortuous blood vessels. Furthermore, the rigidity of the unexpanded stent increases the risk of damaging vessels during insertion. Foreshortening of the stent during insertion complicates accurate placement of the stent and reduces the area that can be covered by the expanded stent. There is, further, no method of programming the stent diameter along its longitudinal axis to achieve a tapered expanded stent, and no method of reenforcement of stent ends or other regions is provided for.

Another example of a conventional stent patent is WO 96/03092, the Brun patent. The stent described in the Brun patent is formed of a tube having a patterned shape, which has first and second meander patterns. The even and odd first meander patterns are 180 degrees out of phase, with the odd patterns occurring between every two even patterns. The second meander patterns run perpendicular to the first meander patterns, along the axis of the tube.

Adjacent first meander patterns are connected by second meander patterns to form a generally uniform distributed pattern. The symmetrical arrangement with first and second meander patterns having sharp right angled bends allows for catching and snagging on the vessel wall during delivery. Furthermore, the large convolutions in the second meander pattern are not fully straightened out during expansion reducing rigidity and structural strength of the expanded stent. There is, further, no method of programming the stent diameter along its longitudinal axis to achieve a tapering stent design, and no method of reenforcement of stent ends or other regions is provided for.

These and other conventional stent designs suffer in varying degrees from a variety of drawbacks including: (a) inability to negotiate bends in vessels due to columnar rigidity of the unexpanded stent; (b) lack of structural strength, axio-laterally, of the unexpanded stent; (c) significant foreshortening of the stent during expansion; (d) limited stent length; (e) constant expanded stent diameter; (f) poor crimping characteristics; and (g) rough surface modulation of the unexpanded stent.

There is a need for a stent with sufficient longitudinal flexibility in the unexpanded state to allow for navigation

5,922,021

| 3 | 4 |

through tortuous vessels. There is a further need for a stent that is structurally strong in the unexpanded state such that risk of damage or distortion during delivery is minimal. A further need exists for a stent that maintains substantially the same longitudinal length during expansion to allow greater coverage at the target site and simplify proper placement of the stent. Yet a further need exists for a stent design with sufficient longitudinal flexibility that long stents of up to 100 mm can be safely delivered through tortuous vessels. There is a need for a stent that is configured to expand to variable diameters along its length, such that a taper can be achieved in the expanded state to match the natural taper of the target vessel. A need exists for a stent which, (i) can be crimped tightly on the expansion balloon while maintaining a low profile and flexibility, (ii) has a smooth surface modulation when crimped over a delivery balloon, to prevent catching and snagging of the stent on the vessel wall during delivery or (iii) with reenforcement rings on the ends or middle or both to keep the ends of the stent securely positioned against the vessel walls of the target blood vessel.

## SUMMARY OF THE INVENTION

Accordingly an object of the present invention is to provide a scaffold for an interior lumen of a vessel.

Another object of the present invention is to provide a stent which prevents recoil of the vessel following angioplasty.

A further object of the invention is to provide a stent that maintains a larger vessel lumen compared to the results obtained only with balloon angioplasty.

Yet another object of the invention is to provide a stent that reduces foreshortening of a stent length when expanded.

Another object of the invention is to provide a stent with increased flexibility when delivered to a selected site in a vessel.

A further object of the invention is to provide a stent with a low profile when crimped over a delivery balloon of a stent assembly.

Yet a further object of the invention is to provide a stent with reduced tuliping of a stent frame.

Another object of the invention is to provide a chain mesh stent that reduces vessel "hang up" in a tortuous vessel or a vessel with curvature.

A further object of the invention is to provide a chain mesh stent that increases radial and axio-lateral strength of the expanded stent.

These and other objects of the invention are achieved in a stent in a non-expanded state. A first expansion strut pair includes a first expansion strut positioned adjacent to a second expansion strut and adjoining strut couples the first and second expansion struts at a distal end of the first expansion strut pair. A plurality of the first expansion strut pair form a first expansion column.

A second expansion strut pair includes a first expansion strut positioned adjacent to a second expansion strut and a joining strut of the second expansion strut pair couples the first and second expansion struts at a proximal end of the second expansion strut pair. A plurality of the second expansion strut pair form a second expansion column.

A first connecting strut includes a first connecting strut proximal section, a first connecting strut distal section and a first connecting strut intermediate section. The first connecting strut proximal section is coupled to the distal end of the first expansion strut pair in the first expansion column and the first connecting strut distal section being coupled to the proximal end of the second expansion strut pair of the

second expansion column. A plurality of the first connecting struts forms a first connecting strut column that couples the first expansion column to the second expansion column. A length of the first connecting strut proximal section is equal to a length of the first connecting strut distal section, and a length of the first connecting strut intermediate section is greater than the length of the first connecting strut proximal and distal sections.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1A is a side elevation view of the pre-expansion mode of an embodiment of the stent of the present invention;

FIG. 1B is a cross sectional view of an embodiment of the stent of the present invention;

FIG. 1C is a longitudinal cross sectional view of an embodiment of the stent of the present invention;

FIG. 2A is a scale drawing of the strut pattern of an embodiment of the stent of the present invention;

FIG. 2B is an expanded view of a section of the pattern of FIG. 2A;

FIG. 3A is a schematic illustration of a pre-expansion mode of an embodiment of the stent of the present invention;

FIG. 3B is a schematic illustration of the post-expansion mode of an embodiment of the stent of the present invention;

FIG. 4A is a scale drawing including dimensions of an embodiment of the stent of the present invention;

FIG. 4B is an enlarged section of the scale drawing of FIG. 4A;

FIG. 5 is a scale drawing of an embodiment of the stent of the present invention with a tapered diameter in its post-expansion mode;

FIG. 6A is a scale drawing of an embodiment of the stent of the present invention with reenforcement expansion columns;

FIG. 6B is a perspective view of the embodiment of FIG. 6A;

FIG. 7A is a scale drawing of an embodiment of the stent of the present invention including relief notches at strut joints to increase flexibility of the joints;

FIG. 7B is an enlarged region of the embodiment of FIG. 7A;

FIG. 7C is an enlarged view of a single connecting strut joining two expansion strut pairs in accordance with the embodiment of FIG. 7A;

FIG. 8A is a side elevation view of an embodiment of the stent of the present invention;

FIG. 8B is a side elevation view of an embodiment of the stent of the present invention, shown as if the stent struts and space there between were transparent;

FIG. 8C is a scale drawing of an embodiment of the stent of the present invention;

FIG. 8D is a variation of the embodiment of the stent of FIG. 8C;

FIG. 8E is a perspective view of the embodiment of FIG. 8D;

FIG. 8F is a drawing illustrating the post-expansion mode of the stent of the embodiment of FIG. 8D of the present invention;

FIG. 8G is an enlarged view of a single connecting strut joining two expansion strut pairs in accordance with an embodiment of the present invention;

FIG. 9A is a side elevation view of an embodiment of the stent of the present invention;

5,922,021

5

FIG. 9B is a perspective view of the embodiment of FIG. 9A;

FIG. 9C is a scale drawing of the embodiment of FIG. 9A;

FIG. 9D is an enlarged region of the drawing of FIG. 9C;

FIG. 9E is a scale drawing of an embodiment of the stent of the present invention;

FIG. 9F is a scale drawing of an embodiment of the stent of the present invention;

FIG. 9G is an enlarged view of a single connecting strut joining two expansion strut pairs in accordance with an embodiment of the present invention;

FIG. 10A is a drawing of an alternate geometry of connecting struts and joining struts in accord with the present invention;

FIG. 10B is a drawing of an alternate geometry of connecting struts and joining struts in accord with the present invention;

FIG. 10C is a drawing of an alternate geometry of connecting struts and joining struts in accord with the present invention;

FIG. 10D is a drawing of an alternate geometry of connecting struts and joining struts in accord with the present invention;

FIG. 10E is a drawing of an alternate geometry of connecting struts and joining struts in accord with the present invention;

FIG. 10F is a drawing of an alternate geometry of connecting struts and joining struts in accord with the present invention; and

FIG. 11 is a delivery balloon catheter, illustrating a method of deliver of a stent in accord with the present invention.

## DETAILED DESCRIPTION

A first embodiment of the present invention is shown in FIGS. 1A, 1B, 1C, 2A and 2B. Referring to FIG. 1A, an elongate hollow tubular stent 10 in an unexpanded state is shown. A proximal end 12 and a distal end 14 define a longitudinal length 16 of stent 10. The longitudinal length 16 of the stent 10 can be as long as 100 mm or longer. A proximal opening 18 and a distal opening 20 connect to an inner lumen 22 of stent 10. Stent 10 can be a single piece, without any seams or welding joints or may include multiple pieces.

Stent 10 is constructed of two to fifty or more expansion columns or rings 24 connected together by interspersed connecting strut columns 26. The first column on the proximal end 12 and the last column on the distal end 14 of stent 10 are expansion columns 24.

Expansion columns 24 are formed from a series of expansion struts 28, and joining struts 30. Expansion struts 28 are thin elongate members arranged so that they extend at least in part in the direction of the longitudinal axis of stent 10. When an outward external force is applied to stent 10 from the inside by an expansion balloon or other means, expansion struts 28 are reoriented such that they extend in a more circumferential direction, i.e. along the surface of cylindrical stent 10 and perpendicular to its longitudinal axis. Reorientation of expansion struts 28 causes stent 10 to have an expanded circumference and diameter. In FIG. 1A, expansion struts 28 of unexpanded stent 10 are seen to extend substantially parallel to the longitudinal axis of stent 10.

Expansion struts 28 are joined together by joining struts 30 to form a plurality of expansion strut pairs 32. Expansion

6

strut pairs have a closed end 34 and an open end 36. Additional joining struts 30 join together expansion struts 28 of adjacent expansion strut pairs 32, such that expansion struts 28 are joined alternately at their proximal and distal ends to adjacent expansion struts 28 to form expansion columns 24. Each expansion column 24 contains a plurality, typically eight to twenty, twenty to sixty, or larger of expansion struts 28. Expansion columns are preferably continuous unbroken ring structures extending around the circumference of the stent 10; however, broken structures in which individual struts or pieces of struts are removed from an otherwise continuous expansion column 24 can also be used.

Connecting struts 38 connect adjacent expansion columns 24 forming a series of interspersed connecting strut columns 26 each extending around the circumference of stent 10. Each connecting strut 38 joins a pair of expansion struts 28 in an expansion column 24 to an adjacent pair of expansion struts 28 in an adjacent expansion column 24. For stent 10 of FIG. 1A, the ratio of expansion struts 28 in an expansion column 24 to connecting struts 38 in a connecting strut column 26 is two to one; however, this ratio in general can be x to 1 where x is greater or less than two. Furthermore, since the stent 10 of FIG. 1A begins with an expansion column 24 on the proximal end 12 and ends with an expansion column 24 on the distal end 14, if there are n expansion columns 24 with m expansion struts 28 per column, there will be m-1 connecting strut columns 26, and n(m-1)/2 connecting struts 38.

The reduced number of connecting struts 38 in each connecting strut column 26, as compared to expansion struts 28 in each expansion column 24, allows stent 10 to be longitudinally flexibility. Longitudinal flexibility can be further increased by using a narrow width connecting strut, providing additional flexibility and suppleness to the stent as it is navigated around turns in a natural blood vessel.

At least a portion of the open spaces between struts in stent 10 form asymmetrical cell spaces 40. A cell space or geometric cell is an empty region on the surface of stent 10, completely surrounded by one or a combination of stent struts, including expansion struts 28, connecting struts 38, or joining struts 30. Asymmetrical cell spaces 40 are cell spaces which have no geometrical symmetry i.e. no rotation, reflection, combination rotation and reflection or other symmetry. Asymmetrical cell spaces 40 have an asymmetrical geometric configuration.

Asymmetrical cell spaces 40 in FIG. 1A are surrounded by a first expansion strut pair 32 in a first expansion column 24, a first connecting strut 38, a second expansion strut pair 32 in an adjacent expansion column 24, a first joining strut 30, a second connecting strut 38, and a second joining strut 30. Furthermore, expansion strut pairs 32 of asymmetrical cell space 40 may be circumferentially offset i.e. have longitudinal axes that are not collinear and have their open ends 36 facing each other. The space between two expansion struts of an expansion strut pair 32 is known as a loop slot 42.

FIG. 1B shows inner lumen 22, radius 44 and stent wall 46 of stent 10. Stent wall 46 consists of stent struts including expansion struts 28, connecting struts 38 and joining struts 30.

FIG. 1C shows, proximal end 12, distal end 14, longitudinal length 16, inner lumen 22, and stent wall 46 of stent 10. Inner lumen 22 is surrounded by stent wall 46 which forms the cylindrical surface of stent 10.

Referring now to FIGS. 2A and 2B, joining struts 30 of stent 10 are seen to extend at an angle to the expansion struts

5,922,021

7

28, forming a narrow angle 48 with one expansion strut 28 in an expansion strut pair 32 and a wide angle 50 with the other expansion strut 28 of an expansion strut pair 32. Narrow angle 48 is less than ninety degrees, while wide angle 50 is greater than ninety degrees. Joining struts 30 extend both longitudinally along the longitudinal axis of stent 10 and circumferentially, along the surface of the stent 1 0 perpendicular to its longitudinal axis.

Expansion strut spacing 52 between adjacent expansion struts 28 in a given expansion column 24 are uniform in stent 10 of FIGS. 2A and 2B; however, non-uniform spacings can also be used. Expansion strut spacings 52 can be varied, for example, spacings 52 between adjacent expansion struts 28 in an expansion column 24 can alternate between a narrow and a wide spacings. Additionally, spacings 52 in a single expansion column 24 can differ from other spacings 52 in other columns 24.

It is noted that varying expansion strut spacings 52 which form the loop slots 42 results in variable loop slot widths. Furthermore, the longitudinal axis of the loop slots 42 need not be collinear or even parallel with the longitudinal axis of loop slots 42 of an adjacent expansion column 24. FIGS. 2A and 2B show an arrangement of expansion slots 42 such that collinear, parallel adjacent loop slots 42 are formed, but non-collinear and non-parallel loop slots 42 can also be used.

Additionally, the shape of loop slots 42 need not be the same among loop slots of a single or multiple expansion columns 24. The shape of loop slots 42 can be altered by changing the orientation or physical dimensions of the expansion struts 28 and/or joining struts 30 which connect expansion struts 28 of expansion strut pairs 32 defining the boundaries of loop slots 42.

Connecting struts 38 couple adjacent expansion columns 24, by connecting the distal end of an expansion strut pair in one expansion column 24 to the proximal end of an adjacent expansion strut pair 32 in a second expansion column 24. Connecting struts 38 of FIGS. 2A and 2B are formed from two linear sections, a first linear section 54 being joined at its distal end to a second linear section 56 at its proximal end to form a first slant angle 58.

The first linear section 54 of a connecting strut 38 is joined to expansion strut 28 at the point where joining strut 30 makes narrow angle 48 with expansion strut 28. First linear section 54 extends substantially collinear to joining strut 30 continuing the line of joining strut 30 into the space between expansion columns 24. The distal end of the first linear section 54 is joined to the proximal end of the second linear section 56 forming slant angle 58. Second linear section 56 extends substantially parallel to expansion struts 28 connecting at its distal end to joining strut 30 in an adjacent expansion column 24. The distal end of second linear section 56 attaches to expansion strut 28 at the point where joining strut 30 makes narrow angle 48 with expansion strut 28. Further, joining strut 30 can have a second slant angle with a width that can be the same or different from the width of the first slant angle.

FIGS. 2A and 2B show connecting struts 38 and joining struts 30 slanted relative to the longitudinal axis of stent 10, with the circumferential direction of the slanted struts alternating from column to adjacent column. Circumferential direction refers to the handedness with which the slanted struts wind about the surface of the stent 10. The circumferential direction of the slant of connecting strut first linear sections 54 in a connecting strut column 26 is opposite the circumferential direction of the slant of connecting strut first

8

linear sections 54 in an adjacent connecting strut column 26. Similarly, the circumferential direction of the slant of joining struts 30 in an expansion column 24 is opposite the circumferential direction of the slant of joining struts 30 in an adjacent expansion column 24. Alternating circumferential slant directions of connecting struts 38 and joining struts 30 prevents axial warping of stent 10 during deliver and expansion. Other non-alternating slant direction patterns can also be used for connecting struts 38 or joining struts 30 or both.

FIG. 3A and 3B show a schematic illustration of a stent design according to the present invention in an unexpanded and expanded state respectively. The design is depicted as a flat projection, as if stent 10 were cut lengthwise parallel to its longitudinal axis and flattened out. The connecting struts 38 consist of first and second linear sections 54 and 56 forming slant angle 58 at pivot point 60. An asymmetrical cell space 40 is formed by expansion strut pairs 32, connecting struts 38 and joining struts 30. Multiple interlocking asymmetrical cell spaces 40 make up the design pattern.

As the stent is expanded, see FIG. 3B, the expansion strut pairs 32 spread apart at their open ends 36, shortening the length of expansion struts 28 along the longitudinal axis of the cylindrical stent. The longitudinal shortening of expansion struts 28 during expansion is countered by the longitudinal lengthening of connecting struts 38. The widening of slant angle 58 during expansion straightens connecting struts 38 and lengthens the distance between the coupled expansion strut pairs 32. The widening of the slant angle of connecting struts 38 substantially compensates for the longitudinal shortening of expansion struts 28. Thus, the stent has substantially constant unexpanded and expanded longitudinal lengths.

When the stent is expanded, each expansion column 24 becomes circumferentially stretched, enlarging the space between struts. The interlinking of expansion columns 24 by connecting struts 38 that have been straightened through the expansion process gives the stent 10 a high radial support strength. The entire stent 10 when expanded is unitized into a continuous chain mesh of stretched expansion columns 24 and connecting strut columns 26 forming an asymmetrical interlocking cell geometry which resists collapse both axially and radially. When the stent is expanded it has increased rigidity and fatigue tolerance.

In addition, efficient bending and straightening of connecting struts 38 at pivot points 60 allows increased longitudinal flexibility of the stent. For the stent to bend longitudinally, at least some of connecting struts 38 are forced to bend in their tangent plane. The tangent plane of a specific connecting strut 38 refers to the plane substantially tangent to the cylindrical surface of the stent at that connecting strut 38. The width of connecting struts 38 can be twice as wide as a thickness. Preferably, a one-to-one ratio is preferred. However, pivot points 60 in connecting struts 38 provide a flexible point about which to more easily bend increasing longitudinal flexibility of the stent.

Referring to FIGS. 4A and 4B, a variation of the first embodiment of stent 10 of the present invention is shown. In this variation, stent 10 has a length 16 of 33.25 mm and an uncrimped and unexpanded circumference 88 of 5.26 mm. Fifteen expansion columns 24 are interspersed with connecting strut columns 26. Each expansion column 24 consists of twelve expansion struts 28 joined alternately at their proximal and distal ends by joining struts 30 forming six expansion strut pairs 32. Expansion struts 28 are aligned parallel to the longitudinal axis of cylindrical stent 10.

5,922,021

| 9 | 10 |

Joining struts 30 form a narrow angle 48 and a wide angle 50 with the respective expansion struts 28 of expansion strut pairs 32. Adjacent expansion columns 24 employ alternating circumferential slant directions of joining struts 30.

In this variation of the first embodiment, expansion strut width 62 is 0.20 mm, expansion strut length 64 is 1.51 mm, and connecting strut width 66 is 0.13 mm. Distance 68 from the outer edge of a first expansion strut 28 to the outer edge of a second adjacent expansion strut 28 in the same expansion column 24 is 0.64 mm, leaving a loop slot width 70 of 0.24 mm.

In this variation of the first embodiment, connecting struts 38 consist of a slanted first linear section 54 joined to a second linear section 56 at a slant angle 58. First linear section 54 is slightly longer than second linear section 56 and is attached at its proximal end to an expansion strut 28 in an expansion column 24. The attachment of the proximal end of first linear section 54 to expansion strut 28 is at the point where joining strut 30 makes narrow angle 48 with expansion strut 28. First linear section 54 extends substantially collinear to joining strut 30 attaching at its distal end to the proximal end of second linear section 56 to form slant angle 58. Second linear section 56 extends substantially collinear to joining strut 30, attaching at its distal end to an expansion strut 28 in an adjacent expansion column 24. The attachment occurs at the point where expansion strut 28 forms narrow angle 48 with joining strut 30. Joining struts 30 and connecting strut first linear sections 54 slant in alternating circumferential directions from column to adjacent column.

The joining of connecting struts 38 and expansion struts 28 at the point where narrow angle 48 is formed aids smooth delivery of stent 10 by streamlining the surface of the unexpanded stent and minimizing possible catching points. Bare delivery of stent 10 to the target lesion in a vessel will thus result in minimal snagging or catching as it is navigated through turns and curvatures in the vessel. Stent 10 behaves like a flexible, tubular sled as it is moved forward or backward in the vessel on the delivery catheter, sliding through tortuous vessels and over irregular bumps caused by atherosclerotic plaques inside the vessel lumen.

When fully expanded Stent 10 of FIGS. 4A and 4B has an internal diameter of up to 5.0 mm, while maintaining an acceptable radial strength and fatigue tolerance. The crimped stent outer diameter can be as small as 1.0 mm or less depending on the condition of the underlying delivery balloon profile; A small crimped outer diameter is especially important if stent delivery is to be attempted without pre-dilation of the target site. When the stent is optimally crimped over the delivery balloon, the surface of the crimped stent is smooth allowing for no snagging of the stent struts during either forward or backward movement through a vessel.

FIG. 5 shows a second embodiment of the present invention in which the stent 10 in its expanded form has a gradual taper from proximal end 12 to distal end 14. The shaded segments 72, 74, 76, 78, 80, 82 and 84 of expansion struts 28 represent regions of expansion struts 28 to be removed. Removal of the shaded segments 72, 74, 76, 78, 80, 82 and 84 provides stent 10 with a gradual taper when expanded with distal end 14 having a smaller expanded diameter than proximal end 12. The degree of shortening of the expanded diameter of the stent 10 at a given expansion column 24 will be proportional to the length of the removed segment 72, 74, 76, 78, 80, 82, or 84 at that expansion column 24. In the expanded stent 10 the shortened expansion struts 28 will

have a shortened component along the circumference of the stent resulting in a shortened circumference and diameter. The tapered diameter portion can be positioned anywhere along the length of stent 10, and the tapering can be made more or less gradual by removing appropriately larger or smaller portions of the expansion struts 28 in a given expansion column 24.

Tapering is especially important in long stents, longer than 12 mm, since tapering of blood vessels is more pronounced over longer lengths. A long stent with a uniform stent diameter can only be matched to the target vessel diameter over a short region. If the proximal vessel size of the stent will be too large for the natural vessel and may cause an intimal dissection of the distal vessel by stent expansion. On the other hand, if the distal vessel size is matched with the stent diameter, the proximal end of the expanded stent will be too small to set inside the vessel lumen. It is therefore desirable to have a stent with a tapered expanded diameter.

Another way to achieve a tapered expanded stent is to change the stiffness of the stent struts, expansion struts, connecting struts or joining struts such that the stiffness of the struts varies along the length of the stent. The stiffness of the struts can be changed by altering length, width or thickness, adding additional stiffening material, using a chemical or mechanical means to alter the physical properties of the stent material, or applying one or a series of elastic elements about the stent.

Along with the use of a tapered diameter stent, a matching tapered balloon catheter would ideally be made for delivery and deployment of the tapered diameter stent. The method of using a tapered matching balloon catheter with a tapered diameter stent is within the scope of the present invention.

Using a tapered balloon to expand a non-tapered stent will also achieve a tapered expanded stent; however, since no metal is removed from the stent, the stent is tapered as a result of incomplete expansion. The stent will therefore have increased metal fraction at the tapered end resulting in increased risk of acute thrombosis. Metal fraction is the proportion of the surface of the expanded stent covered by the stent strut material. Shortening the expansion struts as shown in FIG. 5 allows for a tapered expanded stent with substantially constant metal fraction along its length.

A third embodiment of the present invention shown in FIGS. 6A and 6B has multiple reenforcement expansion columns 86 placed along the length of the stent 10. The reenforcement columns 86 are placed along the stent length to provide additional localized radial strength and rigidity to stent 10. Additional strength and rigidity are especially important at the ends of the stent to prevent deformation of the stent both during delivery and after placement. During delivery the stent ends can catch on the vessel wall possibly deforming the unexpanded stent and altering its expansion characteristics. After the stent has been placed it is important that the stent ends are rigid so that they set firmly against the vessel wall; otherwise, during a subsequent catheter procedure, the catheter or guidewire can catch on the stent ends pulling the stent away from the vessel wall and possibly damaging and/or blocking the vessel.

The specific variation of the third embodiment of stent 10 depicted in FIGS. 6A and 6B has a length 16 of 20.70 mm and an uncrimped and unexpanded circumference 88 of 5.26 mm. The stent 10 consists of six expansion columns 24 and three reenforcement expansion columns 86, each consisting respectively of twelve expansion struts 28 or reenforcement

5,922,021

expansion struts 90. The reenforcement expansion columns 86 are positioned one at either end, and one along the length of the stent 10.

The expansion strut width 62 is 0.15 mm, reenforcement expansion strut width 92 is 0.20 mm, and the connecting strut width 66 is 0.10 mm. The narrow angle 48 formed by joining strut 30 and expansion strut 28 is 75 degrees, and the narrow angle 94 formed by reenforcement joining strut 96 and reenforcement expansion strut 90 is 60 degrees.

Other arrangements of reenforcement expansion columns 86, such as providing reenforcement expansion columns 86 only on the ends of the stent, only on one end, or at multiple locations throughout the length of the stent can also be used and fall within the scope of the present invention. A taper can also be programmed into the reenforced stent 10 by shortening expansion struts 28 and reenforcement expansion struts 90 in appropriate expansion columns 24 and 86.

A fourth embodiment of the present invention, shown in the FIGS. 7A, 7B and 7C, is similar to the third embodiment but has the added feature of relief notches 98 and 100. A relief notch is a notch where metal has been removed from a strut, usually at a joint where multiple struts are connected. Relief notches increase flexibility of a strut or joint by creating a thinned, narrow region along the strut or joint. Relief notch 98 is formed at the joint formed between first linear section 54 of connecting strut 38 and expansion strut 28. Relief notch 100 is formed at the joint between second linear section 56 of connecting strut 38 and expansion strut 28. The positioning of the relief notches gives added flexibility to the unexpanded stent and prevents warping at the joints when the stent is expanded. This results in a smooth surface modulation to the expanded stent frame. Relief notches can be placed at other joints and can be included in any of the previously mentioned embodiments.

FIGS. 8A and 8B show a side elevation view of a variation of the fifth embodiment of the stent of the present invention. In this embodiment a four piece slanted connecting strut 38 is used to couple the corner of an expansion strut pair 32 in one expansion column 24 to the joining strut 30 of a circumferentially offset expansion strut pair 32 in an adjacent expansion column 24. The expansion struts 28, joining struts 30, expansion columns 24, reenforcement expansion struts 90, reenforcement joining struts 96, and reenforcement expansion columns 86 are substantially similar to the fourth embodiment of FIG. 6A. Connecting struts 38 in connecting strut columns 26, however, have an altered geometry and connectivity, described in more detail below.

FIG. 8A shows only the stent struts on the front half of the stent surface. The stent struts on the rear half of the stent surface are not shown. The stent appears as it would if the stent struts and space there between were opaque. FIG. 8B shows all stent struts from both the front and rear halves. The stent appears as it would if the stent struts and the space there between were transparent.

A first variation of a fifth embodiment of the present invention, shown in FIG. 8C consists of a stent 10 with twelve expansion columns 24, four reenforcement expansion columns 86, and fifteen connecting strut columns 26. In this variation, the stent 10 has a length 16 of 31.96 mm, and an unexpanded circumference 88 of 5.26 mm.

Connecting struts 38 shown in an enlarged view in FIG. 8G are made up of four linear sections, a proximal end section 162, first and second intermediate sections 164 and 166 respectively and a distal end section 168 forming three slant angles 170, 172 and 174. The proximal end of proximal section 162 is attached to a corner 176 of an expansion strut

pair 32 of an expansion column 24. Corner 176 is formed where joining strut 30 makes narrow angle 48 with expansion strut 28. A second corner 178 of expansion strut 32 is formed where joining strut 30 makes wide angle 50 with expansion strut 28. Corners 176 and 178 can have an angular shape formed by joining linear expansion struts 28 and joining struts 30, or preferably corners 176 and 178 are rounded to remove sharp edges and provide increased flexibility. Additionally rounded corners provide stent 10 with greater expandability and reduce stress in the stent strut material at the corners in the expanded stent.

Proximal end section 162 of connecting strut 38 extends from corner 176 and is attached at its distal end to first intermediate section 164 forming slant angle 170. First intermediate section 164 extends from proximal end section 162 such that first intermediate section 164 is parallel to expansion struts 28 and is connected at its distal end to the proximal end of second intermediate section 166 forming slant angle 172.

Second intermediate section 166 extends in a slanted orientation relative to the longitudinal axis of stent 10, extending both longitudinally along and circumferentially about stent 10. Preferably, second intermediate section 166 is parallel to joining strut 30 of the circumferentially offset expansion strut pair 32 in adjacent expansion column 24.

Second intermediate section 166 attaches at its distal end to the proximal end of distal end section 168 forming slant angle 174. Distal end section 168 extends from second intermediate section 166 attaching at its distal end to joining strut 30 of circumferentially offset expansion strut pair 32 of adjacent expansion column 24. The attachment is at a point intermediate corners 176 and 178, where joining strut 30 forms narrow angle 48 and wide angle 50 respectively with expansion struts 28.

The connection point of distal end section 168 to joining strut 30 is closer to corner 176 than corner 178. Preferably the connection point is one to two or more expansion strut widths from corner 176. Offsetting the connection point of distal end section 168 to joining strut 30 from corner 176 to a point intermediate corner 176 and corner 178 reduces warping of the expanded stent 10, resulting in a smooth surface modulation and reduced risk of thrombosis. Additionally, this design provides a longer total straightened length of connecting strut 38, which further reduces foreshortening of stent 10 during expansion.

A second variation of a fifth embodiment of the present invention, shown in an unexpanded form in FIGS. 8D, 8E and in an expanded form in FIG. 8F consists of a stent 10 with six expansion columns 24, two reenforcement expansion columns 86, and seven connecting strut columns 26. In this variation, the stent 10 has a length 16 of 15.04 mm, and an unexpanded circumference 88 of 5.26 mm. The stent design 10 is substantially similar to the design of the first variation of the fifth embodiment of FIG. 8C with a reduced number of expansion columns, reenforcement expansion columns, and connecting strut columns.

FIG. 8F illustrates a portion of the expanded stent 10 of the second variation of the fifth embodiment. After expansion of stent 10 by balloon or other means, the expansion struts 28 are spread apart circumferentially, increasing the separation at the open end 36 of expansion strut pairs 32 resulting in an increase in the circumference of the stent 10. The spreading of the expansion struts 28 causes a longitudinal shortening of the expansion columns 24, which is compensated by a straightening of the connecting struts 38. During the expansion process, the slant angles 170, 172 and

5,922,021

13

174 widen straightening the connection struts 38, and causing an increase in the separation distance between adjacent expansion columns 24. The asymmetrical interlocking cell geometry of the expanded stent is illustrated in FIG. 8F.

FIGS. 9A, 9B, 9C, 9D, 9E, 9F and 9G illustrate a sixth embodiment of the stent of the present invention. In this embodiment a three piece slanted connecting strut 38 is used to couple the joining strut 30 of an expansion strut pair 32 in one expansion column 24 to the joining strut 30 of a circumferentially offset expansion strut pair 32 in an adjacent expansion column 24. The joints between segments of connecting strut 38 are curved forming a smooth rounded shape. The expansion struts 28, joining struts 30, expansion columns 24, reenforcement expansion struts 90, reenforcement joining struts 96, and reenforcement expansion columns 86 are substantially similar to the fourth embodiment of FIG. 8A. Connecting struts 38 in connecting strut columns 26, however, have an altered geometry and connectivity, described in more detail below.

A first variation of a sixth embodiment of the present invention, shown in FIG. 9A, 9B and 9C consists of a stent 10 with eight expansion columns 24, three reenforcement expansion columns 86, and ten connecting strut columns 26. In this variation, the stent 10 has a length 16 of 20.32 mm.

Relief notches 204 are utilized at the joints between reenforcement expansion struts 90 and reenforcement joining struts 96 in the reenforcement expansion columns 86 at the stent proximal end 12 and distal end 14. Relief notches 204 reduce the width of the joints between reenforcement expansion struts 90 and reenforcement joining struts 96, which reduces stress in the metal at the joints during and after expansion of the stent. Relief notches 204 are particularly important at the stent ends since the stent ends are especially susceptible to warping during and after expansion. Preferably relief notches 204 reduce the joint widths, such that the joint widths are substantially the same as the thickness of stent wall 46 (see FIGS. 1B and 1C).

Connecting struts 38 shown in an enlarged view in FIG. 9D are made up of three linear segments, a proximal end section 194, an intermediate section 196 and a distal end section 198 forming two slant angles 200, 202. The connecting struts 38 have wide radii of curvature at the joints between connecting strut sections 194, 196 and 198. The shape of connecting strut 38 is thus curved or wavy rather than jagged and angular. The slant angles 200 and 202 are defined by linearly extrapolating proximal end section 194, intermediate section 196 and distal end section 198, as shown by the dotted lines in FIG. 9D.

FIG. 9E shows a variation of the connecting strut design of the sixth embodiment of the present invention. The connecting strut 38 of FIG. 9E has smaller radii of curvature at the joints between proximal end section 194, intermediate section 196 and distal end section 198. Connecting strut 38 of FIG. 9E is thus more jagged and angular than that of FIG. 9D.

Referring to the connecting struts 38 of FIG. 9D and 9E, the proximal end of proximal end section 194 is attached to joining strut 30 of expansion strut pair 32 intermediate corners 176 and 178. Proximal end section 194 of connecting strut 38 extends from joining strut 30 and is attached at its distal end to intermediate section 196 forming slant angle 200. Intermediate section 196 extends from proximal end section 194 in a slanted orientation relative to the longitudinal axis of stent 10, extending both longitudinally along and circumferentially about stent 10. Intermediate section 196 is preferably parallel to joining struts 30 of coupled expansion strut pairs 32.

14

Intermediate section 196 is connected at its distal end to the proximal end of distal end section 198 forming slant angle 202. Distal end section 198 extends from second intermediate section 196 attaching at its distal end to joining strut 30 of circumferentially offset expansion strut pair 32 of adjacent expansion column 24. The attachment is at a point intermediate corners 176 and 178, where joining strut 30 forms narrow angle 48 and wide angle 50 respectively with expansion struts 28.

The connection point of proximal end section 194 and distal end section 198 to joining struts 30 is closer to corner 176 than corner 178. Preferably the connection point is one to two or more expansion strut widths from corner 176. Offsetting the connection point of distal end section 198 to joining strut 30 from corner 176 to a point intermediate corner 176 and corner 178 reduces warping of the expanded stent 10, resulting in a smooth surface modulation and reduced risk of thrombosis. Additionally, this design provides a longer total straightened length of connecting strut 38, which further reduces foreshortening of stent 10 during expansion.

The connecting strut 38 of the sixth embodiment has one hundred and eighty degree rotational symmetry about its center. The symmetry of the connecting strut 38 does not, however, result in a symmetrical cell space as the width of loop slots 42 connected in each cell space are different. Adjacent loop slots 42 in each expansion column have alternating narrow and wide widths, preserving the asymmetry of the cell spaces. Introduction of one or many symmetrical cell spaces can be achieved in this design e.g. by providing uniform loop slot width to loop slots in adjacent expansion columns 24 contained in the same cell space. Additionally completely non-uniform cell space patterns utilizing symmetric or asymmetric cell spaces can be achieved e.g. by providing non-uniform variations in the widths of loop slots 42.

A second variation of a sixth embodiment of the present invention, shown in an unexpanded form in FIGS. 9F consists of a stent 10 with six expansion columns 24, three reenforcement expansion columns 86, and eight connecting strut columns 26. In this variation, the stent 10 has a length 16 of 16.00 mm, and an unexpanded circumference 88 of 5.26 mm. The stent design 10 is substantially similar to the design of the first variation of the sixth embodiment of FIGS. 9A, 9B and 9C with a reduced number of expansion columns 24 and connecting strut columns 26.

A third variation of a sixth embodiment of the present invention, shown in an unexpanded form in FIGS. 9F consists of a stent 10 with twelve expansion columns 24, four reenforcement expansion columns 86, and fifteen connecting strut columns 26. In this variation, the stent 10 has a length 16 of 30.01 mm, and an unexpanded circumference 88 of 5.26 mm. The stent design 10 is substantially similar to the design of the first variation of the sixth embodiment of FIGS. 9A, 9B and 9C with an increased number of expansion columns 24 reenforcement expansion columns 86 and connecting strut columns 26.

FIGS. 10A, 10B, 10C, 10D, 10E and 10F illustrate some examples of alternate connecting strut designs which can be used in any of the previously discussed embodiments. FIG. 10A shows a rounded loop connecting strut 38 which joins two circumferentially offset expansion strut pairs 32 in adjacent expansion columns. Expansion struts 28 in each expansion strut pair 32 are joined by adjoining strut 30. Joining struts 30 are slanted such as to form a narrow angle 48 and a wide angle 50 with the expansion struts 28 they

5,922,021

15

connect. The rounded loop connecting strut 38 connects expansion struts 28 at the point where narrow angle 48 is formed between expansion struts 28 and joining struts 30. The slopes of the rounded connecting strut 38 at its proximal end 102 and distal end 104 substantially match the slopes of the joining struts 30 connecting the pairs of expansion struts 28. The rounded loop connecting strut 38 thus blends smoothly into the joining struts 30. Additionally the rounded loop connecting strut 38 has a first radius of curvature 106 and a second radius of curvature 108.

In the design of FIG. 10B a rounded loop connecting strut 38 joins two circumferentially offset expansion strut pairs 32 in adjacent expansion columns. Expansion struts 28 in each expansion strut pair 32 are joined by a joining strut 30. Joining struts 30 are at right angles to the expansion struts 28 they connect. The rounded loop connecting strut 38 connects to expansion struts 28 at the same point as joining struts 30. The rounded connecting strut 38 has a first radius of curvature 106 and a second radius of curvature 108 such that it connects circumferentially offset expansion strut pairs 32.

In the design of FIG. 10C connecting strut 38 joins two circumferentially offset expansion strut pairs 32 in adjacent expansion columns. Expansion struts 28 in each expansion strut pair 32 are joined by adjoining strut 30. Joining struts 30 are slanted such as to form a narrow angle 48 and a wide angle 50 with the expansion struts 28 they connect. The connecting strut 38 connects expansion struts 28 at the point where narrow angle 48 is formed between expansion strut 28 and joining strut 30.

The connecting strut 38 is made up of three linear sections 110, 112, and 114 forming two slant angles 116 and 118. The proximal end of section 110 is attached to expansion strut 28 at the point where joining strut 30 forms narrow angle 48 with expansion strut 28. Section 110 extends substantially collinear to joining strut 30 and is attached at its distal end to intermediate section 112 forming slant angle 116. Intermediate section 112 extends at an angle to section 110 such that intermediate section 112 is substantially parallel to expansion struts 28 and is connected at its distal end to the proximal end of distal section 114 forming slant angle 118. Distal section 114 extends at an angle such that it is substantially collinear to joining strut 30 of the adjacent expansion strut pair 32. Distal section 114 attaches at its distal end to expansion strut 28 of the adjacent expansion strut pair 32, at the point where joining strut 30 forms narrow angle 48 with expansion strut 28.

In the design of FIGS. 10D and 10E a connecting strut 38 joins two circumferentially offset expansion strut pairs 32 in adjacent expansion columns. Expansion struts 28 in each expansion strut pair 32 are joined by a joining strut 30. Joining struts 30 are at right angles to the expansion struts 28 they connect. The connecting strut 38 connects to expansion strut 28 at the same point as joining struts 30.

The connecting struts 38 of FIGS. 10D and 10E are made up of multiple connecting strut sections connected end to end to form a jagged connecting strut 38 with multiple slant angles, coupling expansion strut pair 32 to adjacent expansion strut pair 32. The connecting strut of FIG. 10D is made up of three connecting strut sections, a proximal section 120, an intermediate section 122 and a distal section 124 defining two slant angles 126 and 128, while the connecting strut of FIG. 10E consists of four connecting strut sections, a proximal section 130, intermediate sections 132 and 134, and a distal section 136 defining three slant angles 138, 140 and 142. In addition, connecting strut section 134 can be

16

modified by replacing connecting strut section 136 by the dotted connecting strut section 144 to give another possible geometry of connecting struts 38.

In the design of FIGS. 10F connecting strut 38 joins two circumferentially offset expansion strut pairs 32 in adjacent expansion columns. Expansion struts 28 in each expansion strut pair 32 are joined by a joining strut 30. Joining struts 30 are slanted such as to form a narrow angle 48 and a wide angle 50 with the expansion struts 28 they connect.

Connecting strut 38 is made up of four linear sections, a proximal end section 180, first and second intermediate sections 182 and 184 respectively and a distal end section 186 forming three slant angles 188, 190 and 192. The proximal end of section 180 is attached to corner 176 at the point where joining strut 30 forms narrow angle 48 with expansion strut 28. Proximal end section 180 extends at an angle to joining strut 30 and is attached at its distal end to first intermediate section 182 forming slant angle 188. First intermediate section 182 extends at an angle to proximal end section 180 such that first intermediate section 182 is substantially parallel to expansion struts 28 and is connected at its distal end to the proximal end of second intermediate section 184 forming slant angle 190. Second intermediate section 184 is substantially longer than the first intermediate section 182. Second intermediate section 184 extends at an angle such that it is substantially collinear to joining strut 30 of the adjacent expansion strut pair 32. Second intermediate section 184 attaches at its distal end to the proximal end of distal end section 186 forming slant angle 192. Distal end section 186 extends in a slightly sloping orientation relative to expansion struts 28, attaching to corner 176 of expansion strut pair 32 where joining strut 30 forms narrow angle 48 with expansion strut 28. Relief notches 206 are formed at the joint between distal end segment 186 of connecting strut 38 and corner 176 of expansion strut pair 32 to increase flexibility of the unexpanded stent and prevent warping when the stent is expanded.

One skilled in the art will recognize that there are many possible arrangements of connecting struts and joining struts consistent with the present invention; the above examples are not intended to be an exhaustive list. In particular, it is noted that (a) connecting strut sections need not be linear but may contain one or many radii of curvature, (b) connecting strut sections may each have a different longitudinal axis, (c) the joint between connecting strut sections need not be jagged or sharp, but rather can be smooth containing one or multiple radii of curvature, and (d) relief notches may be present at any of the strut joints.

The stent of the present invention is ideally suited for application in coronary vessels although versatility in the stent design allows for applications in non-coronary vessels, the aorta, and nonvascular tubular body organs.

Typical coronary vascular stents have expanded diameters that range from 2.5 to 5.0 mm. However, a stent with high radial strength and fatigue tolerance that expands to a 5.0 mm diameter may have unacceptably high stent metal fraction when used in smaller diameter vessels. If the stent metal fraction is high, the chances of acute thrombosis and restenosis potential will increase. Even with the same metal fraction a smaller caliber vessel is more likely than a larger one to have a high rate of thrombosis. It is, therefore, preferred to have at least two different categories of stents for coronary application, for example, small vessels stents for use in vessels with diameters from 2.5 mm to 3.0 mm, and large vessel stents for use in vessels with diameters from 3.0 mm to 5.0 mm. Thus, both small vessels and large

5,922,021

**17**

vessels when treated with the appropriate sized stent will contain stents of similar idealized metal fraction.

The stent of the present invention can be made using a CAM-driven laser cutting system to cut the stent pattern from a stainless steel tube. The rough-cut stent is preferably electro-polished to remove surface imperfections and sharp edges. Other methods of fabricating the stent can also be used such as EDM, photo-electric etching technology, or other methods. Any suitable material can be used for the stent including other metals and polymers so long as they provide the essential structural strength, flexibility, biocompatibility and expandability.

The stent is typically at least partially plated with a radiopaque metal, such as gold, platinum, tantalum or other suitable metal. It is preferred to plate only both ends of the stent by localized plating; however, the entire stent or other regions can also be plated. When plating both ends, one to three or more expansion columns on each end of the stent are plated to mark the ends of the stent so they can be identified under fluoroscopy during the stenting procedure. By plating the stent only at the ends, interference of the radiopaque plating material with performance characteristics or surface modulation of the stent frame is minimized. Additionally the amount of plating material required is reduced, lowering the material cost of the stent.

After plating, the stent is cleaned, typically with detergent, saline and ultrasonic means that are well-known in the art. The stents are then inspected for quality control, assembled with the delivery balloon catheter, and properly packaged, labeled, and sterilized.

Stent 10 can be marketed as stand alone or as a premounted delivery balloon catheter assembly as shown in FIG. 11. Referring to FIG. 11, the stent 10 is crimped over a folded balloon 146 at the distal end 148 of a delivery balloon catheter assembly 150. The assembly 150 includes a proximal end adapter 152, a catheter shaft 154, a balloon channel 156, a guidewire channel 158, a balloon 146, and a guidewire 160. Balloon 146 can be tapered, curved, or both tapered and curved from a proximal end to a distal end in the expanded state. Additionally stent 10 can be non-tapered or tapered in the expanded state.

Typically the guidewire 160 is inserted into the vein or artery and advanced to the target site. The catheter shaft 154 is then forwarded over the guidewire 160 to position the stent 10 and balloon 146 into position at the target site. Once in position the balloon 146 is inflated through the balloon channel 156 to expand the stent 10 from a crimped to an expanded state. In the expanded state, the stent 10 provides the desired scaffolding support to the vessel. Once the stent 10 has been expanded, the balloon 146 is deflated and the catheter shaft 154, balloon 146, and guidewire 160 are withdrawn from the patient.

The stent of the present invention can be made as short as less than 10 mm in length or as long as 100 mm or more. If long stents are to be used, however, matching length or preferably slightly longer delivery catheter balloons will typically be needed to expand the stents into their deployed positions. Long stents, depending on the target vessel, may require curved long balloons, tapered long balloons or curved and tapered long balloons for deployment. Curved and/or tapered balloons which match the natural curve and taper of a blood vessel reduce stress on the blood vessel during and after stent deployment. This is especially important in many coronary applications which involve stenting in curved and tapered coronary vessels. The use of such curved and/or tapered balloons is within the scope of the present invention.

**18**

The foregoing description of a preferred embodiment of the invention has been presented for purposes of illustration and description. It is not intended to be exhaustive or to limit the invention to the precise forms disclosed. Obviously, many modifications and variations will be apparent to practitioners skilled in this art. It is intended that the scope of the invention be defined by the following claims and their equivalents.

What is claimed is:

1. A stent in a non-expanded state, comprising:

a first expansion strut pair including a first expansion strut positioned adjacent to a second expansion strut and a joining strut of the first expansion strut pair that couples the first and second expansion struts at a distal end of the first expansion strut pair, a plurality of the first expansion strut pair forming a first expansion column;

a second expansion strut pair including a first expansion strut positioned adjacent to a second expansion strut and a joining strut of the second expansion strut pair that couples the first and second expansion struts of the second expansion strut pair at a proximal end of the second expansion strut pair, a plurality of the second expansion strut pair forming a second expansion column;

a first connecting strut including a first connecting strut proximal section, a first connecting strut distal section and a first connecting strut intermediate section, the first connecting strut proximal section being coupled to the distal end of the first expansion strut pair in the first expansion column and the first connecting strut distal section being coupled to the proximal end of the second expansion strut pair of the second expansion column, a plurality of the first connecting strut forming a first connecting strut column that couples the first expansion column to the second expansion column, the first connecting strut intermediate section being non-parallel to the first connecting strut proximal and distal sections, wherein the first expansion strut of the first expansion strut pair in the first expansion column has a longitudinal axis offset from a longitudinal axis of the first expansion strut of the second expansion strut pair in the second expansion column.

2. The stent of claim 1, wherein a spacing distance between the first expansion strut pair and an adjacent first expansion strut pair in the first expansion column are the same.

3. The stent of claim 1, wherein a spacing distance between the second expansion strut pair and an adjacent second expansion strut pair in the second expansion column are different.

4. The stent of claim 1, wherein a spacing distance between the first expansion strut pair and an adjacent first expansion strut pair in the first expansion column, and a spacing distance between the second expansion strut pair and an adjacent second expansion strut pair in the second expansion column are the same.

5. The stent of claim 1, wherein a spacing distance between the first expansion strut pair and an adjacent first expansion strut pair in the first expansion column, and a spacing distance between the second expansion strut pair and an adjacent second expansion strut pair in the second expansion column are different.

6. The stent of claim 1, wherein a first radius of curvature is formed where the first connecting strut proximal section is coupled to the first connecting strut intermediate section.

7. The stent of claim 1, wherein a second radius of curvature is formed where the first connecting strut distal section is coupled to the first connecting strut intermediate section.

5,922,021

**19**

8. The stent of claim 1, wherein a first radius of curvature is formed where the first connecting strut proximal section is coupled to the first connecting strut intermediate section and a second radius of curvature is formed where the first connecting strut distal section is coupled to the first connecting strut intermediate section.

9. The stent of claim 1, wherein a first slant angle is formed where the first connecting strut proximal section is coupled to the first connecting strut intermediate section.

10. The stent of claim 1, wherein a second slant angle is formed where the first connecting strut distal section is coupled to the first connecting strut intermediate section.

11. The stent of claim 1, wherein a first slant angle is formed where the first connecting strut proximal section is coupled to the first connecting strut intermediate section and a second slant angle is formed where the first connecting strut distal section is coupled to the first connecting strut intermediate section.

12. The stent of claim 1, wherein the stent further includes a radiopaque marker.

13. The stent of claim 1, wherein the stent includes an electroplated material for radiopaque observation under fluoroscopy.

14. The stent of claim 1, wherein a proximal end and a distal end of the stent are at least partially radiopaque electroplated.

15. The stent of claim 1, wherein a ratio of a number of expansion struts in an expansion strut column to a number of connecting struts in a connecting strut column is 2 to 1.

16. The stent of claim 1, wherein the stent includes m first and second expansion columns, n expansion struts per column and n (m-1)/2 connecting struts.

17. The stent of claim 1, wherein the first and second expansion columns are each unbroken, continuous structures.

18. The stent of claim 1, further comprising:
  a reenforcement expansion column made of a plurality of reenforcement expansion struts, wherein each reenforcement expansion strut has a width that is greater than a width of an expansion strut in the first or second expansion columns.

19. The stent of claim 18, wherein the reenforcement expansion column includes a plurality of relief notches.

20. The stent of claim 1, wherein the stent has a proximal end with a first reenforcement expansion column and a distal end with a second reenforcement expansion column.

21. The stent of claim 20, wherein the first and second reenforcement expansion columns each include a plurality of relief notches.

22. The stent of claim 20, further comprising:
  a third reenforcement expansion column intermediate the stent proximal end and the stent distal end.

23. A stent in a non-expanded state, comprising:
  a first expansion column formed of a plurality of first expansion column strut pairs, a first expansion strut pair including a first expansion strut adjacent to a second expansion strut and a first joining strut that couples the first and second expansion struts at a proximal end of the first expansion strut pair, a second expansion strut pair including a third expansion strut adjacent to the second expansion strut and a second joining strut that couples the second and third expansion struts at a distal end of the second expansion strut pair, a third expansion strut pair including a fourth expansion strut adjacent to the third expansion strut and a third joining strut that couples the third and fourth expansion struts at a proximal end of the third expan-

**20**

sion strut pair, a fourth expansion strut pair including a fifth expansion strut adjacent to the fourth expansion strut and a fourth joining strut that couples the fourth and fifth expansion struts at a distal end of the fourth expansion strut pair, a first expansion strut pair first corner formed where the first joining strut is coupled to the first expansion strut, and a first expansion strut pair second corner formed where the first joining strut is coupled to the second expansion strut, and a second expansion strut pair first corner formed where the second joining strut is coupled to the second expansion strut, and a second expansion strut pair second corner formed where the second joining strut is coupled to the third expansion strut, and a third expansion strut pair first corner formed where the third joining strut is coupled to the third expansion strut, and a third expansion strut pair second corner formed where the third joining strut is coupled to the fourth expansion strut, and a fourth expansion strut pair first corner formed where the fourth joining strut is coupled to the fourth expansion strut, and a fourth expansion strut pair second corner formed where the fourth joining strut is coupled to the fifth expansion strut;

a second expansion column formed of a plurality of second expansion column strut pairs, a first expansion strut pair including a first expansion strut adjacent to a second expansion strut and a first joining strut that couples the first and second expansion struts at a proximal end of the first expansion strut pair, a second expansion strut pair including a third expansion strut adjacent to the second expansion strut and a second joining strut that couples the second and third expansion struts at a distal end of the second expansion strut pair, a third expansion strut pair including a fourth expansion strut adjacent to the third expansion strut and a third joining strut that couples the third and fourth expansion struts at a proximal end of the third expansion strut pair, a fourth expansion strut pair including a fifth expansion strut adjacent to the fourth expansion strut and a fourth joining strut that couples the fourth and fifth expansion struts at a distal end of the fourth expansion strut pair, a first expansion strut pair first corner formed where the first joining strut is coupled to the first expansion strut, and a first expansion strut pair second corner formed where the first joining strut is coupled to the second expansion strut, and a second expansion strut pair first corner formed where the second joining strut is coupled to the second expansion strut, and a second expansion strut pair second corner formed where the second joining strut is coupled to the third expansion strut, and a third expansion strut pair first corner formed where the third joining strut is coupled to the third expansion strut, and a third expansion strut pair second corner formed where the third joining strut is coupled to the fourth expansion strut, and a fourth expansion strut pair first corner formed where the fourth joining strut is coupled to the fourth expansion strut, and a fourth expansion strut pair second corner formed where the fourth joining strut is coupled to the fifth expansion strut; and

a first connecting strut column formed of a plurality of first connecting struts, each connecting strut of the first connecting strut column including a connecting strut proximal section, a connecting strut distal section and a connecting strut intermediate section, a first connecting strut proximal section is coupled to the joining strut of the second expansion strut pair of the first expansion

5,922,021

| 21 | 22 |

strut column, and a first connecting strut distal section is coupled to the joining strut of the first expansion strut pair of the second expansion strut column, and a second connecting strut proximal section is coupled to the joining strut of the fourth expansion strut pair of the first expansion strut column, and a second connecting strut distal section is coupled to the joining strut of the third expansion strut pair of the second expansion strut column, the first connecting strut intermediate section being non-parallel to the first connecting strut proximal and distal sections wherein the first expansion strut of the first expansion strut pair in the first expansion column has a longitudinal axis offset from a longitudinal axis of the first expansion strut of the second expansion strut pair in the second expansion column.

24. The stent of claim 23, wherein the stent includes a proximal expansion column, a distal expansion column, a plurality of connecting struts positioned between the proximal and distal expansion columns, and a plurality of expansion columns positioned between the proximal and distal expansion columns, each expansion column being made of a plurality of juxtapositioned proximal and distal looped slots.

25. The stent of claim 23, wherein the first expansion column, the second expansion column, and the first connecting strut column form a plurality of geometric cells.

26. The stent of claim 25, wherein at least a portion of the plurality are asymmetrical geometric cells.

27. The stent of claim 23, wherein the first expansion column, the second expansion column, and the first connecting strut column form a plurality of cells and at least a portion of the plurality of cells form non-uniform cell space patterns.

28. The stent of claim 23, wherein the first expansion strut column, the second expansion strut column and the first connecting strut column form a plurality of geometric configurations and at least a portion of the plurality form asymmetrical geometric configurations.

29. The stent of claim 23, wherein the first expansion strut column, the second expansion strut column and the first connecting strut column form a plurality of geometric configurations and at least a portion of the plurality form symmetrical geometric configurations.

30. The stent of claim 23, wherein the first connecting strut proximal section is coupled to the joining strut of the second expansion strut pair of the first expansion strut column, and the first connecting strut distal section is coupled to the first corner of the first expansion strut pair of the second expansion strut column, and the second connecting strut proximal section is coupled to the joining strut of the fourth expansion strut pair of the first expansion strut column, and the second connecting strut distal section is coupled to the first corner of the third expansion strut pair of the second expansion strut column.

31. The stent of claim 23, wherein the first connecting strut proximal section is coupled to the joining strut of the second expansion strut pair of the first expansion strut column, and the first connecting strut distal section is coupled to the second corner of the first expansion strut pair of the second expansion strut column, and the second connecting strut proximal section is coupled to the joining strut of the fourth expansion strut pair of the first expansion strut column, and the second connecting strut distal section is coupled to the second corner of the third expansion strut pair of the second expansion strut column.

32. The stent of claim 23, wherein the first connecting strut proximal section is coupled to the first corner of the

second expansion strut pair of the first expansion strut column, and the first connecting strut distal section is coupled to the joining strut of the first expansion strut pair of the second expansion strut column, and the second connecting strut proximal section is coupled to the first corner of the fourth expansion strut pair of the first expansion strut column, and the second connecting strut distal section is coupled to the joining strut of the third expansion strut pair of the second expansion strut column.

33. The stent of claim 23, wherein the first connecting strut proximal section is coupled to the second corner of the second expansion strut pair of the first expansion strut column, and the first connecting strut distal section is coupled to the joining strut of the first expansion strut pair of the second expansion strut column, and the second connecting strut proximal section is coupled to the second corner of the fourth expansion strut pair of the first expansion strut column, and the second connecting strut distal section is coupled to the joining strut of the third expansion strut pair of the second expansion strut column.

34. The stent of claim 23, wherein the first connecting strut proximal section is coupled to the first corner of the second expansion strut pair of the first expansion strut column, and the first connecting strut distal section is coupled to the first corner of the first expansion strut pair of the second expansion strut column, and the second connecting strut proximal section is coupled to the first corner of the fourth expansion strut pair of the first expansion strut column, and the second connecting strut distal section is coupled to the first corner of the third expansion strut pair of the second expansion strut column.

35. The stent of claim 23, wherein the first connecting strut proximal section is coupled to the first corner of the second expansion strut pair of the first expansion strut column, and the first connecting strut distal section is coupled to the second corner of the first expansion strut pair of the second expansion strut column, and the second connecting strut proximal section is coupled to the first corner of the fourth expansion strut pair of the first expansion strut column, and the second connecting strut distal section is coupled to the second corner of the third expansion strut pair of the second expansion strut column.

36. The stent of claim 24, wherein the first connecting strut proximal section is coupled to the second corner of the second expansion strut pair of the first expansion strut column, and the first connecting strut distal section is coupled to the first corner of the first expansion strut pair of the second expansion strut column, and the second connecting strut proximal section is coupled to the second corner of the fourth expansion strut pair of the first expansion strut column, and the second connecting strut distal section is coupled to the first corner of the third expansion strut pair of the second expansion strut column.

37. The stent of claim 23, wherein the first connecting strut proximal section is coupled to the second corner of the second expansion strut pair of the first expansion strut column, and the first connecting strut distal section is coupled to the second corner of the first expansion strut pair of the second expansion strut column, and the second connecting strut proximal section is coupled to the second corner of the fourth expansion strut pair of the first expansion strut column, and the second connecting strut distal section is coupled to the second corner of the third expansion strut pair of the second expansion strut column.

38. The stent of claim 23, wherein the first column expansion strut pairs define first column loop slots, and the second column expansion strut pairs define second column loop slots.

5,922,021

23

39. The stent of claim 38, wherein the first column loop slots are parallel to the second column loop slots.

40. The stent of claim 38, wherein the first column loop slots are not parallel to the second column loop slots.

41. The stent of claim 38, wherein the first column loop slots are longitudinally offset from the second column loop slots.

42. The stent of claim 38, wherein the first column loop slots are non-collinear to the second column loop slots.

43. The stent of claim 38, wherein the first column loop slots are collinear with the second column loop slots.

44. The stent of claim 38, wherein a width of first column loop slots is the same as a width of second column loop slots.

45. The stent of claim 38, wherein a width of the first column loop slots is different than a width of the second column loop slots.

46. The stent of claim 38, wherein a shape of the first column loop slots is different than a shape of the second column loop slots.

47. The stent of claim 38, wherein a shape of the first column loop slots is the same as a shape of the second column loop slots.

48. The stent of claim 38, wherein a shape of a first column loop slot of the first expansion column is different from a shape of an adjacent first column loop slot of the first expansion column.

49. The stent of claim 38, wherein a shape of a first column loop slot of the first expansion column is the same as a shape of an adjacent first column loop slot of the first expansion column.

50. The stent of claim 38, wherein a width of a first column loop slot of the first expansion column is different from a width of an adjacent first column loop slot of the first expansion column.

51. The stent of claim 38, wherein a width of a first column loop slot of the first expansion column is the same as a width of an adjacent first column loop slot of the first expansion column.

52. The stent of claim 23, wherein each connecting strut proximal section has a substantially linear geometry.

53. The stent of claim 52, wherein each connecting strut distal section has a substantially linear geometry.

54. The stent of claim 53, wherein each connecting strut intermediate section has a substantially linear geometry.

55. The stent of claim 23, wherein a ratio of a number of expansion struts in an expansion strut column to a number of connecting struts in a connecting strut column is 2 to 1.

56. The stent of claim 23, wherein the stent includes m first and second expansion columns, n connecting struts per column and n (m−1)/2 connecting struts.

57. The stent of claim 23, wherein the first and second expansion columns are each unbroken, continuous column structures.

58. The stent of claim 23, wherein one of the first or second expansion column is a broken column structure.

59. The stent of claim 23, further comprising:

a plurality of first expansion columns;

a plurality of second expansion columns; and

a plurality of first connecting strut columns, each first connecting strut column coupling a first expansion column to a second expansion column.

60. The stent of claim 59, wherein a plurality of first expansion columns, second expansion columns and first connecting strut columns form a continuous a chain mesh strut frame pattern.

61. The stent of claim 59, wherein the plurality of first expansion columns, the plurality of second expansion col-

24

umns and the plurality of first connecting strut columns form an elongated structure.

62. The stent of claim 23, further comprising:

a reenforcement expansion column made of a plurality of reenforcement expansion struts, wherein each reenforcement expansion strut has a width that is greater than a width of an expansion strut in the first or second expansion columns.

63. The stent of claim 23, wherein the stent has a proximal end with a first reenforcement expansion column and a distal end with a second reenforcement expansion column.

64. The stent of claim 23, wherein the stent has a reenforcement expansion column between a proximal end and a distal end of the stent.

65. The stent of claim 23, further comprising:

a third expansion column formed of a plurality of third expansion column strut pairs, a first expansion strut pair including a first expansion strut adjacent to a second expansion strut and a first joining strut that couples the first and second expansion struts at a proximal end of the first expansion strut pair, a second expansion strut pair including a third expansion strut adjacent to the second expansion strut and a second joining strut that couples the second and third expansion struts at a distal end of the second expansion strut pair, a third expansion strut pair including a fourth expansion strut adjacent to the third expansion strut and a third joining strut that couples the third and fourth expansion struts at a proximal end of the third expansion strut pair, a fourth expansion strut pair including a fifth expansion strut adjacent to the fourth expansion strut and a fourth joining strut that couples the fourth and fifth expansion struts at a distal end of the fourth expansion strut pair, a first expansion strut pair first corner formed where the first joining strut is coupled to the first expansion strut, and a first expansion strut pair second corner formed where the first joining strut is coupled to the second expansion strut, and a second expansion strut pair first corner formed where the second joining strut is coupled to the second expansion strut, and a second expansion strut pair second corner formed where the second joining strut is coupled to the third expansion strut, and a third expansion strut pair first corner formed where the third joining strut is coupled to the third expansion strut, and a third expansion strut pair second corner formed where the third joining strut is coupled to the fourth expansion strut, and a fourth expansion strut pair first corner formed where the fourth joining strut is coupled to the fourth expansion strut, and a fourth expansion strut pair second corner formed where the fourth joining strut is coupled to the fifth expansion strut; and

a second connecting strut column formed of a plurality of second connecting struts, each connecting strut of the second connecting strut column including a connecting strut proximal section, a connecting strut distal section and a connecting strut intermediate section, a first connecting strut proximal section is coupled to the joining strut of the second expansion strut pair of the second expansion strut column, and a first connecting strut distal section is coupled to the joining strut of the first expansion strut pair of the third expansion strut column, and a second connecting strut proximal section is coupled to the joining strut of the fourth expansion strut pair of the second expansion strut column, and a second connecting strut distal section is coupled to the joining strut of the third expansion strut pair of the third expansion strut column.

5,922,021

**66**. The stent of claim **65**, wherein the first expansion strut of the first expansion strut pair in the second expansion column has a longitudinal axis offset from a longitudinal axis of the first expansion strut of the second expansion strut pair in the third expansion column.

**67**. The stent of claim **65**, wherein the first expansion column, the second expansion column, and the first connecting strut column form a first plurality of geometric cells, and the second expansion column, the third expansion column and the second connecting strut column form a second plurality of geometric cells.

**68**. The stent of claim **68**, wherein at least a portion of the first plurality of geometric cells and at least a portion of the second plurality of geometric cells form asymmetric cells.

**69**. The stent of claim **67**, wherein at least a portion of the first plurality of geometric cells and at least a portion of the second plurality of geometric cells are symmetric cells.

**70**. The stent of claim **67**, wherein each geometric cell of the first plurality includes a proximal looped slot and a distal looped slot, and each geometric cell of the second plurality includes a proximal looped slot and a distal looped slot.

**71**. The stent of claim **70**, wherein each distal looped slot of a cell of the first plurality is juxtapositioned to a corresponding proximal looped slot of a cell of the second plurality.

**72**. The stent of claim **65**, wherein the stent includes a proximal expansion column, a distal expansion column, a plurality of connecting struts positioned between the proximal and distal expansion columns, and a plurality of expansion columns positioned between the proximal and distal expansion columns, each expansion column being made of a plurality of juxtapositioned proximal and distal looped slots.

**73**. The stent of claim **23**, wherein a width of the first connecting strut is equal to or less than a width of the first expansion strut of the first or second expansion columns.

**74**. The stent of claim **23**, wherein a width of a connecting strut of the first connecting strut column is larger than a width of a first expansion strut of the first or second expansion columns.

**75**. The stent of claim **23**, wherein a width of the second expansion strut of the first or second expansion columns is substantially the same as the width of the first expansion strut of the first or second expansion columns.

**76**. The stent of claim **23**, wherein the stent has a tapered diameter in an expanded state.

**77**. The stent of claim **23**, wherein the stent has a tapered geometry extending from a proximal end to a distal end in an expanded state.

**78**. The stent of claim **23**, wherein the stent is configured to be positioned at an exterior of an expandable balloon.

**79**. The stent assembly of claim **78**, wherein the balloon is curved extending from a proximal end and a distal end in an expanded state.

**80**. The stent assembly of claim **79**, wherein the balloon is tapered in an expanded state and the stent has a non-tapered geometry in an expanded state.

**81**. The stent assembly of claim **79**, wherein the balloon and the stent are both tapered in an expanded state.

**82**. The stent assembly of claim **79**, wherein the stent is non-tapered in an expanded state.

**83**. The stent assembly of claim **79**, wherein the stent is tapered in an expanded state.

**84**. The stent of claim **79**, wherein the stent in an expanded state is non-tapered, and the balloon is tapered and curved in an expanded state.

**85**. The stent of claim **79**, wherein the stent is tapered in an expanded state, and the balloon is tapered and curved in an expanded state.

\*    \*    \*    \*    \*



US005922021C1

(12) **EX PARTE REEXAMINATION CERTIFICATE** (8961st)

# United States Patent
**Jang**

(10) **Number:**        **US 5,922,021 C1**

(45) **Certificate Issued:**        *Apr. 17, 2012

(54) **INTRAVASCULAR STENT**

(75) Inventor: **G. David Jang**, Redlands, CA (US)

(73) Assignee: **Boston Scientific SciMed, Inc.,** Maple Grove, MN (US)

**Reexamination Request:**
    No. 90/009,598, Nov. 17, 2009
    No. 90/011,439, Jan. 17, 2011

**Reexamination Certificate for:**

| | |
|---|---|
| Patent No.: | **5,922,021** |
| Issued: | **Jul. 13, 1999** |
| Appl. No.: | **08/845,657** |
| Filed: | **Apr. 25, 1997** |

( * ) Notice: This patent is subject to a terminal disclaimer.

**Related U.S. Application Data**

(63) Continuation-in-part of application No. 08/824,142, filed on Mar. 25, 1997, and a continuation-in-part of application No. 08/824,866, filed on Mar. 25, 1997, and a continuation-in-part of application No. 08/824,865, filed on Mar. 25, 1997.

(60) Provisional application No. 60/017,484, filed on Apr. 26, 1996.

(51) **Int. Cl.**
    *A61F 2/00*        (2006.01)
    *A61F 2/06*        (2006.01)

(52) **U.S. Cl.** ...................................................... **623/1.15**
(58) **Field of Classification Search** ........................ None
    See application file for complete search history.

(56) **References Cited**

To view the complete listing of prior art documents cited during the proceedings for Reexamination Control Numbers 90/009,598 and 90/011,439, please refer to the USPTO's public Patent Application Information Retrieval (PAIR) system under the Display References tab.

*Primary Examiner*—Cary Wehner

(57)        **ABSTRACT**

A stent in a non-expanded state has a first expansion strut pair consisting of a first expansion strut positioned adjacent to a second expansion strut and a joining strut which couples the first and second expansion struts at a distal end of the first expansion strut pair. A plurality of the first expansion strut pair form a first expansion column. A second expansion strut pair consists of a first expansion strut positioned adjacent to a second expansion strut and a joining strut couples the first and second expansion struts at a proximal end of the second expansion strut pair. A plurality of the second expansion strut pair form a second expansion column. A first connecting strut includes a first connecting strut proximal section, a first connecting strut distal section and a first connecting strut intermediate section. The first connecting strut proximal section is coupled to the distal end of the first expansion strut pair in the first expansion column and the first connecting strut distal section is coupled to the proximal end of the second expansion strut pair of the second expansion column. A plurality of the first connecting struts form a first connecting strut column that couples the first expansion column to the second expansion column. A length of the first connecting strut proximal section is equal to a length of the first connecting strut distal section, and a length of the first connecting strut intermediate section is greater than the length of the first connecting strut proximal and distal sections.



US 5,922,021 C1

**1**

## EX PARTE
## REEXAMINATION CERTIFICATE
## ISSUED UNDER 35 U.S.C. 307

THE PATENT IS HEREBY AMENDED AS
INDICATED BELOW.

**2**

AS A RESULT OF REEXAMINATION, IT HAS BEEN
DETERMINED THAT:

The patentability of claim **36** is confirmed.

Claims **23** and **24** are cancelled.

Claims **1-22**, **25-35** and **37-85** were not reexamined.

\* \* \* \* \*

## CERTIFICATE OF SERVICE

I, Jed I. Bergman, hereby certify that a copy of the foregoing PRINCIPAL

BRIEF FOR PLAINTIFF-APPELLANT G. DAVID JANG, M.D. was served on

this 23th day of May, 2016, upon the following in the manner indicated:

**VIA ECF**

Edward Han
Matthew M. Wolf
John E. Nilsson
Arnold & Porter, LLP
601 Massachusetts Ave., NW
Washington, DC 20001

Dated: May 23, 2016                    Respectfully submitted,


                                       */s/ Jed I. Bergman*
                                       Jed I. Bergman
                                       KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
                                       1633 Broadway
                                       New York, NY 10019
                                       Tel: (212) 506-1700

                                       *Attorney for Plaintiff-Appellant G. David Jang,*
                                       *M.D.*

## CERTIFICATE OF COMPLIANCE

I certify that the foregoing PRINCIPAL BRIEF FOR PLAINTIFF-APPELLANT

G. DAVID JANG, M.D. complies with type-volume and typeface requirements as

follows:

1. The foregoing complies with the type-volume limitation of Fed. R. App. P.

   32(a)(7)(B).  This brief contains 12,201 words, excluding the parts of the brief

   exempted by Fed. R. App. P. 32(a)(7)(B)(iii) and Fed. Cir. R. 32(b).

   Microsoft Word 2013 was used to calculate the word count; and

2. The foregoing complies with the typeface requirements of Fed. R. App. P.

   32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6).  This

   brief has been prepared in proportionally-spaced typeface using Microsoft

   Word 2013 in 14-point Times New Roman typeface.

Dated: May 23, 2016                    Respectfully submitted,


                                       */s/ Jed I. Bergman*
                                       Jed I. Bergman
                                       KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
                                       1633 Broadway
                                       New York, NY 10019
                                       Tel: (212) 506-1700
                                       *Attorney for Plaintiff-Appellant G. David Jang,
                                       M.D.*